Julie Klein Fischer
Shelli D. Stewart
MORROW & FISCHER, PLLC
332 N. Broadmore Way, Ste. 102
Nampa, Idaho  83687
Telephone:   (208) 475-2200
Facsimile:   (208) 475-2201
ISB No.:   4601, 7459
*jfischer@morrowfischer.com*
*shellidstewart@morrowfishcer.com*

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD KAYSER and MARY KAY KAYSER,<br><br>    Plaintiffs,<br><br>-vs-<br><br>PAM JANE McCLARY, an individual,<br><br>    Defendant. | **CASE NO.  CV 10-00119-REB**<br><br>**DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ( Dkt. 14, Filed April 20, 2010)** |

COMES NOW, Defendant Pam Jane McClary, by and through her undersigned counsel of record, the law firm of Morrow & Fischer, PLLC, and hereby files *Defendant's Memorandum in Response to Plaintiffs' Motion to Partial Summary Judgment*.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

# I.

# FACTUAL BACKGROUND

James McClary was Defendant, Pamela McClary's father. Mr. McClary died in June 2004. During his life, he owned certain parcels of real property located on Roberts Road in Boise, Idaho. At one time he owned Lots A, B, C and D shown on Exhibit A to the Affidavit of Pamela McClary filed concurrently herewith ("*McClary Aff.*").

In 1979, Mr. McClary entered into an option contract to sell Lot D to Paul B. and Iretta Larsen. *See* Exhibits 3–6 to Deposition of Rex Larsen ("*Larsen Depo.*") at pp. 28, 35, attached as **Exhibit A** to the Affidavit of Julie Klein Fischer filed concurrently herewith ("*Fischer Aff.*"). The purchase price for Lot D, as reflected in the option contract and related documents was $40,000. *Id*. Notably, none of the documents related to that transaction (McClary to Larsen) make any reference to a view easement over any of James McClary's other property. Lot D was conveyed to the Larsens on February 12, 1980. *See* Exhibits 3-6 to *Larsen Depo.*, attached as Exhibit A to *Fischer Aff.*; *see also* the Warranty Deed, attached as **Exhibit F** to *Fischer Aff.*

After purchasing Lot D from Mr. McClary, the Larsens constructed a home thereon. At one point, although it is not clear when, it is believed Mr. McClary informally agreed not to build on Lot D which was directly North of Lot D. The agreement was for the benefit of Mr. Larsen. The men were friends, and the "agreement" was never reduced to writing. *See* Deposition of Pam McClary ("*McClary Depo."*) pp. 23, ll. 16-25, 24-25, attached as **Exhibit B** to *Fischer Aff.*

During his life, Paul B. Larsen was in the real estate business. *Larsen Depo.*, p. 23, ll. 9-25; p. 25, ll. 4-25, attached as **Exhibit A** to *Fischer Aff.* Similarly, Paul's son Rex Larsen also was and is a realtor. *Id.* p 21, ll. 2-4; p. 19, ll. 6-21.

In December 1999 the Larsens entered into a contract with Donald and Mary Kayser to sell

the Lot D property. A copy of the contract is attached to the *Affidavit of Anna Eberlin* (Dkt. 14-8) as Exhibit A. Rex Larsen acted as a dual agent for both his parents and the Kaysers in that transaction. *Id.*

At the direction of Donald Kayser, closing was conditioned upon "Seller [Larsens] providing Buyer satisfactory documentation showing the McCleary [sic] Lot behind subject property cannot be used as a building site for a new home." *Id.* As a result, Rex Larsen instructed his father's attorney to prepare an easement over Mr. McClary's Lot B. Rex Larsen dictated the terms to be included in the Easement then delivered the written Easement to James McClary to sign. *Larsen Depo.*, pp. 74-93, attached as Exhibit A to *Fischer Aff.* It is believed that Mr. McClary signed the Grant of Easement on January 11, 2000 (the "Easement"). The Easement was notarized and recorded by Rex Larsen. *Id.,* p. 94, ll. 1-8; pp. 116-117. Thereafter, Mr. Kayser executed an addendum to the purchase and sale agreement (for Lot D) confirming that the conditions to closing had been satisfied. *See* Exhibit 22 to *Larsen Depo.*, attached as **Exhibit A** to *Fischer Aff.* The transaction between the Larsens and Kaysers closed on January 19, 2000. *See* the Warranty Deed, attached as **Exhibit C** to *Fischer Aff.* Rex Larsen was paid a six percent commission in connection therewith. *Larsen Depo.*, p. 62, ll. 24-25; p. 63, ll. 1-5.

On the date Mr. McClary signed the Easement agreement, he was not of sound mind. *See Affidavit of Julie Aaron in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment* ("*Aaron Aff.*"); *Affidavit of Debra Sipiora in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment* ("*Sipiora Aff.*"); and *Affidavit of Joyce Brewer in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment* ("*Brewer Aff.*") filed concurrently herewith. *See also McClary Aff.*

Defendant, Pam McClary learned about the Easement after her father's death. She has never

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 3

believed the Easement to be valid or binding for the reasons discussed herein. *McClary Aff.*, ¶ 6.

In 2010, Ms. McClary constructed a fence on Lot B. The Kaysers then sued Ms. McClary to enforce the Easement.

## II.

## STANDARD OF REVIEW

The standards for summary judgment are well known. Pursuant to Federal Rule of Civil Procedure 56, the Court should not grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 1986). The Court must "view the evidence in the light most favorable to the [non-moving party]," and draw "all reasonable inferences in his favor." *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004); *Devereauz. v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). In considering a motion for summary judgment, the Court may not weigh the evidence or make credibility determinations. *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

## III.

## ARGUMENTS

**A.**     <u>The Written Easement is Invalid for Lack of Consideration.</u>

Plaintiffs assert the Easement at issue is valid, binding and complies with I.C. § 9-503. *Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment* (Dkt. 14-1), p. 7. However, despite Plaintiffs' optimism, the issue is not whether the Easement complies with the statute of frauds (I.C. § 9-503). Rather, the relevant inquiry is whether the Easement is supported by consideration.

It is established law that the grant of an easement must be supported by consideration.

*Northwest Pipeline Corp. V. Forrest Weaver Farm, Inc.*, 103 Idaho 180, 183, 646 P.2d 422, 425 (1982). Valid consideration must comprise a bargained for exchange – *i.e.* each party gives something. *See Boise Tower Associates, LLC v. Hogland*, 147 Idaho 774, 780, 215 P.3d 494, 500 (2009) (*citing* Restatement (Second) of Contracts § 71 (1981)). Although there is a presumption of consideration when a document is written, the presumption is rebuttable and not conclusive. Idaho Code § 29-103. A party seeking to avoid or invalidate a contract may do so by introducing evidence of lack of consideration. *Lewis v. Fletcher*, 101 Idaho 530, 617 P.2d 834 (1980); *see also Aker v. Aker*, 52 Idaho 713, 20 P.2d 796 (1980) (the "presumption" does not go to the extent of presuming the source of the consideration).

In the present matter, the lack of consideration for the Easement is undisputed. James McClary, who signed the Easement on January 11, 2000, was given nothing in exchange therefore. Indeed, every witness involved in obtaining the Easement confirmed that Mr. McClary received nothing in exchange for executing the same.

Rex Larsen, the real estate agent responsible for obtaining the Easement in order to sell his parents' property testified as follows:

> Q. Mr. Kayser didn't pay Mr. McClary anything for the written agreement, correct?
> A. That is correct.
> Q. And your father and mother didn't pay Mr. McClary anything for the written agreement, correct?
> A. Correct.

*Larsen Depo.*, p. 74, l. 4 through p. 75, l. 4, attached as **Exhibit A** to *Fischer Aff*.

Mary Kayser testified as follows on the issue of consideration:

> Q. Regarding the written Grant of Easement -- again, that document is the one that we've been referring to in front of you that was executed by Mr.

>       McClary in January of 2000 -- are you aware of any compensation value that was given to Mr. McClary in exchange for his executing that written agreement?
> A.    No.
> Q.    You're not aware of you or your husband paying him or giving him anything for that easement?
> A.    No. It never came up.
> Q.    How about, again, Mr. Larsen, you're not aware of Mr. Larsen, Rex Larsen, Paul Larsen, giving Mr. McClary anything in exchange for that written agreement?
> A.    No.

Deposition of Mary Kay Kayser ("Mary Kay Kayser Depo."), p. 19, l. 11 through p. 20, l. 7, attached as **Exhibit D** to *Fischer Aff*.

Continuing on, Donald Kayser offered the following testimony regarding the written Easement:

> Q.    Did you give Mr. McClary anything in exchange for this written Grant of Easement?
> A.    Did I give him?
> Q.    Yes.
> A.    No.
> Q.    Did Mr. Larsen give him anything in exchange for this written Grant of Easement?
> A.    I don't know.
> Q.    Do you have any idea when it says, and other good and valuable consideration, what that is referring to?
> A.    I have no idea.
> Q.    Do you have any information that aside from the verbal agreement, any consideration, anything of value was given to Mr. McClary in exchange for him granting this written Easement agreement?
> A.    I have no knowledge.

Deposition of Donald Kayser ("Donald Kayser Depo."), p. 49, l. 5 through p. 50, l. 10, attached as **Exhibit E** to *Fischer Aff*.

Finally, Defendant Pam McClary also confirmed she is not aware of any consideration given to her father for the Grant of Easement. *Affidavit of Pamela McClary in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment* ("McClary Affidavit"), ¶ 8(g); *McClary*

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 6

*Depo.*, p. 96, ll. 5-25, attached as **Exhibit B** to *Fischer Aff*.

In sum, the Easement fails for want of consideration, as a matter of law.

**1.     The Reference to Consideration in the Easement is Not Conclusive.**

Although it is settled the written Easement lacks consideration, Defendant acknowledges that the document itself contains a reference to "consideration." Accordingly, a brief discussion of that language is in order.

Regarding the issue of consideration, the Easement provides, in part:

> WHEREAS, Grantor did make a verbal agreement with Grantees at the time that Grantees purchased said Lot D from Grantor that, as a material consideration for the purchase of said Lot D, Grantor would not build a structure on said Lot B.
>
> * * *
>
> 1.     In consideration of the verbal agreement referred to above and other good and valuable consideration, Grantor does hereby grant to Grantees an easement for an unobstructed view over said Lot B...for the benefit of said Lot D...

*See* Exhibit A to the *Affidavit of Anna Eberlin* (Dkt. 14-8).

Despite this language, the verbal agreement *cannot* act as consideration for the written Easement because (1) the verbal agreement violates the statute of frauds (and contains no consideration of its own); and (2) the written Easement is dramatically different from the alleged verbal agreement. Each of these issues is discussed below.

> **a.     *The Oral Agreement Cannot Act as Consideration for the Written Easement Because it Violates the Statute of Frauds.***

Pursuant to the statute of frauds, no estate or interest in real property can be created, granted, assigned, surrendered or declared unless the same is in writing. Idaho Code § 9-503. This includes the grant of an easement. *Fajen v. Powlus*, 96 Idaho 625, 533 P.2d 746 (1975) (finding the trial court erred in granting a parking easement to the purchaser of adjoining property, where the easement at issue was based on an oral agreement).

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 7

One exception to the statute of frauds is part performance. Idaho Code § 9-504. However, the part performance exception applies only where the partial performance of the asserting party is referable solely to the existence of the alleged oral contract. *Hinkle v. Winey*, 126 Idaho 993, 895 P.2d 594 (Ct.App. 1995). If the alleged part performance can be explained as consistent with some other purpose or arrangement, then an oral contract will not be established. *Id.*

Further, the party asserting the existence of the oral contract has the burden of showing the alleged partial performance was consistent *solely with the existence of the oral contact* and *not with any other arrangement*. *Id.* The existence of the oral contract must be proved by clear and convincing evidence. *Id.* (citing *Johnson v. Alberti*, 67 Idaho 44, 170 P.2d 403 (1946)).

In this case, the alleged oral agreement occurred between James McClary and Paul B. Larsen sometime in the 1980s. There is no conclusive evidence regarding the date the alleged oral agreement was made. However, Plaintiffs likely will argue that the Larsens' purchase of Lot D from Mr. McClary was consideration for the oral agreement. The extension of that argument is that the Larsens' payment to Mr. McClary (of the purchase price) constituted partial performance, thereby validating the parties' verbal agreement. Unfortunately (for Plaintiffs) this argument fails because payment of the purchase price is also *consistent* with the purchase of Lot D itself. Because Plaintiffs are asserting the existence of the oral contract, they have the burden of showing the alleged partial performance was consistent solely with the existence of the oral contact. Plaintiffs have not and cannot make that showing.[1] *Larsen Depo.*, p. 74, l. 4 through p. 75, l. 4, attached as **Exhibit A** to *Fischer Aff.* The payment made by the Larsens for Lot D was to purchase the Lot, not to

---

[1] Similarly, there is no evidence that Mr. McClary partially performed under the parties' alleged verbal agreement. The fact Lot B remained a grassy area (without a building) is consistent with a retired man enjoying his property. He did not have a need to sell the lot, and was always hopeful that his daughter would move back to Boise and live near him. It is quite conceivable he was reserving the Lot for Pam.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 8

purchase an easement (in the form of an oral agreement). Accordingly, the verbal agreement was not ever enforceable under the statute of frauds and cannot be consideration for the later written Easement.

Further, and perhaps more significantly, no consideration was given to Mr. McClary for the alleged oral agreement. Again, Plaintiffs have asserted that the consideration for the oral agreement was the purchase of the Lot D (Larsen from McClary). However, there is not a single fact in the record to support that statement. Notably, the documents reflecting the sale of Lot D from Mr. McClary to the Larsens contains no reference to an easement, oral agreement, or any payment to Mr. McClary for agreeing to restrict the uses of Lot B. *See* Exhibits 3-6 to *Larsen Depo.*, attached as **Exhibit A** to *Fischer Aff*.

For all of these reasons, the "oral agreement" *cannot* be consideration for the later written Easement.

> b. ***The Oral Agreement Cannot Act as Consideration for the Written Easement Because the Written Easement Dramatically Expands the Scope of the Oral Agreement.***

In addition to its failure to comport with the statute of frauds, the oral agreement (as described by the witnesses herein) is dramatically different in scope than the Easement. Thus, even if the oral agreement was supported by valid consideration (which it is not) that same consideration cannot be used to support the Easement because it is a completely different agreement.

"It is well established 'that a promise to do, or the doing of, what one is already bound by contract to do, is not valid consideration.'" *Shore v. Peterson*, 146 Idaho 903, 910, 204 P.3d 1114, 1121 (Idaho,2009) (quoting *Dashnea v. Panhandle Lumber Co.*, 57 Idaho 232, 238, 64 P.2d 390, 393 (1937) (quoting *Indep. Sch. Dist. No. 6 v. Mittry*, 39 Idaho 282, 289, 226 P. 1076, 1078 (1924)).

In this case, the preamble to the Easement describes the earlier verbal agreement as a

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 9

promise "not to build a structure on Lot B." *See* **Exhibit A** to the *Affidavit of Anna Eberlin* (Dkt. 14-8). That statement appears to be consistent with all other parties' understanding the alleged verbal agreement. *Larsen Depo.*, p. 45, l. 20 through p. 46, l. 15, attached as **Exhibit A** to *Fischer Aff.*; *McClary Depo.*, p. 23, l. 3 through p. 24, l. 16, and Exhibit 1 thereto, attached as **Exhibit B** to *Fischer Aff.*; *Donald Kayser Depo.*, p. 17, l. 14 through p. 18, l. 9, attached as **Exhibit E** to *Fischer Aff.*; *see also* PSA from Larsen to Kayser requiring documentation of the easement "not to build," Exhibits 3-6 to *Larsen Depo.*, attached as **Exhibit A** to *Fischer Aff.* Thus, everything that is known about the alleged verbal agreement is that Mr. McClary may have agreed (with Mr. Larsen) not to build a home on Lot B. Nothing more.[2]

In contrast, the Easement restricts virtually every potential use of Lot D. Specifically, it prohibits the construction of <u>anything</u>, including fences, trees, shrubs, swimming pools, garage, home or personal property including recreational vehicles that would in any way degrade or restrict the view from Lot D. The Easement bears little resemblance to the nature of the alleged oral agreement described in the preamble.

Further, it is noteworthy that the Easement was created at the direction of Rex Larsen who had a direct interest in closing the transaction between the Larsens and Kaysers. Rex Larsen dictated the terms of the Easement to his father's attorney and then caused it to be signed by Mr. McClary. *Larsen Depo.*, p. 82, l. 14 through p. 93, l. 16, attached as **Exhibit A** to *Fischer Aff.* He did so even though he admittedly was expanding the terms of what he understood the oral agreement to be. In exchange, Rex Larsen was paid a commission. *Id.* at p. 62, l. 24 through p. 63, l. 8.

In any event, because the written agreement vastly expands the terms of the alleged oral

---

2 There is no evidence Mr. McClary intended the verbal agreement to be binding, long term, or benefit anyone other than Paul Larsen.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

agreement, the two agreements cannot share the same consideration. They are different and separate agreements, *each* of which must have valuable consideration to be enforceable. Any suggestion that the Easement was nothing more than an extension of the verbal agreement is flawed, at best.

> ### *c.   There is absolutely no evidence in the record of any "other good and valuable consideration.*

Although the written Easement refers to "other good and valuable consideration," there is absolutely no evidence that any consideration, other than the oral agreement, was provided as consideration for the written Easement. The lack of any consideration for the written Easement already has been discussed above, and those arguments will not be duplicated here.

**B.   The Easement is Invalid Because James McClary Was Not Competent to Execute the Document.**

James McClary was not competent to enter into the Easement. As set forth in Idaho Code § 29-101, "All persons are capable of contracting except minors, persons of unsound mind, and persons deprived of civil rights." According to those who knew James McClary and spent time with him during the time the Easement was executed, he was not in a position mentally or otherwise to understand the consequences of a legal document.[3]

As set forth in the Affidavit of Pam McClary, her father was hospitalized for congestive heart failure in December 1999 and was not released from the hospital until December 23, 1999. *McClary Affidavit*, ¶ 8(a), filed concurrently herewith. Pam McClary stayed with her father at his home until December 29, 1999 and then returned to her home in Denver. *Id.* According to Ms. McClary, during December 1999 and January 2000 James McClary was under the 24 hour care of care of live-

---

[3] According to the Idaho Supreme Court, lay witness opinions are allowed to describe mental condition or capacity, comparisons between acts and conduct of a person who was at a given time sane and his acts at a time when he was laboring under mental disability, and sanity and competency to transact business. *See Chamberlin v. George*, 63 Idaho 658, 125 P.2d 307 (1942); *see also Herring v. Davis*, 47 Idaho 211 273 P. 757 (1929); *see also Weber v. Della Mountain Min. Co.*, 14 Idaho 404, 94 P. 441 (1908).

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 11

in caregivers, was taking a number of medications, and was supposed to be on oxygen twenty-four hours per day (although he often refused to use his oxygen which caused him to be less alert and detached). *Id*. at ¶¶ 8(b)-(d). As further testified by Ms. McClary, James McClary rarely left the house during this time and was extremely hard of hearing, refusing to wear a hearing aid (which made speaking with him on the phone virtually impossible). *Id*. at ¶ 8(b). According to Ms. McClary, based on her observations and knowledge of her father's condition in late 1999 and early 2000, she does not believe her father was in any position mentally or otherwise to understand the consequences of a legal document on January 2000. *Id*. at ¶ 8(e).

As further set forth in the Affidavit of Joyce Brewer, a long-time family friend who knew James McClary for a number of years, she visited James McClary in the hospital in December 1999 and continued to visit him at his home after his release from the hospital. *Brewer Aff*., ¶¶ 2-5, filed concurrently herewith. According to Ms. Brewer, when she visited James McClary in the hospital he appeared to be a different person than who she knew. *Id*. at ¶ 4. Ms. Brewer knew James McClary as a self confident, strong business man who was always dressed meticulously and put together. *Id*. at ¶ 3. However, when Ms. Brewer visited Mr. McClary in the hospital during Christmas 1999 he was lying on his bed completely unaware that his gown was open and he was exposing himself. *Id*. at ¶ 4. According to Ms. Brewer, after his release from the hospital, Mr. McClary's health continued to decline, he was feeble, less attentive (making it difficult to engage in conversation with him), and he only left his home for doctor's appointments. *Id*. at ¶¶ 5- 6. Ms. Brewer also recalls Mr. McClary's hearing was bad and she would have to stand directly in front of him and speak loudly in order for him to hear her. *Id*. at ¶ 6. According to Ms. Brewer, based on her observations of James McClary during late 1999 and early 2000, she questions whether he was in a position to understand or know what he was doing and would never have asked him to execute a

legal document in the condition she observed him in. *Id*. at ¶ 8.

According to the Affidavit of Debra Sipiora, a nurse practitioner who cared for James McClary, in late 1999 and early 2000 Mr. McClary's health was very poor and he required twenty-four hour care and assistance. *Sipiora Aff.*, ¶¶ 3, 6, 7, filed concurrently herewith. Ms. Sipiora worked approximately forty hours each week at the McClary home, typically from 3:00 p.m. to 7:00 a.m. and was not comfortable leaving Mr. McClary alone. *Id*. at ¶¶ 5-6. According to Ms. Sipiora, Mr. McClary often refused to use oxygen which affected his ability to function and focus on simple tasks. *Id*. at ¶ 7. During 1999 and 2000, Mr. McClary was also suffering from Peripheral Neuropathy ("PN") which caused significant pain and tenderness, requiring Mr. McClary to take a number of medications. *Id*. at ¶ 6. Ms. Sipiora also recalls Mr. McClary was not able to hear well and did not use hearing aids; he rarely took phone calls but if he did, she would have me turn the volume up as loud as it would go so Mr. McClary could try to hear the person on the other end. *Id*. at ¶ 8. Ms. Sipiora recalls Mr. McClary being very reclusive during the time she worked for him, that he rarely took phone calls and did not like visitors, and that he did very little other than watch television (with the volume very loud), and sleep as he watched. *Id*. at ¶ 9. According to Ms. Sipiora, based on her observations and interaction with Mr. McClary, her knowledge of the medications he was taking and knowledge of his health condition (including his refusal to use oxygen as ordered by his doctors), and his impaired hearing, she does not believe he would have understood what he was doing, or even cared to understand in January 2000.[4] *Id*. at ¶ 10.

---

[4] Interestingly, the testimony of Pamela McClary, Joyce Brewer, and Debra Sipiora regarding Mr. McClary's condition is in stark contrast to the testimony of Rex Larsen and Donald Kayser regarding their interactions with James McClary during that same timeframe. According to Rex Larsen, he spoke to Mr. McClary over the phone between December 26, 1999 and January 6, 2000 to discuss a written Easement and Mr. McClary said, "you bet, let's do it...send it over....absolutely, Rex, I'm happy to do this for Paul...it's what we agreed on." *Larsen Depo.*, p. 49, ll. 2-16; p. 50, ll. 8-17; p. 70, l. 19 through p. 71, l. 16; p. 76, l. 25 through p. 77, l. 8, attached as **Exhibit A** to *Fischer Aff*. Further, according to Rex Larsen's description of the meeting between he and Mr. McClary on January 11, 2000, during which

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 13

Based on the foregoing evidence of James McClary's mental capacity and physical condition during January 2000, there is at a minimum a material question of fact as to whether Mr. McClary was of sound mind, capable of entering into a contract when he signed the easement on January 11, 2000. Accordingly, summary judgment declaring the validity of the written Easement must be denied.

C. **Plaintiffs Cannot Be Considered Bona Fide Purchasers Entitled to the Benefit of the Easement Because the Easement is Invalid for Lack of Consideration and They Did Not Acquire the Easement in Good Faith.**

Plaintiffs claim because they purchased Lot D as bona fide purchasers ("BFPs") "by paying valuable consideration and in good faith, i.e., without knowing of adverse claims," the easement is binding on Ms. McClary. *Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment* (Dkt. 14-1), p. 11. However, despite such claim, the evidence demonstrates the Easement is invalid for lack of consideration. The Kaysers were fully aware the Easement was obtained without consideration and under suspect conditions.

It appears from their argument that Plaintiffs are attempting to once again equate the consideration paid for Lot D with the consideration paid for the Easement. Regardless if Plaintiffs paid valuable consideration for Lot D, that does not mean they also paid valuable consideration for the Easement. As established above, there was no consideration paid for the Easement and the consideration paid by Plaintiffs for Lot D cannot be the same consideration for the Easement. Accordingly, the fact that Plaintiffs paid valuable consideration for Lot D does not automatically

---

Mr. McClary signed the easement, Rex did not observe Mr. McClary wearing a hearing aid or using oxygen; however he did not recall Mr. McClary having any problems hearing and claimed they had a coherent conversation regarding their families and about how happy Mr. McClary was at the time. *Id*. at p. 82, l. 14 through p. 93, l. 16. Donald Kayser also claims to have spoken to James McClary on the phone in January 2000 and discussed in "great detail" the history of the Larsen property and his oral agreement with Larsen. *Donald Kayser Depo.*, p. 26, l. 6 through p. 30, l. 5, attached as Exhibit E to *Fischer Aff*.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 14

validate the Easement for which no consideration was paid.[5] Thus, even if Plaintiffs are considered BFPs of Lot D and (are therefore protected against adverse claims as to Lot D) the fact remains the Easement is invalid for lack of consideration and is not binding.

Further, Plaintiffs did not acquire the easement in good faith. At the time the Kaysers became interested in purchasing Lot D, they were fully aware there was no binding or enforceable easement over Lot D. Accordingly, Donald Kayser instructed Rex Larsen to get something in writing. *Donald Kayser Depo.*, p. 17, l. 14 through p. 21, l. 11, attached as **Exhibit E** to *Fischer Aff.* Plaintiffs had concerns about the Easement prior to purchasing Lot D which is exactly why they wanted something in writing. Donald Kayser specifically testified:

> Q. Did you at any time discuss with any of the parties we've been talking about, the Larsens or the McClarys, what the easement did to the value of the McClary lot?
> A. No.
> Q. Did you consider that when you requested the easement be documented?
> A. No. Because I assumed the easement was already in agreement and just being put into writing.
> Q. I may have asked you this. Again, I don't want to repeat. If it was already in place, it had been sufficient for Mr. Larsen for over 20 years, why was it important for you to have it in writing? Were you concerned the verbal agreement wasn't enforceable?
> A. It would bother me, yes.
> Q. Why?
> A. Well, I'm not a lawyer, but I understand verbal agreements are hard to enforce.

*Donald Kayser Depo.*, p. 54, l. 22 through p. 55, l. 15, attached as **Exhibit E** to *Fischer Aff.*

Further, at the time Donald Kayser insisted upon a written document (to secure the Easement) he was aware of Mr. McClary's declining health and that Mr. McClary was under the

---

[5] As eluded to by the 9th Circuit in *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 666, if there is evidence that the contested easement is invalid, then the court just looks to whether the easement is binding on the grantor based on the BFP analysis. However, under the circumstances of the present case, there is significant evidence that the easement is invalid, thus, the BFP argument is not conclusive.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 15

supervision of caregivers. In discussing his relationship with James McClary, Donald Kayser explained that they were neighbors for a number of years[6] and described them as "very close friends." *Donald Kayser Depo.*, p. 27, ll. 5-21, attached as **Exhibit E** to *Fischer Aff*. Despite his comments that they were "very close friends," Donald Kayser testified he never spoke to James McClary about the *written* Easement and had no idea how Rex Larsen obtained James McClary's signature. *See Id*. at p. 26, l. 6 through p. 36, l. 9. Donald Kayser also stated at the time the Easement was executed in 2000 he had not seen James McClary for quite some time but would see caregivers at Mr. McClary's home. *See Id*. Clearly Plaintiffs were not the unknowing purchasers they claim to be. Plaintiffs had every reason to know obtaining the Easement from an elderly man in failing health was questionable to say the least.

As set forth above, Plaintiffs did not pay valuable consideration for the Easement and did not acquire the Easement in good faith. Accordingly, Plaintiffs argument that the Easement is binding on Ms. McClary because the Kaysers were BFPs must be summarily dismissed.

### IV.

### CONCLUSION

For the reasons set forth above, and in the record on file herein, Ms. McClary respectfully requests Plaintiffs' Motion for Summary Judgment be denied, and that she be given the opportunity to present her entire case to a jury.

DATED this 2nd day of July, 2010.

---

[6] Prior to purchasing Lot D from the Larsens, the Kaysers lived on the opposite side of James McClary and were therefore his next-door neighbors for a number of years.

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 16

MORROW & FISCHER, PLLC


     /s/ Julie Klein Fischer
By: Julie Klein-Fischer
    Attorneys for Defendant

DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 17

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 2nd day of July, 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Wayne Meuleman | Anna Eberlin |
| Attorney for Plaintiffs | Attorney for Plaintiffs |
| *meuleman@lawidaho.com* | *aeberlin@lawidaho.com* |

                                            /s/ Julie Klein Fischer
                                    for MORROW & FISCHER, PLLC

T:\Clients\M\McClary, Pam\Pleadings\Summary Judgment\Memo Response to SJ.doc