Julie Klein Fischer
MORROW & FISCHER, PLLC
332 N. Broadmore Way, Ste. 102
Nampa, Idaho  83687
Telephone:      (208) 475-2200
Facsimile:      (208) 475-2201
ISB No.:        4601
*jfischer@morrowfischer.com*

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD KAYSER and MARY KAY KAYSER, <br><br> Plaintiffs, <br><br> -vs- <br><br> PAM JANE McCLARY, an individual, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) |

**CASE NO.  CV 10-00119-REB**

**AFFIDAVIT OF JULIE KLEIN FISCHER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

STATE OF IDAHO   )
                           :ss
County of Canyon     )

JULIE KLEIN FISCHER, being first duly sworn upon oath, deposes and says:

1.      A true and correct copy of the pertinent portions of the transcript of the June 22, 2010 deposition of Rex Larsen is attached hereto as **Exhibit A** and incorporated herein by this reference.

2.      A true and correct copy of the pertinent portions of the transcript of the March 11, 2010 deposition of Pamela MClary is attached hereto as **Exhibit B** and incorporated herein by this reference.

3.      Attached hereto as **Exhibit C** is a true and correct copy of the recorded warranty deed from Paul and Iretta Larsen to Donald and Mary Kayser dated January 19, 2000.

4.      A true and correct copy of the pertinent portions of the transcript of the June 16, 2010 deposition of Mary Kayser is attached hereto as **Exhibit D** and incorporated herein by this reference.

5.      A true and correct copy of the pertinent portions of the transcript of the June 16, 2010 deposition of Donald Kayser is attached hereto as **Exhibit E** and incorporated herein by this reference.

6.      Attached hereto as **Exhibit F** is a true and correct copy of the recorded warranty deed from James McClary to Paul and Iretta Larsen, dated February 12, 1980.

FURTHER AFFIANT SAYETH NAUGHT.

DATED this 2nd day of July, 2010.

_____/s/ Julie Klein Fischer_____
Julie Klein Fischer


SUBSCRIBED TO AND SWORN before me this 2nd day of July, 2010.

[SEAL]                         _____/s/ Laura M. Terrazas_____
                               Notary Public for Idaho
                               My Commission Expires:____01/19/2013_____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of July, 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Wayne Meuleman                          Anna Eberlin
Attorney for Plaintiffs                 Attorney for Plaintiffs
*meuleman@lawidaho.com*                 *aeberlin@lawidaho.com*


            /s/ Julie Klein Fischer
        for MORROW & FISCHER, PLLC


T:\Clients\M\McClary, Pam\Pleadings\Summary Judgment\Affidavit opposing SJ.JKF.doc

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


DONALD KAYSER and MARY KAY KAYSER,   )
                                     )
                    Plaintiffs,      )   Case No.
vs.                                  )   CV10-00119REB
                                     )
                                     )
                                     )
PAM JANE McCLARY, an individual,     )
                                     )
                    Defendant.       )
_____)


DEPOSITION OF REX LARSEN

June 22, 2010

Boise, Idaho


Rebecca M. Martin, CSR No. 759

Rex Larsen                    June 22, 2010                Kayser v. McClary

1    were.

2         Q.   That's fair enough.

3              When you say, about this, you mean

4    relative to this easement issue?

5         A.   Yes.  Yes.

6         Q.   Let's back up just a little bit.  I want

7    to ask you a couple quick questions about what you

8    do.  What's your current occupation?

9         A.   Real estate.

10        Q.   I don't think you gave me one of your

11   cards.

12        A.   No.

13        Q.   Do you have your own business, or

14   currently employed by someone?

15        A.   I have my own.  It's Rex B. Larsen and

16   Associates.

17        Q.   How long have you operated Rex B. Larsen

18   and Associates?

19        A.   Probably three years.

20        Q.   Is that a corporation?

21        A.   It's an LLC.

22        Q.   Okay.  And are you --

23        PAM McCLARY:  Julie, excuse me.  I'm not

24   hearing any responses at all.

25        MS. FISCHER:  They're quiet.  We'll try to

1    sure we're right.

2         Q.   Your parents were Paul B. Larsen and

3    Iretta Larsen; is that correct?

4         A.   Correct.

5         Q.   Are either of your parents still living?

6         A.   No, they're not.

7         Q.   Did your father just pass this year?

8         A.   Year and a half ago.  Mother passed just

9    three months ago.

10        Q.   Where were your parents living the last

11   couple of years?

12        A.   They lived in Alterra Villa, which was

13   off of river -- Park Center Boulevard for my father's

14   duration over the last 10 years of his life.  Then

15   mother lived there, and then the last six months of

16   her life, she lived at the -- darn it, I can't

17   remember the name of it right now.  The little

18   convalescent center off of Fairview down by Jerry's.

19   Darn it, I'm sorry.

20        Q.   That's okay.

21        A.   I should be able to remember the name.

22   She was there for about six months about.

23        Q.   Was there a probate opened for your

24   mother's estate recently?

25        A.   Yes.

1    business like it used to.  The escrow companies

2    handle the things that we were accustomed to doing

3    for years.  We no longer are notarizing the purchase

4    and sale agreements, which back in the earlier days

5    was a requirement of the transaction.

6         Q.  **So you just didn't renew it because you**

7    **weren't using it; is that fair?**

8         A.  That's fair.

9         Q.  **Tell me a little bit about your father,**

10   **if you would.  I understand he also was in the real**

11   **estate business?**

12        A.  Uh-huh.

13        Q.  **How long was he in that business?**

14        A.  Probably about from 1947 up to about --

15   he retired in about '85.

16        Q.  **So he spent the bulk of his adult life**

17   **in the real estate business; is that fair?**

18        A.  Yes, that's fair.

19        Q.  **Did he have a separate name for -- you**

20   **said you started Rex B. Larsen and Associates.  There**

21   **was a Paul B. Larsen and Associates, I believe?**

22        A.  Yes.

23        Q.  **Is that the business entity that he**

24   **operated under most of his career?**

25        A.  It is, yeah.

Rex Larsen                    June 22, 2010                  Kayser v. McClary

1    Q.  At some point, did the business change

2    from real estate to some type of consulting business?

3         A.  No.

4         Q.  Your father, during that time period,

5    you said about '47 to '85, he was involved in the

6    Paul B. Larsen and Associates, Inc.  Did he have any

7    other occupation or business, or was real estate his

8    primary occupation, I guess, for lack of better word?

9         A.  Yeah.  It was his primary occupation.

10   He did have other companies that they acquired real

11   estate property with their investors and friends.

12   And we had a management company that managed motels

13   for numbers of years.  And you were probably, when

14   you said consulting, referring to the motel division

15   of our company, which is what the name Paul B. Larsen

16   was most known for, for hotels and motels, which is

17   probably where you got the consulting.  We didn't do

18   consulting for fees.

19        He was also an MIA appraiser, but he did

20   not use that license.  He just used it for his own

21   knowledge.  He didn't use it for a fee.

22        Q.  Okay.  What did the hotel management

23   company do?

24        A.  Just managed the properties that we

25   owned.

Rex Larsen                          June 22, 2010                    Kayser v. McClary

1    that.  Let's start with this one anyway.

2             (Deposition Exhibit No. 3 was marked.)

3             Q.  BY MS. FISCHER:  There's No. 3 in front

4    of you, which is an Option to Purchase.  It has the

5    Paul B. Larsen Realtors logo on the top left-hand

6    side I see that.

7             A.  Uh-huh.

8             Q.  Were you involved in representing either

9    your parents or -- you already said you didn't

10   represent the McClarys -- in connection with their

11   purchase of the Hillcrest Drive lot?

12            A.  No, I was not.

13            Q.  Do you know who prepared this Option to

14   Purchase agreement?

15            A.  You know, it might have been my father,

16   and it also might have been Wayne Birch, who was a

17   partner of my father's, because he notarized it.

18            Q.  Wayne did?

19            A.  Yeah.  Wayne was one of my father's

20   partners in the business, and he has since deceased.

21   This Option Agreement is just a standard form that

22   was used from time to time in the company.

23            Q.  That was going to be my next question.

24   Do you recognize this as a form that was used by Paul

25   B. Larsen Realtors?

1    Thank you.

2         (A break was taken from 1:56 p.m. to 1:59 p.m.)

3         (Deposition Exhibits 4 through 6 were marked.)

4         **Q.   BY MS. FISCHER:  I'm going to hand you**

5    **Exhibits 4, 5, and 6, which I'll just represent to**

6    **you are copies that we obtained one way or another**

7    **that are in our files.  If you could take a look at**

8    **those, we had talked about what the purchase price**

9    **was for the lot between your parents and the**

10   **McClarys.**

11        **I guess take a look at those, I'll give**

12   **you time to review them.  My first question is:  Have**

13   **you seen any of those documents before?  They may be**

14   **part of your file.  I don't know.**

15        A.   I've not seen these.

16        **Q.   You haven't seen copies of these?**

17        MS. FISCHER:  Pam, did you do something

18   different?  We're getting a buzzing noise.  Are you

19   on a different phone?

20        PAM McCLARY:  This phone is really buzzing.

21   Sorry.

22        MS. FISCHER:  That's what I'm wondering.

23   We're hearing it too.  It's gone now.  It's back.

24        PAM McCLARY:  I think it's the cord.

25        MS. FISCHER:  That's good now.

1    forever.  That's what I would have said, too.

2           **Q.  When you say McClary didn't believe that**

3    **was a buildable lot, that's based on not a discussion**

4    **with Mr. McClary, but the letter that's Exhibit**

5    **No. 2?**

6           A.  No.  I had a discussion with

7    Mr. McClary, too, in the preparation of the -- I had

8    to go to Mr. McClary to say, would you like to put

9    this in writing.  He said, you bet, let's do it.  I

10   said, okay, I'll have an attorney draw it up, and you

11   take it look at it.  He said, send it over.

12          At that point he said -- he told me that

13   he remembered clearly the agreement that he and Paul

14   Larsen had, and that nothing would be built or

15   obstruct that view.  He instructed me to give him an

16   easement document for him to review.

17          **Q.  I want to go back to -- you said that**

18   **you talked with your father about the agreement**

19   **between he and Mr. McClary.  What did he tell you the**

20   **agreement was?  I know it's been a long time.  How**

21   **did he describe the view easement?**

22          A.  You're speaking of my father?

23          **Q.  Yeah.  How did he describe to you the**

24   **agreement that -- how did your father describe to you**

25   **the agreement that he had with Mr. McClary regarding**

1    the use of Mr. McClary's lot?

2           A.   Julie, I think I've said it two or three

3    times already.  Simply that there would be nothing

4    built on that lot and that the view would remain.

5    Those two items.

6           Q.   Simple as that?

7           A.   Yeah.

8           Q.   Did you ever have any discussions with

9    Mr. McClary about why he believed his lot over which

10   this view easement exists was not buildable?

11          A.   Yes.  When I called Jim up to talk with

12   him about putting the verbal agreement in writing, as

13   a side comment he said, absolutely, Rex, I'm happy to

14   do this for Paul.  It's what we agreed on.  That lot

15   is something that's not -- I can't use his words, he

16   just basically said, it's not buildable.  I said, I

17   appreciated that.  We'll get it done.

18          Q.   Did you do any investigation to

19   determine whether or not it was or was not buildable?

20          A.   No.  No.  It wasn't necessary.  Nobody

21   cared whether it was buildable or not.  They just

22   wanted the easement.

23          Q.   Did you discuss with Mr. McClary the

24   fact that he may be able to do some kind of lot line

25   adjustment or other activity that would make the lot

Rex Larsen                    June 22, 2010                Kayser v. McClary

1    making?

2        A.   Correct.   No one sat there and told me

3    that the $40,000 included the easement, but they

4    might as well have.

5        Q.   Today with the written -- let me ask it

6    this way:   In your view as a realtor, I'm asking your

7    opinion at this point based on your experience in

8    this industry, is the Kaysers' lot worth more or less

9    with the Easement Agreement, the Grant of Easement?

10       A.   It's worth more.

11       Q.   Do you have any opinion as to how much

12   more it's worth?

13       A.   The question probably should really be:

14   Without the easement is the property worth less?

15       Q.   Okay.   What's the answer to that

16   question?

17       A.   Yes.   Without the easement, you have

18   some serious backyard problems.   With the easement,

19   you have eliminated the backyard problem and have

20   made it marketable.   That's the difference.

21       Q.   By serious backyard problems, you mean

22   it's just a very small backyard?

23       A.   Yeah.

24       Q.   What was your commission in connection

25   with selling your folks' lot to the Kaysers?

1          A.   Six percent.  Of course I didn't get all

2     that.

3          Q.   **That was your contracted agreed upon**

4     **amount, right?**

5          A.   Right.

6          Q.   **And when you say you didn't get all**

7     **that, just for the record, explain what you mean.**

8          A.   I have to share it with the broker.

9          Q.   **Will you just explain to me in very**

10    **general terms what it meant to be the dual agent for**

11    **both the Kaysers and the Larsens in connection with**

12    **your folks selling the property to the Kaysers?**

13         A.   Well, the State of Idaho has a law that

14    permits a real estate agent to represent the two

15    parties as long as it is disclosed, and that there

16    are certain fiduciary responsibilities that you must

17    adhere to; the largest of which is that if you know

18    of anything that can damage the other, you are to

19    open the discussion, particularly to price.  If you

20    know that somebody is willing to pay more or willing

21    to take less, it needs to be disclosed to the other

22    party.  In essence, that's what limited dual agency

23    is.

24         Q.   **In your file that you brought with you**

25    **today, again, I haven't looked through it in a great**

Rex Larsen                        June 22, 2010                        Kayser v. McClary

[Page 70]

1        A.   No.  We never discussed that.

2        Q.   Did you ask him that?

3        A.   Huh-uh.

4        Q.   No?

5        A.   No.

6        Q.   What did you do next, then?  Did you

7   then contact Mr. McClary?

8        A.   Yes.

9        Q.   And you think you would have contacted

10  him before January 6th?

11       A.   I did.

12       Q.   Okay.

13       A.   Between that date and this date.

14       Q.   You're pointing at documents.

15       A.   Between the date that we had the offer

16  consummated.

17       Q.   Which is Exhibit No. 7, okay.

18       A.   Which was around the 26th of February.

19       Q.   It's December I think?

20       A.   December, I mean.  The 26th of December

21  and the 6th of January.

22       Q.   In between those two dates, then you

23  contacted Mr. McClary?

24       A.   Uh-huh.

25       Q.   And what method did you contact him?

1       Was it by phone?  Did you go to his house?

2              A.   By phone.

3              Q.   When you called him, did he answer the

4       telephone?

5              A.   I don't remember.

6              Q.   Tell me about the conversation that you

7       do remember having with Mr. McClary by phone.

8              A.   I explained that Dad was selling the

9       home.  Jim said he understood, he knew that.  That in

10      order for us to preserve the verbal agreement between

11      the two parties, everybody wants to put it in writing

12      in the form of an easement.  Dad wants to know, Jim,

13      if that's something you're willing to do.  Jim said

14      of course, happy to do it.  We reviewed the terms

15      that Dad and I had discussed that ought to be in the

16      easement.  I reviewed those with Jim.

17             Q.   What were those terms?

18             A.   Basically, right here, on your

19      exhibit --

20             Q.   8?

21             A.   This one here.

22             Q.   So in Exhibit 9, which is your letter?

23             A.   Yeah.  This was then put to writing and

24      sent over to Randall Fredricks.

25             Q.   I want to stay with your discussion --

Rex Larsen                    June 22, 2010              Kayser v. McClary

1  into an easement, if I recall correctly.  And I was

2  just saying that it should include the verbal

3  agreement as consideration for the easement.

4        Q.  What does that mean to you, the verbal

5  agreement is consideration for the restriction?

6        A.  Well, in other words, we're just --

7  we're initiating something that had already been

8  done -- we're finalizing something that had already

9  been agreed upon and is the consideration -- the

10 prior agreement is the consideration for drawing the

11 document today.

12       Q.  When you use the term consideration,

13 what does that mean to you?

14       A.  Purpose.  Value.  The valuable purpose

15 of doing whatever we're going to do.

16       Q.  Mr. Kayser didn't pay Mr. McClary

17 anything for the written agreement, correct?

18       A.  That is correct.

19       Q.  And your father and mother didn't pay

20 Mr. McClary anything for the written agreement,

21 correct?

22       A.  Correct.

23       Q.  So at the time the Grant of Easement,

24 which is Exhibit No. 8, was entered into, the only

25 consideration for that agreement was the verbal

1    agreement; is that fair?

2         A.   That is fair.  Which, interestingly

3    enough, was the consideration for them purchasing the

4    lot.

5         MS. EBERLIN:  I'm going to inject an

6    objection to your question.  It's a little late, but

7    calls for legal conclusion.

8         Q.   BY MS. FISCHER:  Looking at Exhibit

9    No. 9 again, which is your January 6th letter to

10   Randall Fredricks, how would a swimming pool obstruct

11   the view over Lot B?

12        A.   Well, the purpose of the -- my

13   understanding of the purpose at this time, Julie, was

14   that nothing was to be constructed there.  If nothing

15   is to be constructed there, I was just laying out

16   examples of things that would create obstructions of

17   any kind, or anything that would be of a constructive

18   nature.  So I was just allowing him to know what the

19   basic understanding would be about construction and

20   let him put it in writing the way he thought it

21   should be.

22        Q.   Would you agree with me that the

23   instructions that you gave to Mr. Fredricks in the

24   January 6th letter go beyond the condition in the

25   Purchase and Sale Agreement that the property,

1    Mr. McClary's property, can't be used as a building

2    site for a new home?

3         A.   You could draw that conclusion, but I

4    think it's unfair, because this is an agreement

5    between two different parties.

6         Q.   When you're saying this, you're patting

7    the Purchase and Sale Agreement, Exhibit No. 7?

8         A.   The Purchase and Sale Agreement is a

9    document between Mr. Kayser and Mr. Larsen.  This is

10   an agreement between Mr. McClary and Mr. Larsen.  I

11   do not think they're related.  Mr. Kayser just wanted

12   to make sure nothing would be built here, and because

13   of that, he would have a good view.  This is the

14   document that refines what the agreement was between

15   Mr. McClary and Mr. Larsen.

16        Q.   When you say this is the document that

17   refines it, you're referring to Exhibit 9?

18        A.   Which is the letter to Randall

19   Fredricks, yes.

20        Q.   And that's your interpretation based on

21   what your father told you the agreement was?

22        A.   And Mr. McClary.

23        Q.   Well --

24        A.   Both of them.

25        Q.   Okay.  Help me out there, then.  Because

1    I understood that you -- when you called Mr. McClary,

2    you reviewed with him the terms as your father had

3    conveyed them to you.  Did you also inquire

4    Mr. McClary as to what his understanding of their

5    agreement was?

6            A.  I asked Mr. McClary, is that correct?

7    And Mr. McClary answered, yes.  Then he instructed me

8    to get him something in writing to review.

9            Q.  Again, I know it's been a long time ago,

10   but what I'm interested in knowing is:  Did you list

11   for Mr. McClary these things, no swimming pool,

12   garage --

13           A.  No.  I didn't be that specific with

14   Mr. McClary.  I just made sure that nothing -- I

15   wanted to make positive that he agreed that nothing

16   was to be built on the lot, so that the view would

17   not be obstructed.  That's really all I asked him.

18           Q.  That's what he agreed with?

19           A.  Correct.

20           Q.  Fair enough.

21               How about recreational vehicles, how

22   does parking a recreational vehicle on the property,

23   how would that obstruct your view?

24           A.  I don't know.

25           Q.  Because that's not constructing

1    anything, correct?

2         A.  I don't know.  I'd have to have an

3    interpretation of the easement now.

4         Q.  **My question is:  Was that something that**

5    **you included, that no recreational vehicles would be**

6    **parked on the lot, or is that something your dad told**

7    **you was part of the agreement between he and**

8    **Mr. McClary?  Where did that restriction come from?**

9         A.  I used it as an example so someone

10   couldn't nefariously just throw something in there to

11   create a problem.

12        Q.  **I don't understand.  Who would throw**

13   **something nefariously in?**

14        A.  Well, if somebody was upset with the way

15   the -- someone didn't like the idea that there was an

16   easement, they could just pull something in there and

17   obstruct the view.  But that wasn't the main point.

18   It was such a sideline to this document, Julie.  The

19   idea was, anything that obstructed the view.  It was

20   the view.  Anything could obstruct the view, a fence

21   could obstruct the view, a bunch of unsightly

22   vehicles could obstruct the view, a swimming pool

23   with a lot of funny-looking, old-looking furniture or

24   people running around in their swimming suits might

25   obstruct the view.

Rex Larsen                     June 22, 2010                  Kayser v. McClary

1           The point was:  Anything that would

2   obstruct the view was placed in my mind and put, as

3   best as I could, I'm just a real estate agent, I'm

4   not a legal mind, I put down the best I could to help

5   the attorney understand the general idea that these

6   two men have agreed upon, and put in writing in my

7   own mind a few words that would help him understand

8   what obstruction of the view would be.  I didn't

9   think anyone would necessarily do that, but I put it

10  in to make sure he understood, obstruction means

11  obstruction.

12          Q.  **Let me ask you this:  Is this fair that**

13  **your father and Mr. McClary had a general agreement**

14  **regarding obstruction, and that when Mr. Kayser asked**

15  **you to assist in reducing that to writing, that you**

16  **tightened up those terms to make it more specific**

17  **than what your folks had agreed to, more specific**

18  **than their gentleman's agreement?**

19          A.  I would answer that this way:  Every

20  time I go to an attorney and give them instructions,

21  they tighten it down for me so I am clear in the

22  mind, and there's no misunderstanding.  I tried to do

23  that --

24          Q.  **Perfect.**

25          A.  -- to make sure there was no

1    misunderstanding of what obstruction really meant.

2    And in my discussion with Jim, he understood that

3    obstruction meant obstruction of the view.

4           Q.   Do you know whether your father, and I

5    include in that your mother, too, I guess.  I assume

6    this deal was largely between your father and

7    Mr. McClary; is that fair?

8           A.   That's fair.

9           Q.   Do you know whether or not as part of

10   their verbal agreement they ever said no trees would

11   be planted in the easement?

12          A.   I'm not sure.

13          Q.   Do you know whether or not there was any

14   discussion about the fact that no fence at all could

15   be constructed on Mr. McClary's lot?

16          A.   The only thing that was discussed,

17   Julie, is that nothing would obstruct the view across

18   the lot.  That would include everything.

19          Q.   Again, I'm not trying to be difficult, I

20   just want to know.  Specifically, did either of them

21   tell you, a swimming pool can't be put on the lot, a

22   recreational vehicle can't be parked on the lot?  Did

23   they tell you that, or is that your assumption based

24   on how they described the general agreement to you?

25          A.   That's fair, yes.

Rex Larsen                    June 22, 2010                 Kayser v. McClary

1      Q.   That's your assumption?

2      A.   That's fair.  You have to understand,

3   this letter wasn't trying to create the easement.  It

4   was trying to create the understanding of what the

5   agreement was, and allow the attorney to put it in

6   the proper language so that both parties could review

7   the easement.  I think it's important to know that

8   when my father read the easement, he said, that

9   sounds fine.  When I took it to Jim and we read it

10  together, he says, this sounds fine.  I wasn't trying

11  to create a legal document.  I was trying to explain,

12  the best that I could, my knowledge what obstruction

13  meant.

14      Q.   And I appreciate that.  I understand

15  where you're coming from.  I was just trying to get

16  at where you got the information to include in the

17  letter.  I think you answered that.

18      A.   Thank you.

19      Q.   Let's go back to -- it looks like you

20  called Mr. Fredricks, then you sent him this letter

21  kind of outlining for him what should be included in

22  the easement.  What happened next?

23      A.   Well, we received the easement back, and

24  I reviewed it with my father, who signed the

25  agreement.

1   Q.  Did your father have an attorney review
2   the easement on his behalf?
3   A.  Well, his attorney prepared it.
4   Q.  Fair enough.  So you told me that
5   already.
6   Did he make any changes or revisions to
7   it that you recall?
8   A.  No.
9   Q.  Did you make any changes or revisions to
10  it?
11  A.  No, I didn't.
12  Q.  So your father signed the agreement?
13  A.  Uh-huh.
14  Q.  And then what did you do next?
15  A.  I took the document -- well, I called
16  Jim up and asked him if it was convenient for me to
17  come over and have him review the document.  And he
18  said, yeah, come on over.  We made an appointment.  I
19  don't remember if it was that day or the next day,
20  but I went over and visited with him.  That's when we
21  reviewed the document.
22  Q.  So you phoned him again to schedule a
23  time to review the easement, correct?
24  A.  Uh-huh.
25  Q.  Again, do you remember at that time

Rex Larsen                    June 22, 2010                    Kayser v. McClary

[Page 83]

1  whether he answered the phone or not?

2           A.   I don't remember.

3           Q.   And it would have been within a day or

4  two of when he signed it; is that fair?

5           A.   A day or two of when my father signed

6  it?

7           Q.   I meant of when Mr. McClary signed it,

8  that you called him.

9           A.   Let's see, it looks like the same day.

10 Looks like they signed it both on the 11th, so it was

11 that day.

12          Q.   So you think you called him and went

13 over --

14          A.   I must have called him the same day that

15 Dad and I got together and Mom and Dad signed it.

16 Because Jim's signature is on that as of the 11th,

17 witnessed by Maria, who was one of the girls that

18 worked to assist him in his home.

19          Q.   Did you offer to drop the easement by

20 and allow Mr. McClary an opportunity to review it --

21          A.   Uh-huh, yes.

22          Q.   -- independently of you?

23          A.   Yes, I did.

24          Q.   What did he say?

25          A.   Let me see it.

1      Q.   So tell me about, then, you went to his

2  house, then; is that right?

3      A.   Yes, I did.

4      Q.   Before I get to that, did you provide a

5  copy of this Easement Agreement for Mr. Kayser to

6  review before you had it executed?

7      A.   I don't think so.  I can't remember, but

8  I don't think so.  I may have, but I don't know.  I

9  wouldn't have really had any reason to.  So I don't

10  think I did.

11      Q.   Why do you say that?  It was ultimately

12  for his benefit, correct?

13      A.   The easement clarified everything he

14  needed.  I knew that.

15      Q.   Tell me about your meeting, then, with

16  Mr. McClary when you went over to have him sign the

17  document.  Did you go by yourself?

18      A.   Yes, I did.

19      Q.   Do you recall if anybody else was there

20  besides the person that witnessed the agreement?

21      A.   Maria was the only person that I thought

22  was there.

23      Q.   Did Mr. McClary answer the door when you

24  went over?

25      A.   No.  I believe that Maria did.

Rex Larsen                    June 22, 2010                    Kayser v. McClary

[Page 85]

1      Q.   What did you tell Mr. McClary when you
2  got to his house?
3           A.   We just greeted each other.  He asked me
4  to have a seat on the couch next to him.  And I can't
5  remember -- it's so hard to remember the details.
6  But we sat and visited for a few minutes just about
7  the usual things that you talk about, how are you
8  feeling.  And how are these girls taking care of you,
9  and that kind of thing.  He just loved these girls.
10 I met two of them outside in front of the house one
11 day, and they were lovely girls.  He basically was
12 just telling me how happy he was, and what a great
13 way these girls look after him.
14           He said, you know, I think your father
15 and mother are doing the right thing moving to a
16 facility that will allow them to do less and be
17 looked after better.  He says, I wish I would have
18 done that.  That's the kind of visit we had.
19           Our discussion turned to the document,
20 and we read it together.
21      Q.   Did you read it aloud to him?
22      A.   Yes.  And he had a copy.  And I --
23      Q.   Let me stop you right there, I'm sorry
24 to interrupt.  Did the copy that Mr. McClary was
25 reviewing contain your parents' signatures?

Associated Reporting Inc.
208.343.4004

1      A.   It had their signatures, yes.

2      Q.   **Go ahead, then.  You read it aloud, and**

3  **he had a copy?**

4      A.   Uh-huh.  And he says it looks fine, Rex,

5  where do I sign.  He called Maria in, and she signed

6  it, and I notarized the document.  I notarized it

7  actually for both Mom and Dad.

8      Q.   **Why did he call Maria in?  I'm sorry, I**

9  **cut you off again.**

10     A.   I told Jim before I came over.  I said,

11  Jim, I want to make sure that we do have a witness

12  for this aside from my notary.  He said that's not a

13  problem, I've got one of my house girls here, and she

14  can do that.  I said, fine.

15     Q.   **So he called Maria in, she signed it, he**

16  **signed it, and you notarized it?**

17     A.   Yes.

18     Q.   **How long did your meeting with**

19  **Mr. McClary last?**

20     A.   40 minutes maybe.

21     Q.   **You recall he was sitting on the couch**

22  **when you went there?**

23     A.   Uh-huh.

24     Q.   **Yes?**

25     A.   Yes.

Rex Larsen                          June 22, 2010                    Kayser v. McClary

1      Q.  Aside from just reading the document

2   aloud to him, what did you do, if anything, to make

3   sure he understood it?

4      A.  I asked him.

5      Q.  What did you ask him?

6      A.  I said, is there anything in here that

7   you disagree with, is it all okay, is this what you

8   and Dad agreed to?  He says, Rex, it looks fine.

9      Q.  Am I correct, did he call Maria back in,

10   that she wasn't present during your whole meeting?

11      A.  Yes.  She was not present during the

12   whole meeting.

13      Q.  Was she present when you read the

14   agreement to Mr. McClary?

15      A.  No.

16      Q.  Was she present at any part of the

17   meeting, or just at the end when she witnessed it?

18      A.  I don't think she -- I don't think she

19   was a part of any of our conversation, except when we

20   got ready to sign.

21      Q.  Did you offer Mr. McClary any

22   explanation or interpretation of any part of the

23   agreement?

24      A.  No, I did not.  He didn't ask.

25      Q.  Did you suggest at the meeting that he

1   have an attorney review the Easement Agreement?

2          A.   No.

3          Q.   Why not?

4          A.   This is a man that has signed legal

5   documents all of his life, bought and sold real

6   estate for one of the largest corporations in the

7   west.  He was simply doing something he agreed to do

8   a few years before.  And I didn't feel any need to do

9   it.  We'd already had conversations about it.  He was

10  prepared.  He asked me to get it drawn, and if it was

11  satisfactory to him, he would sign it.

12         Q.   Did you ever suggest that he discuss the

13  easement with any members of his family before he

14  signed it?

15         A.   I did ask him in our conversation if he

16  wanted me to -- in the conversation earlier, I said,

17  would you like me to have Randall Fredricks send this

18  to your attorney.

19         Q.   Was that in a telephone conference?

20         A.   Yes.  That was in the very beginning.

21         Q.   What did he say?

22         A.   He said, no, just get it prepared.

23         Q.   Were you aware at the end of December

24  Mr. McClary's daughter had been in town staying with

25  him?

1        A.   No, I was not.

2        Q.   Why did you go to Mr. McClary's house

3   instead of have him come over to your folks' house

4   when they signed it?

5        A.   Just a convenience.  I do that to as

6   many people as I can.

7        Q.   Was Mr. McClary, at that time, able to

8   get himself from his home to your parents' home?

9        A.   I wouldn't know that.  I wouldn't know.

10        Q.   Based on your observations of him when

11   you went to his house, did he appear he would be able

12   to get himself physically from his house to your

13   parents home?

14        A.   Well, he didn't stand.  We just sat

15   together.  So I couldn't answer that question.

16        Q.   Why didn't your parents go with you to

17   Mr. McClary's house?

18        A.   Well, they're getting up in years, too.

19   And I think, and I can't say this for sure, but I

20   think, Julie, that Mom -- I think that Dad and Jim

21   had visited about this.  My recollection is that Dad

22   and Jim had discussed this on the phone.  And we're

23   talking about a couple of guys that are older now.

24   Jim was not playing golf anymore.  My dad was

25   starting to slow his golf game down, too.

1          Q.   Do you know whether or not your dad and

2    Mr. McClary discussed that you were coming over on

3    the phone before you went there, or are you just

4    assuming that may have occurred?

5          A.   I'm assuming just from the kind of

6    conversations that Dad and I had.  I felt that Jim

7    and he had at least discussed the idea that Rex would

8    be calling or something like that.  The details and

9    the memories, I don't have that.

10         Q.   You don't know for sure that occurred,

11   correct?

12         A.   I don't.

13         Q.   Were your parents physically able to go

14   to Mr. McClary's home if they had wanted to?

15         A.   I think so, sure.

16         Q.   I'm assuming that you went to his house

17   on the 11th, because that's the day it's notarized,

18   of January.  Prior to that, how long had it been

19   before that that you'd seen Mr. McClary?  Personally

20   seen him, not just talked on the phone.

21         A.   I don't remember.

22         Q.   Months, years?

23         A.   I would say probably years.

24         Q.   When you were at Mr. McClary's home on

25   January 11th, was he using oxygen?

Rex Larsen                    June 22, 2010                    Kayser v. McClary

1       A.   I didn't see any oxygen.

2       **Q.   Was he wearing a hearing aid?**

3       A.   I didn't observe one.  I mean, I can't

4   remember.  He might have.  My dad and mom wore

5   hearing aids, too.  It wouldn't have registered with

6   me, Julie.

7       **Q.   Fair enough.**

8           **Did he appear to have any trouble**

9   **hearing you?**

10      A.   No.  Not at all.  We sat right next to

11  each other.

12      **Q.   Did you sit right next to him so that he**

13  **could hear you?**

14      A.   No.  He invited me to sit where I sat.

15      **Q.   When you went to his home on**

16  **January 11th to have the easement signed, were you**

17  **aware that he required 24-hour care, live-in care at**

18  **that time?**

19      A.   I didn't know it was required.  But I

20  noticed that she was there.  And in our discussion he

21  told me there is someone there with him all the time.

22  No, I didn't define it as 24-hour care.  I didn't

23  know to what level of care he was requiring.  He

24  looked healthy.  He was happy.  He was excited to see

25  me.  He exemplified all the type of actions that the

Rex Larsen                        June 22, 2010                    Kayser v. McClary

1    Jim McClary I knew before, just didn't have the same

2    old look, you know.  He was getting older.

3          Q.   Do you know how old he was on

4    January 11th when he signed the easement?

5          A.   I don't know.

6          Q.   Were you aware when you had him sign the

7    easement that he had been hospitalized in December?

8          A.   No.

9          Q.   Did you have any information as to why

10   he had permanent 24-hour care?

11         A.   Well, my mom and dad were getting ready

12   to do something of a similar nature, and it just

13   seemed natural.  He had a lot of money, and I thought

14   that's the right way to live if you don't have your

15   wife.  It's good to have someone there for safety,

16   security.  The more wealthy people in the Valley that

17   I know, that's what they've all done.  I think it's a

18   smart, very intelligent way to conduct your affairs

19   in your latter years.

20         Q.   You weren't aware it was required; is

21   that true?

22         A.   No.  I did not know that.

23         Q.   Do you know whether Mr. McClary was on

24   any medications at the time he signed the easement?

25         A.   No.

1       Q.   Did you ask him if he was on any

2   medications?

3       A.   No.

4       Q.   Did you ask his caregiver, Maria, if he

5   was on any medications?

6       A.   No.

7       Q.   When you left the meeting with

8   Mr. McClary, did he walk you to the door?

9       A.   No.   I don't believe he did.

10      Q.   Did he ever get up from his chair while

11   you were there, or the couch where he was sitting?

12      A.   No.

13      Q.   What room is it that you met him in?

14      A.   I can't remember the location in the

15   house.   But it would be what I might call a family

16   room.

17      Q.   Looking at Exhibit 8, which is the Grant

18   of Easement, do you know who caused it to be

19   recorded?

20      A.   I believe I delivered that to the County

21   to be recorded.

22      Q.   Do you know if you provided a copy to

23   Mr. McClary after it was recorded?

24      A.   I'm not sure.   I don't have anything in

25   my records that indicate that I did.

1      Q.   You witnessed his signature obviously,

2   correct?

3      A.   Correct.

4      Q.   You notarized his signature, correct?

5      A.   Correct.

6      Q.   Do you keep a -- at the time, did you

7   keep a notary log?

8      A.   No.

9      Q.   Were you aware at the time that you were

10   required to keep a notary log?

11      A.   No.   This notary of mine went back to

12   the '70s.

13      Q.   Did you notarize a lot of documents in

14   your days?

15      A.   In those days, yeah.

16      Q.   Do you know whether Mr. McClary was

17   given anything by anyone in exchange for signing this

18   written Grant of Easement?

19      A.   No, he wasn't.   I should maybe rephrase

20   that and say, I was close to all the parties to this

21   document, and to the purchase agreement, and none of

22   them did.   There would be no cause for anyone else

23   to.   So I think it's fair for me to say no, no one

24   did.

25      Q.   Thank you.   I appreciate your

**Paul B. Larsen**
REALTORS...since 1946

## O P T I O N   T O   P U R C H A S E

SELLER:   James D. McClary

Mary Jane McClary

BUYER:   Paul B. Larsen

Iretta N. Larsen

THIS AGREEMENT, made and entered into this 5th day of November, 1979, by and between James D. McClary and Mary Jane McClary, husband and wife, hereinafter called the Seller, and Paul B. Larsen and Iretta N. Larsen, husband and wife, hereinafter called the Buyer.

### W I T N E S S E T H :

In consideration of One Hundred and No/100------------------------------------------------------------------, ($100.00), the receipt of which is hereby acknowledged, the Seller hereby grants unto the Buyer the exclusive right and option to and including January 15, 1980, to purchase the real property situated in City of Boise, County of Ada, State of Idaho, more particularly described as follows:

Lot "D", in Block "B" of Capitol Sites Subdivision, as further shown on resubdivision of Lots 3, 4, 12, 13, and a portion of Lot 5, Block "B".

See attached resubdivision plat.

In the event Buyer elects to exercise this Option, it may do so at any time after January 1, 1980, and prior to the expiration of this Option by notifying the Seller in writing of its intention to so exercise said Option. The deposit of said notice in the United States mail, addressed to the Seller, shall be deemed sufficient notice given.

### T E R M S   O F   S A L E

PURCHASE PRICE: It is understood and agreed that the total purchase price shall be the sum of Forty Thousand and No/100------------------------------------------------------, ($40,000.00), in lawful money of the United States of America, upon possession and conveyance by Deed or merchantable title.

TERMS:  (Other than all cash).

Cash.

Ten     (10)
POSSESSION:  On or before thirty (30) days after receipt of notice of Buyer's election to purchase, Seller shall deliver possession of the property.

TITLE INSURANCE:  Seller agrees that it will immediately, upon notice from the Buyer of the exercising of the Option, secure a Title Insurance Policy in the amount of Forty Thousand and No/100---------------------------------------, ($40,000.00), showing a merchantable title in the Seller, free and clear of all liens and encumbrances, except current taxes and assessments.

Buyer shall have fifteen (15) days from the receipt of said Title Insurance Policy within which to have the same examined. If there are objections to Seller's title, Seller shall have a reasonable time to correct the same. If no objections are made within fifteen (15) days, then Buyer shall be presumed to have accepted said title as merchantable. If Seller does not remove said objections, if any, Buyer may do so and deduct the cost from the purchase price.

TAXES AND ASSESSMENTS: It is understood and agreed that Seller shall pay all taxes and assessments to date of possession, and that Buyer shall pay all taxes and assessments after date of possession.

REALTORS FEE: Seller agrees to pay to PAUL B. LARSEN & ASSOCIATES, INC. a real estate agent's fee in the amount of ___None___ percent, (___0 %___), of the sales price when the sale is completed.

EARNEST MONEY DEPOSIT: It is understood and agreed that in the event the Buyer exercises the Option herein granted, the earnest money deposit shall be credited against the purchase price. In the event the Buyer does not exercise the Option herein granted, the earnest money shall be forfeited by the Buyer to the Seller as liquidated damages and not as a penalty.

DATED this ___5th___ day of ___November___, 19 79 .

_James M. McClary_

_Mary Jane M. Clary_
SELLER

_Paul B. Larsen_

_Iretta N. Larsen_
BUYER

STATE OF IDAHO          )
                       :ss
COUNTY OF _Ada_        )

On this _14_ day of _November_, 19 _79_, personally appeared _James and Mary Jane M. Clary_ and acknowledged to me that _they_ executed the foregoing instrument.

_Sally J Clark_
Notary Public For Idaho
Residing At _Boise_, Idaho

STATE OF IDAHO          )
                       :ss
COUNTY OF _Ada_        )

On this _7th_ day of _November_, 19 _79_, personally appeared _Paul B. Larsen and Iretta N. Larsen_ and acknowledged to me that _they_ executed the foregoing instrument.

_Wayne Burch_
Notary Public For Idaho
Residing At _Boise_, Idaho

(2)

# PIONEER TITLE COMPANY
## OF ADA COUNTY

BOISE, IDAHO

TITLE INSURANCE • ESCROWS
### CLOSING STATEMENT

AMENDED

SELLER: McClary, James D. & Mary Jane          ADDRESS:

BUYER: Larsen, Paul B. & Iretta N.             . PRORATION DATE: 2-1-80

BROKER:                                        LOAN NO.

ESCROW OFFICER:  David E. Sells                ESCROW NO. P 48570

| | Debit | Credit |
|---|---|---|
| SALES PRICE: | | |
| EARNEST MONEY PD. TO: | | 40,000.00 |
| DEPOSIT INTO ESCROW | | |
| | | |
| LOAN AMOUNT | | |
| INTEREST @ | | |
| RESERVES: Taxes        Mo. @ | | |
| Fire Ins.       Mo. @ | | |
| FHA MI         Mo. @ | | |
| | | |
| LOAN ORIGINATION FEE | | |
| LOAN DISCOUNT FEE          % | | |
| CREDIT REPORT | | |
| APPRAISAL FEE | | |
| | | |
| LOAN PAYOFF | | |
| | | |
| | | |
| LOAN ASSUMED: | | |
| INTEREST | | |
| RESERVES | | |
| | | |
| CONTRACT OF SALE: | | |
| | | |
| ESCROW FILING FEE: | | |
| | | |
| LOAN ASSUMPTION FEE: | | |
| | | |
| SEWER: | | |
| | | |
| IRRIGATION: | | |
| | | |
| L. I. D. | | |
| TAXES: 1980 prorated on lot estimate 1-1-80 | 12.69 | |
| | | |
| FIRE INSURANCE | | |
| | | |
| TITLE INSURANCE   Owners policy premium | 222.50 | |
| | | |
| RECORDING | | |
| ATTORNEY FEE | | |
| BROKER'S COMMISSION | | |
| | | |
| | | |
| | | |
| ESCROW WITHHOLD: | | |
| | | |
| ESCROW CLOSING FEE:   one half share | 55.00 | |
| BALANCE | 39,709.81 | |
| TOTAL | 40,000.00 | 40,000.00 |

We hereby certify that the foregoing is a true and
correct statement of funds received and disbursed
by us in the above closing, and that all parties have
received a copy.

PIONEER TITLE COMPANY OF ADA COUNTY

By:
       David E. Sells

Date:  2-19-80

We, the undersigned, have read and approved the
above closing statement.

James D. McClary

Mary Jane McClary

## ESCROW INSTRUCTIONS

Seller McClary, James D. & Mary Jane _____

Buyer Larsen, Paul B. & Iretta N. _____          Escrow No. P 48570

PIONEER TITLE COMPANY OF ADA COUNTY:          Date: 2-6-80

    I hand you herewith an executed warranty deed in favor of Paul B. & Iretta N. Larsen

_____ which you are authorized to use in connection with your above numbered Escrow upon payment for my account of $40,000.00 demand for deed _____

and when you can issue your Owners _____ Title Insurance Policy in your usual form, containing the printed exceptions usual in such policies (with your liability thereunder not to exceed $ 40,000.00 _____) on the following described real property situated in the County of Ada _____ and State of Idaho, to-wit:

    Lot D. in Block B Capital Sites Subdivision

which will show record title to said property vested in Paul B. Larsen and Iretta N. Larsen, husband and wife _____ free and clear of incumbrances, except building and use restrictions, easements, zoning and building laws and ordinances, if any, as the same may now appear of record, printed conditions and exceptions contained in form of title insurance policy herein provided for, and

    Mortgage-deed of trust, executed by_____ in favor of _____ the payment of $_____ to secure and exceptions numbered 2,3,4,5,6 & 7 and 1980 taxes _____ in your commitment No. P 48570 Dated 10-30-79 _____, which the undersigned have read and approved.

    I authorize you to deduct or pay, before the closing of this Escrow, the following:

1. 1980 taxes prorated from 1-1-80 to 2-1-80 based on estimate    $    69.44 *12.69*
2. Owners title insurance premium    222.50
3. One half share of escrow closing fee    55.00
4. Balance due to the undersigned: Please indicate if you want a check sent to you or credited to an account here:    39,653.06

                     *Check to be delivered*

    It is understood that water and utility charges will be adjusted between the seller and buyer outside this escrow. — In anything in this escrow relating to fire insurance, including adjustments, if any, you shall be fully protected in assuming that each policy is in force and that the necessary premium therefor has been paid, all matter regarding cancellation and transferring of fire insurance will be handled outside of escrow. — You will file for record the necessary legal instruments and then pay off such incumbrances of record as may exist at the time of filing such instruments, to vest the title as above stated, and shall not be held responsible for any liens that may attach after such filing or recording. — You are not required to ascertain compliance with any "consumer credit protection," truth in lending," or similar laws, and it is agreed you will have no liability for loss or damage arising out of non-compliance with said laws. — All adjustments to be made on a basis of a calendar year. — When requested to do so, a copy of the closing statement showing disbursements, in accordance with these instructions may be delivered to the realtor who consummated the transaction, the mortgagee or its agent or to any attorney.

    Any amendment of or supplements to any instructions must be in writing and if you are unable to comply with the instructions within 15 _____ days after date, said money and/or instruments shall be returned to me on my written demand, but in the absence of such demand you will proceed to comply with these instructions as soon as possible.

    In the event that any controversy should arise between the parties hereto or with any third person, you shall not be required to determine the same or to take any action in the premises, but you may await settlement of any such controversy by joint instructions of the parties or by appropriate legal proceedings. In the event that you should become a party to any such legal proceedings, we jointly and severally agree to pay and to hold you harmless from and against any and all costs, charges, damages, attorneys' fees or other expense which you in good faith may incur.

    Receipt of money and/or instruments hereinabove mentioned is hereby acknowledged.

                  _James D. McClary_ _____
                  James D. McClary

PIONEER TITLE COMPANY
OF ADA COUNTY

                  _Mary Jane McClary_ _____
                  Mary Jane McClary



**Paul B. Larsen**

REALTORS...since 1946

February 1, 1980

Mr. Dave Sells
Pioneer Title Company
821 West State Street
Boise, ID        83702

RE:  Lot D, Block B, Capital Sites Subdivision – Boise, Idaho.

Dear Dave:

Enclosed is an executed copy of an Option to Purchase, dated November 5, 1979,
between James D. and Mary Jane McClary, Sellers, and Paul B. and Iretta N.
Larsen, Buyers, also, my check for $40,000 to cover the total purchase price.

Your company issued Commitment Number P-48570 for title insurance in the amount
of $40,000.  The quoted premium was $222.50.  With the commitment for title
insurance was a plat of Capital Sites Subdivision, showing the exact dimensions
of the property in question.

You are hereby requested to close this transaction in accordance with the terms
of the Option to Purchase.  The McClarys may be reached at their winter address:
7940 East Camelback Road, Apartment 512, Scottsdale, Arizona, 85251.

It is agreeable to prorate the real property taxes as of February 1, 1980.  I
will be at the Furnace Creek Lodge in Death Valley, California, all of next week,
but will return to the office the following Monday.

Very sincerely,

Paul B. Larsen

PBL:lag
Enclosures

cc:  James D. McClary

*Dave — I suppose your costs will be divided 50-50 between Sellers + Buyers.*

*Paul*



# PIONEER TITLE COMPANY
## OF ADA COUNTY

## REPRESENTING PIONEER NATIONAL TITLE INSURANCE

Please Reply To:  ☒ 821 W. State St.          ☐ Suite 500          ☐ Suite D          ☐ 1235 E. Fairview
Boise, Idaho 83702          85 South Cole Road          1603 South Latah          Meridian, Idaho 83642
(208) 336-6700          Boise, Idaho 83707          Boise, Idaho 83705          (208) 888-3500
(208) 377-2700          (208) 343-8200

James D. & Mary Jane McClary

ESCROW NO.  P 48570
RE:  McClary - Larsen
DATE:  2-29-80

In connection with the above numbered Escrow, we enclose the following:

(     ) Statement of Receipts and Disbursements
( X ) Our check #  0416          in the sum of $ 39,709.81
(     ) Deed recorded          Instrument No.
(     ) Deed of Trust recorded          Instrument No.
(     ) Note dated          in the sum of $
(     ) Title Insurance Policy No.
(     ) Fire Insurance Policy in the amount $
( x ) copy of amended closing statement
( x ) copy of closing instructions

The above check represents the proceeds from the sale of the above property.

It has been a pleasure doing business with you. If we can be of further assistance please contact us.

EX. NO. 6
R. Larsen
DATE 06/22/10
ASSOCIATED
REPORTING INC.

Any other documents to which you are entitled will be forwarded as soon as they are available.

Thanks!

Yours very truly,

Pioneer Title Company
of Ada County

By: _____
David E. Sells

027



## ADDENDUM/AMENDMENT # _1_ (1,2,3, etc.)



THIS IS AN ADDENDUM/AMENDMENT TO A PURCHASE AND SALE AGREEMENT.  READ THE ENTIRE DOCUMENT, INCLUDING ANY ATTACHMENTS, CAREFULLY BEFORE SIGNING. IF YOU HAVE ANY QUESTIONS, CONSULT YOUR ATTORNEY OR ACCOUNTANT BEFORE SIGNING.

This is an ADDENDUM ☒ or an AMENDMENT ☐ to the Real Estate Purchase and Sale Agreement and Receipt for Earnest Money.

Earnest Money Dated: __DECEMBER  24__, 19 __2000__ ID # __118623__

ADDRESS: __4848 HILLCREST DR, BOISE, ID   83705__

BUYER(S): __KAYSER__

SELLER(S): __LARSEN__

The undersigned Parties hereby agree as follows:

__HAVING REVIEWED THE PRELIMINARY TITLE REPORT, THE HOME INSPECTION REPORT, THE SELLER PROPERTY DISCLOSURE REPORT & THE GRANT OF EASEMENT BETWEEN JAMES D. McCLARY & THE SELLER, DATED 1-11-00 & RECORDED 1-12-00, THE BUYER AGREES THAT ALL CONDITIONS TO THIS SALE & PURCHASE HAVE BEEN SATISFIED AND THE BUYER'S EARNEST MONEY WILL BECOME NONREFUNDABLE UPON BUYER & SELLER SIGNING ADDENDUM #1.__

__BUYER ALSO ACKNOWLEDGES THAT REX LARSEN, LIMITED DUAL AGENT IN THIS TRANSACTION, IS A RELATIVE OF THE SELLER.__

The herein agreement, upon its execution by both parties, is made an integral part of the aforementioned Agreement.

_DR Kayser_ _____ BUYER

_Mary K. Kayser_ _____ BUYER

DATED: __1/17/00__

TIME: __NOON__  ☐ A.M. ☐ P.M.

_____ SELLER

_____ SELLER

DATED: _____

TIME: _____  ☐ A.M. ☐ P.M.

This form is printed and distributed by the Idaho Association of REALTORS®, Inc./Ada County Association of REALTORS®, Inc.  This form has been designed for and is provided only for use by real estate professionals licensed by the Idaho Real Estate Commission who are also members of the National Association of REALTORS®.
USE BY ANY OTHER PERSON IS PROHIBITED.
©Copyright Idaho Association of REALTORS®, Inc./Ada County Association of REALTORS®, Inc.  All rights reserved.

Addendum/Amendment Revised - June 15, 1999



# Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


DONALD KAYSER and            )

MARY KAY KAYSER,             )

      Plaintiffs,  )

vs.                          )          Case No. 10-119

PAM JANE McCLARY,            )

an individual,               )

      Defendant.   )

_____    )


DEPOSITION OF PAMELA JANE McCLARY

MARCH 11, 2010


REPORTED BY:


BARBARA BURKE, CSR No. 463


Notary Public

Page 21

1  that document?
2      A. Yes, but I --
3      MS. FISCHER: You know, when I said,
4  "answer honestly," I wasn't implying that she
5  hadn't answered honestly earlier.
6      My point was, I believe -- and I'm not
7  trying to testify for Ms. McClary -- I think
8  there's some confusion as to which documents
9  she's seen in the case.
10     THE WITNESS: Yes.
11     MS. FISCHER: So if you recognize it,
12 say so; if you don't, then just say so.
13     THE WITNESS: Well, looking at it now,
14 I realize that this was the easement that I
15 believe we took -- yes. I'm not sure if I took
16 this over to the Larsens (sic) or not, but I --
17     Q. (BY MR. MEULEMAN) Excuse me. You took
18 it to the Larsens?
19     A. No, no. I don't think I did. I think
20 I just went over there without paper.
21     MS. FISCHER: You mean "Kayser."
22     THE WITNESS: Oh, Kayser, Kayser,
23 Kayser. Yes.
24     Q. (BY MR. MEULEMAN) Okay. I don't want
25 to mix the two subjects.

Page 22

1      A. No.
2      Q. I was just asking you if you recognize
3  this to be the easement that is in question?
4      A. Now, yes, I do.
5      Q. Okay.
6      A. My memory has been refreshed.
7      Q. Right. It's not a trick question --
8  I just want to know that we're talking about the
9  same thing.
10     So this is the easement that's in
11 dispute in this lawsuit, as you understand it?
12     A. Yes.
13     Q. Okay. As I understand your previous
14 testimony, when you discovered a copy of that
15 easement in your father's records, that led you
16 to go have your conversation with the Kaysers?
17     A. Yes.
18     Q. And I don't remember that you said you
19 took it with you, but --
20     A. No.
21     Q. -- you just talked about it.
22     A. Yes.
23     Q. Okay. But you first learned about this
24 easement when you discovered it in your father's
25 records shortly after his death in 2004?

Page 23

1      A. Yes, a few weeks, give or take.
2  I can't give you an exact timeline.
3      Q. That's fine. Could I direct your
4  attention to the third paragraph of Exhibit 1
5  that begins with the word, "Whereas." Do you
6  see that?
7      A. Yes.
8      Q. Would you just read that to your
9  yourself, and I've got some questions about it.
10     A. Okay. (Pause.) Yes.
11     Q. Do you see that paragraph refers to a
12 verbal agreement between your father and the
13 Larsens?
14     A. Yes.
15     Q. Do you have any knowledge of what
16 verbal agreement that's referring to?
17     A. Yes.
18     Q. And what is your knowledge about that?
19     A. It was after the Larsens had purchased
20 the property, and when I would -- when they were
21 here in the summers, I would see Mr. Larsen
22 practicing his chip shots. It was problematic
23 because he was going blind, so it was kind of his
24 golf course.
25     MS. FISCHER: The question was, "Do you

Page 24

1  have any information about what that verbal
2  agreement was?"
3      THE WITNESS: As far as I knew, my
4  father called it a "gentlemen's agreement." He
5  was going to let -- he wasn't going to build, and
6  that was the original agreement from 20 years
7  before. It had happened a long time before. It
8  was after the Larsens had built their house,
9  I believe.
10     Q. (BY MR. MEULEMAN) And your father
11 referred to it as a "gentlemen's agreement"?
12     A. Yes.
13     Q. And did you learn of this --
14     A. This was not their agreement. Their
15 agreement was simply that while the Larsens lived
16 there, my dad wouldn't build anything there.
17     Q. Okay. And this is information you
18 obtained from whom? Who told you this?
19     A. My father, and I believe -- yes.
20 I believe I may have been around that summer --
21 I'm unsure, but my father talked about it.
22     Q. But you think that agreement was
23 several years before this easement?
24     A. It was when the Larsens -- after they
25 had first bought the house in, I believe -- I

Page 25

1    would have to refer to papers as to what year
2    they purchased the house.
3        Q. It was around 1980, I think.
4        A. Okay. Yes.
5        Q. What brought up the subject between you
6    and your father about this gentlemen's agreement?
7        A. Nothing. He was talking, and Mr. Larsen
8    and Mrs. Larsen would -- I mean, there wasn't an
9    occasion. It's just that I recall just with my
10   father in conversations.
11       Q. And Mr. Larsen, that's this Paul B.
12   Larsen and Iretta N. Larsen --
13       A. Yes.
14       Q. -- who are the grantees under this
15   easement --
16       A. Um-hmm. (Nodding head.)
17       Q. -- owned the property that is now the
18   Kaysers' property; right?
19       A. Yes.
20       Q. And how did the Larsens acquire the
21   property, do you know?
22       A. They purchased it from my father.
23       Q. Okay. And that would be about 1980?
24   I won't -- I think that's about the right time.
25       A. Yes. It might be earlier than that.

Page 26

1    I just -- I'm sorry -- I really can't give you an
2    exact date.
3        Q. Okay. And in 1980 or roughly then, you
4    were then living in Denver?
5        A. Yes.
6        Q. What I'm trying to figure out is when
7    your father described to you this gentlemen's
8    agreement, what brought up the subject -- if you
9    can remember?
10       A. I have no idea. It was just in regular
11   conversation.
12       Q. Do you have an idea of when that
13   happened, this discussion?
14       A. I'm assuming -- I can't give you an
15   exact date. It was, I think, a few months after
16   the Larsens had bought the property, but I'm not
17   sure.
18       Q. Okay. Was this a conversation just
19   between you and your father, or were there other
20   people involved?
21       A. No. My mother may have been there,
22   but, you know, I really don't recall.
23       Q. Did you only have one conversation with
24   your father about that gentlemen's agreement?
25       A. I don't know.

Page 27

1        Q. And the best you can remember of your
2    father's description of the gentlemen's agreement
3    that he wouldn't build anything on the property
4    that's the subject of this easement?
5        MS. FISCHER: Object to the form.
6        THE WITNESS: I didn't know about --
7    at that time I didn't know about this easement.
8    I don't believe this easement existed when the
9    Larsens bought it.
10       Q. (BY MR. MEULEMAN) Right. What
11   I'm trying to figure out is what your father
12   described to you to be the substance of the
13   gentlemen's agreement.
14       A. All he said was that as long as the
15   Larsens lived there, he agreed not to build
16   anything there.
17       Q. Okay. And it's your belief that it's
18   that gentlemen's agreement that would be referenced
19   in this easement as the "verbal agreement"?
20       A. Yes.
21       MS. FISCHER: Object as to form.
22       THE WITNESS: Yes. I believe so.
23       Q. (BY MR. MEULEMAN) But you don't know --
24       A. Yeah, I'm not sure.
25       Q. But you don't know of any other agreements,

Page 28

1    do you?
2        A. No.
3        Q. Okay. In Paragraph 1 of this
4    easement -- do you see that?
5        A. Um-hmm. (Nodding head.)
6        Q. It says, "In consideration of the
7    verbal agreement referred to above and other good
8    and valuable consideration." Do you know what
9    that might mean?
10       A. No. As to -- no. There was no --
11       MS. FISCHER: "Yes" or "No."
12       THE WITNESS: Yes.
13       Q. (BY MR. MEULEMAN) Do you know what the
14   reference to "other good and valuable consideration"
15   might be?
16       A. No.
17       Q. Okay. In paragraph 3 of the easement
18   you'll see that it states that there won't be any
19   construction of fences and trees and the like on
20   the property "-- without the prior consent of the
21   owner of Lot D," and that would be either the
22   Larsens or the Kaysers, wouldn't it?
23       A. Not at this time. It would be only the
24   Larsens.
25       Q. Okay. Did your father say anything

Page 97

1    Q. What would you expect to find?
2    A. A bank deposit of some amount of money.
3    Q. So you didn't find any bank deposit --
4 on what date? What were you looking for?
5 I mean, I'm trying to think what you would be
6 looking for to reach that conclusion?
7        MS. FISCHER: Object to the form of
8 the question.
9        THE WITNESS: We'd be looking for money.
10       MS. FISCHER: I'll object to the form.
11 She hasn't said she looked for anything yet.
12    Q. (BY MR. MEULEMAN) And which date did
13 you look for? Was it the date of the written
14 easement?
15       MS. FISCHER: Object to the form. She
16 hasn't testified that she was looking for any
17 deposit.
18       THE WITNESS: We were simply going
19 through files and papers.
20    Q. (BY MR. MEULEMAN) And you went through
21 files and papers and didn't see any money?
22    A. Yes.
23    Q. And you looked in the bank deposits?
24    A. We had the banking records, yes. They
25 were part -- there were a lot of things to go

Page 98

1 through for the Estate, and as we were doing
2 that, we were on the lookout, but we never found
3 anything.
4    Q. Okay. And what I'm trying to get to is
5 when you were looking -- you were looking for a
6 specific period of time, the day he may have
7 received money for this easement?
8        MS. FISCHER: Same objection.
9        THE WITNESS: Well, we didn't know
10 about the easement at the time. Then when we
11 learned about the easement, you know, we were
12 looking for that.
13       There isn't -- one of the things is
14 that there's no mention of any sum in this
15 easement that had been exchanged.
16    Q. (BY MR. MEULEMAN) Right. Okay.
17 And that's all you know about the lack of
18 consideration?
19    A. Um-hmm. (Nodding head.)
20    Q. Okay.
21    A. Yes.
22    Q. Let me go to the top of the second
23 page, please. The last sentence of the paragraph
24 that comes over says, "As I discussed with
25 Kayser's first attorney, Steve Rand, if Mr. Kayser

Page 99

1 wants the McClary lot, he should purchase it."
2    A. Um-hmm. (Nodding head.)
3    Q. Did you know that your lawyer had
4 suggested that Mr. Kayser purchase the McClary lot?
5        MS. FISCHER: Object to the form.
6        THE WITNESS: No. I --
7        MS. FISCHER: "Yes" or "No."
8        THE WITNESS: No.
9    Q. (BY MR. MEULEMAN) Did you have any
10 intention of offering to sell the easement parcel
11 Mr. Kayser?
12    A. No. I made it very clear the lot went
13 with the house.
14    Q. Okay. Is your house for sale now?
15    A. No.
16    Q. And it's not been listed since you
17 previously listed the house, has it?
18    A. No.
19    Q. Okay. In connection with your
20 ownership of the easement parcel, have you ever
21 protested a tax assessment or objected to the
22 tax appraisal for that lot?
23    A. Yes.
24    Q. When?
25    A. It was at some point probably a

Page 100

1 year and a half, two years -- it wasn't until I
2 got the property in my name, and I went down to
3 the tax assessment -- the property assessment
4 office and took the document.
5    Q. Which document is that?
6    A. The easement.
7    Q. Oh, okay.
8    A. And --
9        MS. FISCHER: The question was "When?"
10       THE WITNESS: Oh, sometime after --
11    Q. (BY MR. MEULEMAN) After you acquired
12 the property?
13    A. Yes.
14    Q. Tell me, what did you tell the Tax
15 Assessor in connection with this easement?
16    A. I showed it to him.
17    Q. Why?
18    A. Because it had an effect on the value
19 of the property.
20    Q. Okay. And did the Tax Assessor change
21 the values for you?
22    A. Yes, he did.
23    Q. Did he change the value on the
24 residence parcel or just on the easement parcel?
25    A. On the easement.

Page 101

1    Q.  And that would have been somewhere in
2  2005 or so when you acquired it?
3    A.  I can't give you an exact date.
4  I don't know.
5    Q.  Okay.  Well, why would you take an
6  easement down to the Tax Assessor that you didn't
7  believe was valid?
8    A.  Because it had to do with the Estate.
9  It changed the value of the property.
10   The Tax Assessor, I believe, had had it
11  at $162 -- I'm sorry -- $162,000 -- that may be
12  incorrect -- and when they redid the -- oh, what
13  do you call it, the --
14   Q.  Appraised value?
15   A.  Yes, the appraised value -- they redid
16  the appraisal, and the value on it went from
17  $162,000 to 0.
18   Q.  To 0?
19   A.  Yes.  That's what the Tax Assessor said
20  and what he did.
21   Q.  So you then got the benefit of reduced
22  taxes on that lot, I take it?
23   A.  Yes, and I also -- yes.
24   Q.  And did you also use the easement in
25  valuing the amount of your father's estate?

Page 102

1    A.  That is, I believe, what Ron Daly and
2  John McGown did.
3    Q.  And so for the purpose of disposing of
4  your father's estate through probate?
5    A.  Yes, they revised it.
6    Q.  They reduced it because of the easement?
7    A.  Yes.
8    Q.  Okay.  Anybody else that you took the
9  easement to to demonstrate the value of the
10  property?
11   A.  No, not -- no.
12   Q.  Why do you think the easement is valid
13  for tax assessment purposes, but not valid for
14  the Kaysers' purposes?
15   MS. FISCHER:  Object as to the form.
16   THE WITNESS:  I did what Mr. McGown
17  told me that I had to -- you know, I should file
18  it because my -- that was to assist the Estate
19  and reduce the tax on it.
20   Q.  (BY MR. MEULEMAN)  Mr. McGown is the
21  one that told you to do that?
22   A.  Yes.
23   Q.  Did Mr. Salladay object to that?
24   A.  No.  That wasn't -- there were --
25   MS. FISCHER:  "Yes" or "No."

Page 103

1    Q.  (BY MR. MEULEMAN)  I'm just wondering
2  because you said that Mr. Salladay was
3  representing you.
4    A.  Yes.
5    Q.  Did either one of them tell you to take
6  it to the Tax Assessor?
7    MS. FISCHER:  Who?  Either one of who?
8    MR. MEULEMAN:  Mr. McGown or
9  Mr. Salladay.
10   MS. FISCHER:  I'll object to the form.
11   THE WITNESS:  I'm not --
12   MS. FISCHER:  Just a second.  You're
13  not to answer any questions regarding what
14  Mr. Salladay told you to do.
15   THE WITNESS:  Oh, okay.
16   Q.  (BY MR. MEULEMAN)  Whose idea was it to
17  take it to the Tax Assessor?
18   MS. FISCHER:  Same objection.
19   THE WITNESS:  I can't recall which one
20  it was -- who it was.
21   Q.  (BY MR. MEULEMAN)  And you think this
22  was fairly shortly after you acquired the deed in
23  2005?
24   A.  I believe -- I just -- I really can't
25  give you a definite date on that.

Page 104

1    Q.  How is the property being -- what's the
2  current appraised value of the easement parcel?
3    A.  Zero.
4    Q.  So at least from the time you were able
5  to change the valuation until now, you have been
6  relying upon that valuation for tax purposes?
7    A.  Yes.
8    MR. MEULEMAN:  That's all I have.
9    MS. FISCHER:  Give us a quick break.
10  I don't think I have anything, either, but I just
11  want to review my notes.
12   MR. MEULEMAN:  Okay.
13   (Recess taken.)
14   MS. FISCHER:  I don't have any other
15  questions.
16   MR. MEULEMAN:  That's all I have.
17   THE REPORTER:  Julie, would you like a
18  copy of her transcript?
19   MS. FISCHER:  Yes, please.
20   (Deposition concluded at 11:52 a.m.)
21   (Signature requested; read and sign
22   secured by Julie Klein Fischer.)
23
24
25

PUBLIC RECORDS
ADA COUNTY RECORDER
J. DAVID NAVARRO

# GRANT OF EASEMENT

FEE _6_ DEPUTY

## 100003146

Agreement made on this _11th_ day of January, 2000, between **JAMES D. McCLARY**, a single man, of Boise, Idaho, (hereinafter "Grantor"), and **PAUL B. LARSEN and IRETTA N. LARSEN**, husband and wife, of Boise, Idaho, (hereinafter "Grantee").

## W I T N E S S E T H

WHEREAS, Grantor is the owner of certain real property located in Ada County, State of Idaho described as:

Lot B, Block B, Capitol Sites Subdivision, a re-subdivision of Lots 3, 4, 12, 13 and a portion of Lot 5, Block B, Capitol Sites Subdivision records of Ada County, State of Idaho;

WHEREAS, Grantees are the owners of certain real property located in Ada County, State of Idaho described as:

Lot D, Block B, Capitol Sites Subdivision, a re-subdivision of Lots 3,4,12,13 and a portion of Lot 5, Block B, Capitol Sites Subdivision records of Ada County, State of Idaho;

WHEREAS, Grantor did make a verbal agreement with Grantees at the time that Grantees purchased said Lot D from Grantor that, as a material consideration for the purchase of said Lot D, Grantor would not build a structure on said Lot B.

## NOW THEREFORE IT IS AGREED AS FOLLOWS:

1. In consideration of the verbal agreement referred to above and other good and valuable consideration, Grantor does hereby grant to Grantees an easement for an unobstructed view over said Lot B, Block B, Capitol Sites Subdivision, (described above) hereinafter the "servient estate" for the benefit of said Lot D, Block B, Capitol Sites Subdivision, (described above), hereinafter the "dominant estate."

2. The easement granted in this instrument shall run with the land and shall be appurtenant thereto and shall inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns.

3. The owner of said Lot B, Block B, Capitol Sites Subdivision (described above), without the prior written consent of the owner of said Lot D, Block B, (described above) shall not construct anything on said Lot B, Block B, including fences, trees, shrubs, swimming pool, garage, home or personal property including recreational vehicles that would in any way degrade or restrict the view from said Lot D, Block B.

4. This easement would not affect the right of the owner of Lot D, Block B to purchase all or a portion of said Lot B, Block B, in which event such easement would not be applicable to the portion so purchased.

GRANT OF EASEMENT, P. 1
20002-01       01/10/00

Exh. No. _1_
Date _3-11-01_
Name _J. McCLARY_
M & M Court Reporting

Exh. 2

# Exhibit C

# WARRANTY DEED

Order No.:55808-KC-JB

**FOR VALUE RECEIVED**

    **Paul B. Larsen and Iretta N. Larsen, Husband and Wife**

the grantor(s), do(es) hereby grant, bargain, sell and convey unto

    **Donald R. Kayser and Mary K. Kayser, Husband and Wife**

whose current address is

    **4848 Hillcrest Drive Boise, ID  83705**

the grantee(s), the following described premises, in Ada County, Idaho, TO WIT:

**Lot D in Block B of CAPITOL SITES SUBDIVISION, (a Resubdivision of Lots 3, 4, 12, 13 and a portion of Lot 5, Block 8, Capitol Sites Subdivision, according to the plat thereof, filed in Book 11 of Plats at Page 580), according to the official plat thereof, filed in Book 46 of Plats at Page(s) 3767, Official Records of Ada County, Idaho.**

    TO HAVE AND TO HOLD the said premises, with their appurtenances unto the said Grantee, heirs and assigns forever.  And the said Grantor does hereby covenant to and with the said Grantee(s), that (s)he is/are the owner(s) in fee simple of said premises; that they are free from all encumbrances Except: Current Year Taxes, all existing patent reservations, easements, right of way, protective covenants, zoning ordinances, and applicable building codes, laws and regulations.

And that (s)he will warrant and defend the same from all lawful claims whatsoever.

Dated: January 19, 2000

_Paul B. Larsen_       _Iretta N. Larsen_

Paul B. Larsen         Iretta N. Larsen

RECORDED - REQUEST OF
AMERICAN LAND TITLE CO.

ADA COUNTY RECORDER
J. DAVID NAVARRO
BOISE, IDAHO

FEE _3.00_ DEPUTY _Hooper_

State of Idaho      2000 FEB -1  PM 4: 23

County of Ada      }

100008274

On this 19th day of January, in the year 2000, before me, a Notary Public in and for said state, personally appeared    Paul B. Larsen and Iretta N. Larsen

known or identified to me to be the person(s) whose name(s) subscribed to the within instrument, and acknowledged to me that  he/she/they executed the same.
IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal the day and year first above written.

_Kimberlie S. Carter_

Notary Public for the State of Idaho
Residing at: Boise, Idaho
Commission Expires: _4/22/2001_



# Exhibit D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


DONALD KAYSER and MARY KAY KAYSER,      )
                                        )
                    Plaintiffs,         )    Case No.
vs.                                     )  CV10-00119-REB
                                        )
                                        )
                                        )
PAM JANE McCLARY, an individual,        )
                                        )
                    Defendants.         )
                                        )


DEPOSITION OF MARY KAY KAYSER

June 16, 2010

Boise, Idaho


Rebecca M. Martin, CSR No. 759

Mary Kay Kayser                    June 16, 2010                    Kayser v. McClary

1      A.   I don't remember.

2      Q.   Did you have any information about

3   medications that Mr. McClary was taking in 2000?

4      A.   No.

5      Q.   Your husband testified that he had a

6   discussion on the telephone with Mr. McClary after

7   the Grant of Easement was signed.  Did your husband

8   share with you any information about that telephone

9   conference?

10      A.   I don't remember.

11      Q.   With respect to the oral agreement

12   between Mr. Larsen and Mr. McClary related to the

13   easement, do you have any information about

14   consideration or value that was given in exchange for

15   that easement?

16      A.   No.

17      Q.   Regarding the written Grant of

18   Easement -- again, that document is the one that

19   we've been referring to in front of you that was

20   executed by Mr. McClary in January of 2000 -- are you

21   aware of any compensation value that was given to

22   Mr. McClary in exchange for his executing that

23   written agreement?

24      A.   No.

25      Q.   You're not aware of you or your husband

Mary Kay Kayser                June 16, 2010              Kayser v. McClary

1    paying him or giving him anything for that easement?

2          A.   No.   It never came up.

3          Q.   How about, again, Mr. Larsen, you're not

4    aware of Mr. Larsen, Rex Larsen, Paul Larsen, giving

5    Mr. McClary anything in exchange for that written

6    agreement?

7          A.   No.

8          Q.   In December 1999, about the time that

9    you entered into the Purchase and Sale Agreement for

10   the Hillcrest property, were you aware that Pam

11   McClary was staying with her father at that time?

12         A.   What was the date again?

13         Q.   December of 1999 when you and your

14   husband entered into the Purchase and Sale Agreement

15   for the Larsen's property.

16         A.   No.   I didn't know whether she was or

17   not.

18         Q.   Do you recall seeing them at Christmas

19   that same year?

20         A.   No.

21         Q.   Do you recall whether you went to a

22   Christmas party at their home in December of 1999?

23         A.   We did not.

24         Q.   After you moved into your home on

25   Hillcrest Drive, did Mr. McClary ever come to your

# Exhibit E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT IDAHO


DONALD KAYSER and MARY KAY KAYSER,     )
                                       )
                 Plaintiffs,           )    Case No.
vs.                                    )  CV10-00119-REB
                                       )
                                       )
PAM JANE McCLARY, an individual,       )
                                       )
                 Defendants.           )
                                       )


DEPOSITION OF DONALD KAYSER

June 16, 2010

Boise, Idaho


Rebecca M. Martin, CSR No. 759

[Page 17]

1      A.   I see the signatures.

2      Q.   Is that your signature?

3      A.   Yes.

4      Q.   Did Rex Larsen fill out the portions of

5  this Exhibit 2 that are not typed, the handwritten

6  portions?

7      A.   I believe he did.  To the best of my

8  recollection, other than the signatures.

9      Q.   Take a look, if you will, at Page No. 3.

10  It's got the 3 on the top right of it.  Paragraph 29,

11  it's the condition or contingency you referred to

12  earlier?

13      A.   Right.

14      Q.   It says, if I'm reading it correctly,

15  seller providing buyer satisfactory documentation

16  showing the McClary lot behind subject property

17  cannot be used as a building site for a new home; you

18  see that?

19      A.   Yes.

20      Q.   Is that a requirement or condition that

21  you insisted upon being in the Purchase and Sale

22  Agreement?

23      A.   Yes.

24      Q.   Why did you request that condition be

25  included in the Purchase and Sale Agreement?

Donald Kayser                    June 16, 2010                    Kayser v. McClary

1       A.   The property was advertised as having a

2  good view.   I think that's -- page 5 talks about

3  that; I haven't looked at it -- unobstructed views,

4  park-like backyard.   I asked Rex, who was also

5  representing his father who owned the property back

6  there, was that part of the sale.   He explained that

7  it was not, that it was owned by Jim McClary, and

8  there was an agreement that the view would not be

9  obstructed.

10       I said, is there a written copy of that

11 agreement, and he said, no.   And I said, well, I

12 think it's essential to my offer that I see a written

13 copy of that agreement.

14       Q.   Let me draw your attention to the last

15 page of Exhibit No. 2, which I think you referred to

16 in terms of unobstructed views.

17       A.   Uh-huh.

18       Q.   The last page of that appears to be an

19 advertisement for the property?

20       A.   Right.

21       Q.   Do you believe that was the

22 advertisement that you may have seen in connection

23 with your purchase of the land and the house?

24       A.   It seems to be.

25       Q.   And where is it that you're referring to

1      in terms of the unobstructed view?

2              A.   In the addendum at the very bottom.

3              Q.   Okay.  So that's what prompted you to

4      ask the question of Rex Larsen?

5              A.   Yes.

6              Q.   Prior to asking Rex Larsen about the

7      ownership of the McClary lot, did you have any

8      information about an easement or agreement between

9      Mr. Larsen and Mr. McClary?

10             A.   No.

11             Q.   So you knew only what Rex Larsen told

12     you, which was that there was an agreement that the

13     view would not be obstructed; is that fair?

14             A.   That's correct.

15             Q.   Let me ask you this:  Did you ever

16     discuss, after entering into this contract, including

17     the Condition No. 29 -- did you ever discuss this

18     issue about an unobstructed view with Paul Larsen?

19             A.   I don't recall.

20             Q.   Did you ever discuss it with his wife?

21             A.   I don't recall.

22             Q.   Why was it important for you that --

23     that agreement between Mr. Larsen and Mr. McClary

24     that Rex Larsen described to you, why was that

25     important for you to be put into writing or somehow

1    documented?

2            A.   That view added value to the property

3    and justified the price that I was willing to pay.

4    And if I were ever to sell the property, I wanted to

5    be sure that that view was protected, because I was

6    paying for it when I purchased it.   And when I sold

7    it, I wanted to be sure that it would survive.   So I

8    asked that it be put in writing so it could be

9    recorded.

10           Q.  Were you just relying on Rex Larsen that

11   there wasn't a formal agreement, or did you ever

12   review, like, a preliminary title commitment to see

13   whether there were any easements recorded?

14           A.   No.   I relied on Rex.   I did that before

15   I made the offer.

16           Q.  Did you have any discussion with Rex

17   about whether it would be possible to document that

18   agreement?  By agreement, I mean the verbal agreement

19   that he described to you between Mr. McClary and

20   Mr. Larsen?

21           MR. MEULEMAN:   Why don't you clarify whether

22   it was possible?   It actually got done.   I'm not sure

23   what you're going for here.

24           Q.   BY MS. FISCHER:   Did you understand my

25   question?

1          A.   Say it again.

2          Q.   **Did you ever have any discussion with**

3    **Rex Larsen about whether or not it was going to be**

4    **possible, or it may be problematic, for example, to**

5    **get documentation of the agreement between**

6    **Mr. McClary and Mr. Larsen?**

7          A.   To the best of my recollection, when I

8    asked him to put that contingency in the contract as

9    part of our offer, I said, is this probable that I'll

10   have this.  To the best of my recollection, he said

11   yes.

12         Q.   **So you questioned whether or not that**

13   **was realistic, maybe, to get the agreement between**

14   **McClary and Larsen documented?**

15         A.   I guess that's fair, because if it

16   wouldn't be, I wouldn't make the offer.

17         Q.   **Is your position you would not have**

18   **purchased the property at the price you paid for it,**

19   **but for -- unless the easement -- the view easement,**

20   **for lack of a better word, was documented?**

21         A.   That is correct.

22         Q.   **I don't want to keep repeating myself,**

23   **but your best recollection is that Rex Larsen said to**

24   **you that, yeah, I think it's possible, in terms of**

25   **getting the agreement formally documented?**

1    Q.  Do you have any reason to believe that
2  this warranty deed, which is marked as Exhibit No. 4,
3  isn't the deed that conveyed the property to you and
4  your wife?
5    A.  I have no reason to question it.
6    Q.  Between the dates that Rex Larsen
7  provided you with a copy of the written easement
8  agreement and the date you actually acquired or
9  closed on the transaction, which I'm going to just
10  assume is around January 19th, 2000, between those
11  dates, did you have any discussions with Jim McClary
12  about either the written agreement or the verbal view
13  easement agreement?
14    A.  Let me make sure I understand your
15  question.  The dates between the time I was shown the
16  recorded agreement and the closing on the property?
17    Q.  Yes.
18    A.  Yes.
19    Q.  You did have communications with
20  Mr. McClary?
21    A.  I did.
22    Q.  And how many times did you visit with
23  him?
24    A.  To the best of my recollection, just
25  once.

Donald Kayser                       June 16, 2010                    Kayser v. McClary

1      Q.   Tell me about that.   Did you call him?

2  Did you go see him?   Did he phone you?   How did that

3  come about?

4          A.   I phoned him.

5          Q.   Why did you call him?

6          A.   Jim and I were very close friends.   We

7  occupied the house that he built on 4909 Roberts

8  Road, which made us his next-door neighbor when we

9  bought that house.   He was very proud of that, and

10  was glad that we were in the house and would tell us

11  all kinds of interesting stories about it.   So I

12  didn't want him to think we were selling the house

13  that we loved and he loved and disappearing.

14          So the call was basically good news bad

15  news.   The bad news is we're selling your house, but

16  the good news is, we're moving in behind you.   We're

17  buying the Larsen property.

18          I said, we look forward to being good

19  neighbors and enjoying that view.   Tell me something

20  about the history of that, Jim.   He went on in great

21  detail to describe to me how all that developed.

22          Q.   This telephone conversation occurred by

23  phone only?

24          A.   Yes.

25          Q.   You initiated the phone contact?

Donald Kayser                   June 16, 2010                   Kayser v. McClary

1           A.   I did.

2           Q.   Do you recall when you phoned

3   Mr. McClary whether he answered the phone, or did

4   someone else answer it?

5           A.   I can't recall.

6           Q.   How long do you think you were on the

7   phone with him during that one conversation?

8           A.   Best of my recollection, probably 15

9   minutes.

10          Q.   Just for clarification, at that time you

11  had the phone conversation with him, the Grant of

12  Easement, Exhibit No. 3 had already been recorded?

13          A.   Yes.

14          Q.   How did the whole, "I'm going to enjoy

15  the view," topic come up?  Did you raise that?

16          A.   I think I did.

17          Q.   Why did you raise that issue?

18          A.   Because I wanted to know -- have him

19  tell me a little bit about how it developed.  And,

20  also, I think in that same conversation, I'm not

21  sure, I said, my grandkids are really going to enjoy

22  that.  Will they be able to play there when they come

23  over for a visit?

24          Q.   Just for clarification in the record,

25  when we say play there in the lot, we're referring to

1  **Mr. McClary's lot that's next to your property that's**

2  **at issue in this lawsuit?**

3           A.   Correct.

4           **Q.   So you said that he, in great detail,**

5  **described to you how this came up.  What do you mean,**

6  **this came up?  What were you referring to, he**

7  **described to me in great detail about the view?**

8           A.   About the view agreement, yes.

9           **Q.   What did he tell you?**

10          A.   That's a long time ago.  To the best of

11  my recollection, he told me that when he sold the

12  lot, that he owned, to Paul Larsen for Paul Larsen to

13  build his house, that at that time, Paul Larsen was

14  very interested in that view over that lot.  And

15  before he purchased the property, he asked Jim if he

16  could rely on that view.  And Jim said, yes, you can

17  definitely rely on it, because furthermore it's --

18  when the lot was re-subdivided or something, he said,

19  that's not a buildable lot.  And I enjoy sitting in

20  my kitchen looking out the kitchen window over that

21  nice open lot and watch the ducks come in and so on.

22               He said something about, on that basis,

23  Larsen was going to construct his house closer to the

24  back line than normally permitted by the zoning

25  department and would need an exception for it to be

Donald Kayser                    June 16, 2010                    Kayser v. McClary

1   closer to that line, and that he, Jim, supported

2   Larsen's request for an exception to build a house

3   closer to that line and wrote something to the

4   planning commission to that effect.  That's the best

5   of my recollection.

6           Q.  So Larsen, if I understand -- I

7   understand it's been a long time ago since you had

8   that discussion.  Your understanding was that

9   Mr. Larsen, Paul Larsen, in connection with building

10  his home on the McClary property -- I'm sorry, on the

11  property that you now own, wanted to verify that

12  before he did that, the view wouldn't be obstructed;

13  is that --

14          A.  Well, I think it was more before he

15  purchased the lot.  When he purchased the lot from

16  Jim McClary, he wanted assurance that nothing would

17  be built on it.

18          Q.  Did you have any discussions with

19  Mr. McClary about why that agreement had never been

20  reduced to writing prior to you purchasing it?

21          A.  No.

22          Q.  You testified, if I understood you

23  correctly, Mr. McClary told you it wasn't a buildable

24  lot anyway?

25          A.  That's correct.

1    Q.   What did you understand that to mean?

2    A.   I didn't know what that meant.

3    Q.   Do you have any understanding of what he

4    meant today?

5    A.   No.   I know he built a sewer line

6    directly across the center of it, which would make it

7    difficult to build anything on it.   But I don't know

8    what he meant by that.

9    Q.   Do you recall anything else about

10   Mr. McClary's explanation of his agreement with

11   Mr. Larsen than what you've told me?

12   A.   What I've said is the best of my

13   recollection.

14   Q.   Did you discuss with Mr. McClary why

15   you -- did the fact that you had required the

16   agreement be reduced to writing, did you discuss that

17   with him?

18   A.   No.

19   Q.   Did he know, to your knowledge, whether

20   or not that written agreement was presented to him

21   for signature based on a request that you made?

22   A.   I don't know.

23   Q.   Did you discuss the written agreement

24   with him at all?

25   A.   No.

Donald Kayser                    June 16, 2010                 Kayser v. McClary

1        Q.  Did you ever discuss with Mr. Paul

2   Larsen, or his wife, at any time this verbal

3   agreement that the Larsens had with Mr. McClary?

4        A.  I don't recall.

5        Q.  Aside from this one telephone call that

6   you had with Mr. McClary after the written easement

7   agreement was recorded, did you discuss with him ever

8   again the easement issue over his property?

9        A.  Not that I recall.

10        Q.  If I asked you this, I apologize:  That

11   telephone conference, to your best recollection,

12   occurred before you closed the transaction with the

13   Larsens?

14        A.  Yes.

15        Q.  If you'll take a look at the Easement

16   Agreement, which is Exhibit No. 3.  Do you know who

17   drafted the easement agreement?

18        A.  No, I don't.

19        Q.  Did you ever ask Mr. Larsen who prepared

20   it?

21        A.  I don't recall asking.

22        Q.  Did you provide any information to

23   Mr. Rex Larsen about what you wanted in a written

24   agreement or documentation?

25        A.  No.  Not to my knowledge, other than

1    what I said in the contingency.

2        Q.   So your testimony is that based on

3    condition or the Contingency No. 29 that you required

4    be in the Purchase and Sale Agreement, that this

5    Grant of Easement, Exhibit No. 3, was created without

6    any input from you?

7        A.   That's correct.   I assume it reflected

8    what their oral agreement had been.

9        Q.   Do you know who recorded or who caused

10   to be recorded the Grant of Easement Agreement,

11   Exhibit 3?

12       A.   To the best of my recollection, I think

13   Rex said he took the initiative to have it recorded.

14       Q.   Let me ask you this:   Rex delivered to

15   you the Grant of Easement, Exhibit No. 3, shortly

16   after it was recorded.

17       A.   Correct.

18       Q.   What discussion did you have with him at

19   that point?   Did he ask you to review it and approve

20   it?   Was there any discussion about the content of

21   the easement agreement?

22       A.   To the best of my recollection, he asked

23   me, would this satisfy the contingency that I had in

24   the contract for sale, and I said yes.

25       Q.   You don't recall any other discussion?

1         A.   No.

2         Q.   Did Mr. Larsen, Rex Larsen, tell you

3   anything about how he had acquired Mr. McClary's

4   signature on this document, Exhibit 3?

5         A.   I can't recall.

6         Q.   Did you have an understanding about how

7   Mr. Rex Larsen acquired James McClary's signature on

8   this document?

9         A.   No.  I didn't know, other than he must

10  have been present, because he notarized the

11  signatures.

12        Q.   You said you were neighbors with

13  Mr. McClary, having lived in his former home, which

14  is next door?

15        A.   Correct.

16        Q.   Did you know any of the caregivers or

17  care providers that were assisting him at the time

18  you purchased the Larsen's property?

19        A.   We would see caregivers from time to

20  time with Jim, but I can't say I knew any.

21        Q.   Let me ask you this:  Why did you call

22  James McClary to talk to him about you moving from

23  one house to another rather than just go next door

24  and talk to him face-to-face?

25        A.   I don't know.

Donald Kayser                          June 16, 2010                          Kayser v. McClary

1        Q.   Prior to that telephone conversation you
2    had with Mr. McClary about the easement that you just
3    described, when is the last time that you had spoken
4    with him?
5        A.   That's hard to recall.  We would see him
6    from time to time going by.  He had been to our house
7    for neighborhood parties to see our kids.  I really
8    can't recall specifically when.
9        Q.   Sure.  Fair enough.
10       You said you saw him when you were going
11   by.  He didn't drive at the time, did he?  I'm
12   talking about the January 2000 time period.
13       A.   I don't know about then.  Yeah.
14       Q.   Do you recall ever seeing him outside,
15   about in his yard about the time you closed the
16   property from the Larsens?
17       A.   I can't recall for sure.
18       Q.   How long had it been since you'd seen
19   Mr. McClary at a neighborhood party or function prior
20   to you purchasing the Larsen's property?
21       A.   Hard to recall, a year or two.
22       Q.   Do you know whether or not Mr. McClary
23   was given a copy of the Grant of Easement, Exhibit
24   No. 3, to review before he was asked to sign it?
25       A.   I don't know.

1          Q.   Did Mr. Rex Larsen ever discuss with you

2     any concerns he had about the enforceability of

3     Exhibit No. 3, the grant easement, before you closed?

4          A.   No.

5          Q.   Again, I apologize if I asked you this

6     earlier, you didn't have any discussion with

7     Mr. McClary about the written Grant of Easement

8     itself, correct, or the terms thereof?

9          A.   To the best of my knowledge, no.

10          Q.   Did you know Pam McClary at the time you

11     entered into the agreement to purchase the Larsen's

12     property?

13          A.   I don't think so.

14          Q.   You don't think you'd ever met Pam at

15     that time?

16          A.   I don't think I had.  Wait a minute.

17     Rephrase the question.  I think I'm answering the

18     wrong question.

19          Q.   Just for the record, you're getting

20     moans from your wife which suggest maybe your answer

21     is wrong.

22          A.   You were asking when we purchased the

23     house?

24          Q.   Yeah.  At about the time you purchased,

25     which is the January 2000 time frame is what I'm

Donald Kayser                    June 16, 2010                    Kayser v. McClary

[Page 49]

1        Q.  But 29 doesn't have anything in it about

2    unobstructed views; it has to do with not building a

3    home?

4        A.  Right.

5        Q.  Okay.  If you look at Paragraph No. 1 in

6    Exhibit 3, which is the Grant of Easement again, it

7    says, in consideration of the verbal agreement

8    referred to above, another good and valuable

9    consideration, grantor grants to grantee the

10   easement.

11            Then it goes on.  You see where I'm at?

12       A.  Right.

13       Q.  What does that mean to you?  Do you

14   understand what that means, in consideration of the

15   verbal agreement?

16       A.  That there was a verbal agreement that

17   was put in writing.

18       Q.  Did you give Mr. McClary anything in

19   exchange for this written Grant of Easement?

20       A.  Did I give him?

21       Q.  Yes.

22       A.  No.

23       Q.  Did Mr. Larsen give him anything in

24   exchange for this written Grant of Easement?

25       A.  I don't know.

1          Q.  Do you have any idea when it says, and

2     other good and valuable consideration, what that is

3     referring to?

4          A.  I have no idea.

5          Q.  Do you have any information that aside

6     from the verbal agreement, any consideration,

7     anything of value was given to Mr. McClary in

8     exchange for him granting this written easement

9     agreement?

10         A.  I have no knowledge.

11              (Deposition Exhibit No. 5 was marked.)

12         Q.  BY MS. FISCHER:  I'm going to give you

13    what's now marked as Exhibit No. 5.  I'll give you

14    time to look at that.  That's an e-mail from Steve

15    Grant, who I believe is one of your attorneys, to me

16    dated February 9th, 2010.  So I'll give you a second

17    to look at that.

18         A.  Okay.

19         Q.  He's got some numbered sentences.  Let

20    me ask you this -- let me just back up.  Who is Steve

21    Grant?

22         A.  He's a personal friend and an attorney

23    who helps me on legal matters.

24         Q.  And you are copied on Exhibit 5, this

25    e-mail; is that correct?

Donald Kayser                     June 16, 2010                Kayser v. McClary

1     A.   That is correct.

2     Q.   Do you remember seeing it before today?

3     A.   Yes.

4     Q.   Did you authorize Steve Grant to e-mail

5     that information to me?

6     A.   I can't recall.

7     Q.   The first paragraph it says, Don Kayser

8     asked me to respond to your various e-mail and

9     telephone exchanges regarding the easement Jim

10    McClary granted to Paul Larsen in 1980.

11         Do you have any reason to believe that

12    you didn't authorize him to do that?

13    A.   No.  That's probably correct.  He and I

14    talked about the issue, and I was to call you, and I

15    did and didn't get a response and told him.  He said,

16    let me go ahead and contact her.

17    Q.   So when Mr. Grant contacted me, he did

18    so in the capacity as your attorney?

19    A.   Yes.

20    Q.   That sentence about the middle of the

21    e-mail, Exhibit 5, says, No. 3, the oral promise was

22    made in whole or in part as consideration for Paul's

23    purchase of Lot D; you see that?

24    A.   I do.

25    Q.   What does that mean?

Donald Kayser                    June 16, 2010                    Kayser v. McClary

1           MR. MEULEMAN:  Probably need Mr. Grant here

2      to answer the question.  It's his e-mail.

3           Q.  BY MS. FISCHER:  I want to know,

4      Mr. Kayser, what do you understand that to mean?  You

5      authorized him to send this e-mail to me.

6           A.  I explained the situation to him.  He

7      interpreted it and sent this.

8           Q.  What do you understand that sentence to

9      mean?

10          MR. MEULEMAN:  The sentence, or just that

11     phrase of the sentence?  I mean, I'm trying to figure

12     out --

13          Q.  BY MS. FISCHER:  The --

14          A.  3?

15          Q.  Yes.

16          A.  Well, that the oral agreement on the

17     view consideration was consideration for Paul

18     Larsen's purchase of the lot, yes.  That's consistent

19     with what Jim told me when I talked to him after the

20     fact on the phone about the history of the easement.

21          Q.  Do you know how much money the Larsens

22     paid to Mr. McClary for the lot?

23          A.  No.

24          Q.  Do you know what amount, if any, was

25     allocated to the value of the easement when they

Donald Kayser                    June 16, 2010                    Kayser v. McClary

[Page 53]

1    purchased the lot?

2         A.   No.

3         Q.   Is it fair that aside from what others

4    have told you, you don't have any independent

5    knowledge of whether or not any consideration was

6    given by Mr. Larsen to Mr. McClary for the verbal

7    agreement regarding the easement?

8         A.   I have no knowledge.

9         Q.   When you discussed the history of that

10   easement with Mr. McClary by telephone, did he tell

11   you anything -- did he indicate to you in any way

12   that he had been paid or was given anything in

13   exchange for agreeing not to build a structure on the

14   lot?

15        A.   All he said was having the agreement not

16   to have anything on that lot was an important part of

17   his purchase.

18        Q.   Okay.  Important part of his purchase.

19   Are you referring to --

20        A.   Larsen's purchase from McClary.

21   McClary's agreement not to do anything on that lot

22   was important to Larsen, just as not to do anything

23   on that lot was very important to me in determining

24   the price I would pay Larsen.

25        Q.   Let's go back to that, the price you

1  would pay Larsen.  What was the value of that

2  easement to you?

3          A.  It was part of the overall value.  I

4  never separated it out.

5          Q.  You said, I think earlier, I don't want

6  to put words in your mouth, that you wouldn't have

7  paid that price for the lot without the easement.

8  Did you have a number in mind that you would pay for

9  the lot?

10          A.  I wouldn't pay that price for the

11  property without the easement.  If there were no

12  easement on the property, I probably would not have

13  bought it.

14          Q.  Probably.  You might have for the right

15  price?

16          A.  No.

17          MR. MEULEMAN:  I object.  That's

18  argumentative.  He gave you his answer.

19          Q.  BY MS. FISCHER:  You're saying you

20  wouldn't have bought it without the easement?

21          A.  Correct.

22          Q.  Did you at any time discuss with any of

23  the parties we've been talking about, the Larsens or

24  the McClarys, what the easement did to the value of

25  the McClary lot?

Donald Kayser                   June 16, 2010                   Kayser v. McClary

[Page 55]

1          A.   No.

2          Q.   **Did you consider that when you requested**

3    **the easement be documented?**

4          A.   No.  Because I assumed the easement was

5    already in agreement and just being put into writing.

6          Q.   **I may have asked you this.  Again, I**

7    **don't want to repeat.  If it was already in place, it**

8    **had been sufficient for Mr. Larsen for over 20 years,**

9    **why was it important for you to have it in writing?**

10   **Were you concerned the verbal agreement wasn't**

11   **enforceable?**

12         A.   It would bother me, yes.

13         Q.   **Why?**

14         A.   Well, I'm not a lawyer, but I understand

15   verbal agreements are hard to enforce.

16         Q.   **Do you know whether or not Rex Larsen**

17   **received a commission, or any kind of compensation in**

18   **connection with selling the property from -- being**

19   **involved in the transactions from the Larsens to you**

20   **and your wife?**

21         A.   I don't know.  What does the contract

22   say?

23         Q.   **You can look at it.  It has him listed**

24   **as the agent for both parties.  There's a broker**

25   **listed on the first page, Larry Laraway?**

# Exhibit F

0008885

# WARRANTY DEED

496 6500

**FOR VALUE RECEIVED**

James D. McClary and Mary Jane McClary, husband and wife

the Grantor S , do    hereby grant, bargain, sell and convey unto

Paul B. Larsen and Iretta N. Larsen, husband and wife

the Grantee s , whose address is

the following described premises, to-wit:

Lot D, Block B, Capitol Sites Subdivision, (a Resubdivision
of Lots 3, 4, 12, 13 and a portion of Lot 5, Block B, Capitol
Sites Subdivision, according to the plat thereof, filed in
Book 11 of Plats at page 580) according to the Plat thereof,
filed in Book 46 of Plats at page 3767, records of Ada County,
Idaho.

TO HAVE AND TO HOLD the said premises, with their appurtenances unto the said GranteeS ,
thier  heirs and assigns forever. And the said GrantorS   do    hereby covenant to
and with the said Grantee S , that    t h e y   are   the owners in fee simple of said premises; that
said premises are free from all encumbrances except reservations of record, easements of
record and general tax and irrigation assessments for the year
1980 which are not yet due and payable

and that   t h e y   will warrant and defend the same from all lawful claims whatsoever.

Dated: February __, 1980

_James D. McClary_    _Mary Jane McClary_

STATE OF Arizona, COUNTY OF Maricopa

On this  12 day of   February , 19 80,
before me, a notary public in and for said State, personally
appeared

James D. McClary and
Mary Jane McClary

known to me to be the person S  whoSe name S  are
subscribed to the within instrument, and acknowledged to
me that   they         executed the same.

_Notary Public_

Residing at _____  Idaho.
Comm Expires  My Commission Expires Nov. 12, 1982

STATE OF IDAHO, COUNTY OF Ada

I hereby certify that this instrument was filed for record
at the request of PIONEER TITLE CO.

at  00  minutes past   8   o'clock a.m.,
this  21st  day of  February
19 80, in my office, and duly recorded in Book
of Deeds at page

**JOHN BASTIDA**

Ex-Officio Recorder

By _Thelma E. Nichols_   Deputy.

Fees $ 2.00
Mail to:



**PIONEER TITLE COMPANY
OF ADA COUNTY**
821 W. State St.
Boise, Idaho 83702 · 208-336-6700
Representing Pioneer National Title Insurance

035