Julie Klein Fischer
MORROW & FISCHER, PLLC
332 N. Broadmore Way, Ste. 102
Nampa, Idaho 83687
Telephone:   (208) 475-2200
Facsimile:   (208) 475-2201
ISB No.:     4601
*jfischer@morrowfischer.com*

Attorneys for Defendant


## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD KAYSER and MARY KAY KAYSER,<br><br>　　　Plaintiffs,<br><br>-vs-<br><br>PAM JANE McCLARY, an individual,<br><br>　　　Defendant. | **CASE NO.  CV 10-00119-REB**<br><br>**AFFIDAVIT OF PAMELA MCCLARY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

STATE OF COLORADO　　)
　　　　　　　　　　　:ss
County of Denver　　　)

Pamela McClary, being first duly sworn, deposes and says:

1. I am the Defendant in the above-captioned matter and make this affidavit based on my own personal knowledge of the facts and statements herein.

2. I am the daughter of James McClary. My father died in June 2004 in Boise, Idaho

where he had resided most of his life.

3.      The probate of my father's estate was one of the worst experiences of my life.  It was a legal and personal nightmare that cost the estate, and me significant sums of money.  The Personal Representative for my father's estate was Ron Daly.

4.      From my father's estate, I received certain real property located at 4903 Roberts Road, Boise, Idaho.  The real property at that address consists of three separate Lots.  Lot A contains the residence and Lot B is the bare lot subject to this action.  There exists a third, small odd shaped parcel just south of Lot A also owned by me (all three pieces are referred to as the "Roberts Road Property") .  Lot D belongs to the Plaintiffs.  A true and correct copy of a plat map showing these parcels is attached hereto as Exhibit A.

5.      The Personal Representative's Deed, conveying the Roberts Road Property to me is dated June 13, 2004 but the Deed was not delivered to me, nor recorded until January 2005.  A true and correct copy of the Personal Representative's Deed is attached hereto as Exhibit B.

6.      At the time the Personal Representative's Deed for the Roberts Road Property was prepared and signed by Ron Daly (June 13, 2004) I was not aware of any recorded easement affecting Lot B.   However, in going through my father's belongings, I found a copy of the Easement which is the subject of this litigation. *See* Exhibit A to *Affidavit of Anna E. Eberlin in Support of Plaintiffs' Motion for Partial Summary Judgment* (Dkt. 14-8).  At the time I found the easement, the attorney for my father's estate (and Ron Daly the Personal Representative) already has commissioned an appraisal of the Roberts Road Property.  I advised them of what I had found – neither of them was aware of the Easement.  Once Mr. Daly and the estate's attorney became aware of the Easement, they caused Lot B to be reappraised, and the value thereof went from roughly $60,000 to $0.

7.      After learning of the Easement, I approached Don Kayser who owned the property

benefitting from the Easement (and who had requested it be prepared). I explained to Mr. Kayser

that I did not believe the Easement was valid. I believe that meeting occurred during the second

week of August of 2004. Following my meeting with Mr. Kayser, he sent me a letter regarding our

conversation and the Easement. The letter is attached hereto as Exhibit C. At that time, the Personal

Representative's Deed conveying the Roberts Drive Property to me had not been recorded.

8.      There are a number of reasons I question the validity of the Easement which appears

to have been signed by my father on January 11, 2000:

a.      My father was very frail and not at all well on the date he signed the

Easement. On December 17, 1999, my father was hospitalized with a heart attack, congestive heart

failure and Pneumonia. I traveled to Boise from Denver to stay with him for Christmas and was

unsure if he would be released from the hospital due to the seriousness of his condition. My fiancé

Robert Rust accompanied me to Boise to meet my father for the first time. Fortunately, my father

was released from the hospital on December 23, 1999. I stayed with him until December 30, 1999

when Robert and I returned to Denver.

b.      In December 1999 and January 2000, my father was under constant care in his

home. He had live-in care givers who provided service to him 24 hours a day, including assistance

with his wheelchair and walker, cooking, organizing his medications, assisting him with oxygen and

oxygen deliveries, transporting him to and from medical appointments (as he could no longer drive),

shopping for groceries, picking out clothing and assisting him in dressing and undressing. The

assistants also helped him with his night clothes and preparing for bed, which included help with a

bedtime diaper and condom catheter. These were used at night because he was not supposed to get

up from bed for fear he wall fall in the bathroom after he took his night-time medications. My father was not capable of living alone or caring for himself at that time.

      c.     My father also was extremely hard of hearing in December 1999 and January 2000 and had been for some time but refused to wear a hearing aid. I would call him regularly from my home in Denver, but speaking with him on the phone was extremely problematic as he could not hear well even with an amplified hand set.

      d.     In January 2000 my father was taking a number of medications, including. Nitroglycerin, Ambien, Previeicid, Probenecid, Beconase, Lopid, Ticlid, Pravichol, Lanoxin, Desiprmine, Norvasc, Provental, Vasotec, and Dilantin. The medications made him groggy and sometimes incoherent. He liked to be left alone and rarely left the house except for doctor's appointments. He had Diabetes, which resulted in part of his foot being amputated. Although I did not live with my father, I spent extensive time with him over the years because he had frequent health crisis. It was not unusual for me to stay with him for as long as three months at a time and doing so enabled me to ensure he was receiving proper care. I was in regular contact with his care providers and have reviewed the daily logs kept by his care providers.

      e.     In January 2000, after his release from the hospital my father was ordered by his doctor to use oxygen 24 hours a day. Despite that he needed the oxygen, he often refused to use it because he thought doing so showed he was weak. When my father was compliant, and used oxygen, I observed a notable difference in him. However, if he was not using his oxygen, he was much less alert and had a diminished ability to participate in conversations. Additionally, after he was released from the hospital (December 23, 1999), I noticed he did not communicate well with other people and was less engaged with others. I observed this conduct through the end of December

1999, and his condition did not improve thereafter. He seemed to decline more and more each time I saw him after Dec. 1999.

       f.     Based on my observations through December 30, 1999 and information available to me about his ongoing care, I do not believe my father was in any position mentally or otherwise to understand the consequences of a legal document in January 2000.

       g.     I have been attempting to obtain additional medical records to further support that my father was not of sound mind in January 2000.

       h.     In addition to the issues discussed in subparagraphs a–f above, I also question the validity of the Easement because my father received no opportunity for legal assistance nor was he given any consideration or payment of any kind for granting the easement. I have searched his records, including account statements and otherwise, and there is no indication he was ever given any payment, of any kind, for restricting the uses of Lot B.

       i.     Further, despite that the Easement restricts all uses of Lot B, and consequently devalued it, my father continued to pay taxes on the Lot as if it was worth over $100,000.00. The assessment changed from year to year, but Lot B was valued at approximately $120,000 (by the assessor) at the time of my father's death. My father also invested in the maintenance of Lot B. Thus between costs for maintenance, watering, general upkeep and taxes, he spent roughly $10,000 annually on Lot B. To my knowledge, neither the Larsens nor the Kaysers ever contributed to these costs. It simply does not make sense to me that my father would continue to pay the taxes on the Lot B (assessed at over $100,000.00) if he had understood the value had been diminished by the Easement. Again, this suggests he did not understand the consequence of his actions in signing the Easement.

9.      After I took title to the Roberts Road Property, I requested the tax assessor reduce the assessment for Lot B.  In doing so, I did not concede the Easement was valid, nor was its validity ever adjudicated during the probate of my father's estate.  Rather, I knew that as long as the Easement was of record, and until its validity was formally resolved, the value of the Lot was diminished and I needed to be as prudent as possible.

10.      At the time I learned about the Easement (which was after my father died) and even though I questioned its validity, I was not in a position to challenge it.  I had spent hundreds of hours in Boise (away from home) dealing with the estate matters and was simply out of money for further litigation.  I also had encountered health issues that required me to return home, undergo two surgeries and consequently attempt to reduce the stress levels in my life.  It was simply impossible for me to pursue another legal action at that time.

11.      Attached hereto as Exhibit D are true and correct copies of photographs I took, which accurately depict the "view" or lack thereof, across Lot B.   There is not a view of the mountains from the Kaysers' property; rather it is screened by existing trees and shrubs.  The Exhibit D photographs were taken in May 2010.

12.     Based on my own research, I have concluded that absent the Easement, Lot B could be a valuable building site. It is the only remaining Lot above the Hillcrest Country Club, and on Roberts Road. Because I own Lot A, I have sufficient land area to adjust the lot lines and ensure Lot B is buildable. In fact, to qualify as a "buildable lot" on Roberts Road, Lot B requires the addition of only six inches of property along the west boundary between Lot A and Lot B (thereby making I seventy feet in width). Thus, to the extent Plaintiffs argue Lot B is not "buildable" that is not consistent with the information I have gathered pertaining thereto.

13.     I recall my parents having a personal and friendly relationship with Paul B. Larsen and Iretta Larsen.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Pamela J. McClary

SUBSCRIBED AND SWORN to before me this _2au_ day of July, 2010.

_____

(SEAL)



Notary Public for _Colo , Denver_
My commission expires: _05-19-2012_

AFFIDAVIT OF PAMELA MCCLARY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of July 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Wayne Meuleman                          Anna Eberlin
Attorney for Plaintiffs                      Attorney for Plaintiffs
*meuleman@lawidaho.com*              *aeberlin@lawidaho.com*


                                    _____/s/ Julie Klein Fischer_____
                                    for MORROW & FISCHER, PLLC


T:\Clients\M\McClary, Pam\Pleadings\Summary Judgment\Affidavit opposing SJ.McClary Final.doc

# Exhibit A



# A RESUBDIVISION OF
## LOTS 3,4,12,13 & A PORTION OF LOT 5, BLOCK B
# CAPITOL SITES SUBDIVISION
## BOISE CITY, ADA COUNTY, IDAHO

# Exhibit B

ADA COUNTY RECORDER J. DAVID NAVARRO        AMOUNT  12.00
BOISE IDAHO 01/25/05  10:47 AM
DEPUTY  Patti Thompson
RECORDED—REQUEST OF
HAWLEY TROXELL ENNIS HAWLEY        105009189

When Recorded Return to:
John S. McGown, Jr.
Hawley Troxell Ennis & Hawley LLP
P.O. Box 1617
Boise, ID  83701-1617

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

## PERSONAL REPRESENTATIVE'S DEED

This Personal Representative's Deed, is made effective June 13, 2004, by and between Ronald F. Daly, Personal Representative of the Estate of James D, McClary, Deceased, hereinafter referred to as "Grantor," and Pamela Jane McClary, an unmarried woman, hereinafter referred to as "Grantee," whose address is 4903 Roberts Drive, Boise, Idaho  83705;

WITNESSETH:

Grantor is the duly qualified, appointed and acting Personal Representative of the Estate of James D. McClary, Deceased, which is filed as Case No. SPIE 0400300M in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada.

Pursuant to the powers vested in the Grantor as Personal Representative under the Idaho Uniform Probate Code, particularly Idaho Code § 15-3-715, Grantor, as the Personal Representative, does by these presents, quitclaim, transfer and convey unto Grantee, and to her heirs, successors and assigns, all right, title and interest of said Estate and of said Decedent in and to the following described parcel of real property situate in the County of Ada, State of Idaho:

PERSONAL REPRESENTATIVE'S DEED

00235.0005.796284.1

See Exhibit "A" attached hereto and incorporated herein by this reference ("Premises").

TOGETHER WITH all and singular the tenements, hereditaments, appurtenances, water and water rights and ditch and ditch rights thereto belonging or in anywise appertaining, the reversion and reversions, remainder and remainders, rents, issues and profits thereof;

SUBJECT TO THE FOLLOWING:

1.  All taxes and assessments for the year 2004 and all subsequent years;

2.  All rights reserved in federal patents, state or railroad deeds or acts authorizing the same, and all building or use restrictions, building or zoning regulations and ordinances of any governmental unit; and

3.  All easements, rights-of-way, restrictions, reservations and covenants of record or appearing on the Premises.

TO HAVE AND TO HOLD, all and singular the same, together with its appurtenances unto the Grantee, and to Grantee's heirs, successors and assigns forever.

IN WITNESS WHEREOF, Grantor has duly executed this Personal Representative's Deed the day and year herein first above written.

ESTATE OF JAMES D. McCLARY,
Deceased

By _____
RONALD F. DALY
Personal Representative of the Estate of
James D. McClary, Deceased

PERSONAL REPRESENTATIVE'S DEED

00235.0005.798284.1

STATE OF IDAHO          )
                        ) ss.
County of Ada           )

      On this 24ᵗʰ day of January, 2005, before me, *Richard F. Goodson*, a Notary Public in and for said State, personally appeared Ronald F. Daly, known or identified to me to be the person whose name is subscribed to the within instrument as Personal Representative of the Estate of James D. McClary, Deceased, and acknowledged to me that he executed the same as such Personal Representative.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.



*Richard F. Goodson*
Notary Public for Idaho
Residing at *Boise, Idaho*
My commission expires *October 22, 2006*

PERSONAL REPRESENTATIVE'S DEED

## EXHIBIT "A"

### PARCEL I

Lots A and B as disclosed in Record of Survey No. 2550 which was recorded as Instrument Number 9357941, on July 21, 1993, records of Ada County, Idaho.  Said Lots are a portion of Lot 14 of CAPITOL SITE SUBDIVISION, and Lots A and B of CAPITOL SITE RESUBDIVISION, are located in the Northeast Quarter of Section 20, Township 3 North, Range 2 East, Boise Meridian, Boise City, Ada County, Idaho.

### PARCEL II

Lot C as disclosed in Record of Survey No. 2550 which was recorded as Instrument Number 9357941, on July 21, 1993, records of Ada County, Idaho, EXCEPT THAT PORTION of Lot C as delineated on that certain Record of Survey No. 2550 being a portion of Lot C, a Resubdivision of Lots 3, 4, 12, 13 and a portion of Lot 5, Block 8 of Capitol Sites Subdivision, according to the Plat thereof, filed in Book 46 of Plats at Page 3767, records of Ada County, Idaho, which portion was conveyed to John W. Maras and Sally D. Maras, husband and wife by that certain Warranty Deed dated June 28, 1996 which was recorded as Instrument Number 96055467, records of Ada County, Idaho.

### PARCEL III

An undivided interest in the road in CAPITOL SITE SUBDIVISION which was platted and named Roberts Road, the Plat of which said CAPITOL SITE SUBDIVISION was filed in Book 11 of Plats at Page 580, Ada County records, and which said Roberts Road was subsequently vacated by Ordinance of Vacation recorded April 26, 1947, as Instrument No. 262428, records of Ada County, Idaho.

Parcel A has been assigned Parcel Number R1281020015, Ada County, Idaho.  Parcel B has been assigned Parcel Number R1281020020, Ada County, Idaho.  That portion of Parcel C described above which contains approximately .021 acres has been assigned Parcel Number R1281020026, Ada County, Idaho.

- 1 -

# Exhibit C

**Donald R. Kayser**
4848 Hillcrest Drive
Boise ID 83705

August 18, 2004

Dear Pam,

Thank you for taking the time on Monday to discuss with me your plans to undo the easement your father granted to Paul Larsen, which preserves an unobstructed view behind my home. I am disappointed that you intend to file a lawsuit to revoke an easement I obviously relied upon (and discussed with your father) when I purchased my home. I am, however, confident that when you more carefully assess the facts that you will reconsider. You are apparently operating under the mistaken assumption that the property is worth more than it is and can in fact be developed if the easement is removed.

When you told me that the assessed value for the parcel (Lot B of the Capital Site Resubdivision) was $200,000 I was certain that you had bad information. In checking the assessed valuation I find that this parcel was assessed at $62,500 in 2002. But even this assessment is high because it is based on a lot area of 0.3 acres, the area of the old lot 12 before the 1980 resubdivision. The actual area of Lot B is approximately 0.20 acres, or two thirds of the size that the assessor was using.

The lot area is significant for another reason. It is my understanding that Lot B does not qualify as a building lot, as stated in writing by your father at the time of the resubdivision and orally to me at the time of my purchase. In other words, your lawsuit will accomplish very little -- it will do nothing more than remove an easement from an undevelopable piece of property.

As I said to you, before I bought the property I checked the legality of the easement and discussed the background and intent with both your father and Paul Larsen. Paul and I are prepared to defend its validity. I would hate to see us you and me incur substantial legal costs based on erroneous facts and legal advice.

Sincerely,

*Don*

Cc: Paul Larsen

Phone: (208) 336-0339          email: don@kayser.org          FAX: (208)-336-7305

# Exhibit D





