## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD KAYSER and MARY KAY KAYSER, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| PAM JANE McCLARY, | ) |
| | ) |
| Defendant. | ) |

Case No. CV 10-00119-REB

**MEMORANDUM DECISION AND ORDER RE: POST TRIAL MOTIONS**

Currently pending before the Court are the following motions: (1) the Kaysers' Motion to Amend Judgment (Docket No. 148), (2) the Kaysers' Motion for an Award of Costs (Docket No. 151, Att. 1), (3) the Kaysers' Motion for an Award of Attorneys' Fees (Docket No. 152), and (4) McClary's Renewed Motion for Judgment as a Matter of Law and Alternative Motion to Alter or Amend the Judgment (Docket No. 153). Having carefully reviewed the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Through their Second Amended Complaint, the Kaysers asserted the following substantive claims against McClary: (1) breach of contract, (2) tortious interference with contract, (3) trespass, and (4) quiet title/injunction. *See* Second Am. Compl. (Docket No. 69). Following a five-day jury trial in October 2011, the jury found that McClary's father, James McClary, was competent at the time he executed the underlying Grant of Easement and that there was valid consideration for that same Grant of Easement. *See* Special Verdict Form, p. 1 (Docket No. 145). In turn, the jury also found that McClary breached the Grant of Easement,

**MEMORANDUM DECISION AND ORDER - 1**

trespassed upon the easement, and tortiously interfered with Plaintiff's contract to sell their property to the Richardsons – all by constructing the at-issue fence.  *See id*. at pp. 2-3.[1]

Although finding that McClary breached the Grant of Easement and trespassed upon the easement by building the fence, the jury concluded that the Kaysers suffered no resulting damage on those claims.  *See id*.  However, the jury found that, in tortiously interfering with the Kaysers' contract to sell their property to the Richardsons, McClary damaged the Kaysers in the amount of $15,000.  *See id*. at pp. 3-4.  The jury additionally assessed punitive damages against McClary in the amount of $8,000.  *See id*. at p. 4.

Through their Motion to Amend Judgment, the Kaysers ask that this Court quiet title to the Grant of Easement in their favor by decreeing the validity of the Grant of Easement; ordering McClary to remove the fence; and, permanently enjoining McClary from taking any action in violation of the Grant of Easement.  *See* Mem. in Support of Mot. to Am. J., pp. 2, 5-9 (Docket No. 148, Att. 1).  Separately, the Kaysers request that the punitive damages award be increased to an amount equal to their attorneys' fees.  *See id*. at pp. 2, 9-13.  In other motions, the Kaysers also seek to recover their litigation costs and attorneys' fees.  *See* Mot. for an Award of Costs (Docket No. 151, Att. 1); Mot. for an Award of Attys' Fees (Docket No. 152).[2]

McClary presents no directed opposition to the Kaysers' Motion to Amend Judgment, submitting instead a "Renewed Motion for Judgment as a Matter of Law or, alternatively,

---

[1]  The Kaysers' quiet title/injunction claim was reserved for the Court's consideration and was not taken up by the jury.  This Memorandum Decision and Order, addressing the Kaysers' Motion to Amend Judgment, speaks to the Kaysers' quiet title/injunction claim.

[2]  The Kaysers point out that, "[i]f the Court grants the Motion for an Award of Attorneys' Fees, then the punitive damages amount should not be increased to include the cost of attorneys' fees," the inverse also being true.  *See* Mem. in Supp. of Mot. to Am. J., p. 13, n.1 (Docket No. 148, Att. 1).

**MEMORANDUM DECISION AND ORDER - 2**

Motion to Alter or Amend the Judgment" that naturally stands as a *de facto* opposition on its own. *See* Renewed Mot. for J. (Docket No. 153). Therein, McClary argues that the so-called Economic Loss Doctrine prohibits any recovery of economic losses under a tortious interference with contract theory and, therefore, the jury's $15,000 damage award was improper. *See* Mem. in Supp. of Renewed Mot. to Am. J., pp. 2, 4-10 (Docket No. 153, Att. 1). McClary further contends that the jury incorrectly found that the Grant of Easement was supported by valid consideration and, as such, argues that judgment should actually be entered in her favor. *See id*. at pp. 2, 10-15.

Because the Kaysers' post-trial requests for relief necessarily turn on the adequacy of the jury's verdict, McClary's Renewed Motion for Judgment as a Matter of Law/Motion to Alter or Amend the Judgment will be taken up first. If the verdict remains intact, the Court will then consider the Kaysers' Motion to Amend Judgment and related Motion for an Award of Costs and Motion for an Award of Attorneys' Fees.

## II. DISCUSSION

### A.   McClary's Renewed Motion for Judgment as a Matter of Law and Alternative Motion to Alter or Amend the Judgment (Docket No. 153)

Presented orally at the close of the Kaysers' case-in-chief on October 6, 2011 and, later, through a formal filing, McClary made a Rule 50(a) Motion for Judgment as a Matter of Law. *See* Mot. for J. as a Matter of Law (Docket No. 138). At that time, McClary made two arguments: (1) the Kaysers' breach of contract claim (and, presumably, the Kaysers' other claims that are dependent upon the existence of a contract, i.e, the Grant of Easement) fails as a matter of law due to the absence of any consideration; and (2) the Kaysers' request for punitive damages should be stricken because there is no basis to support such a claim. *See id*. The Court

**MEMORANDUM DECISION AND ORDER - 3**

denied the motion when it was raised during trial, and the jury returned a verdict in the Kaysers'

favor.  McClary now moves to renew her Motion for Judgment as a Matter of Law, pursuant to

F.R.C.P. 50(b).

     1.     <u>Legal Standard for Rule 50(b) Motion</u>

Renewed motions for judgment as a matter of law are made pursuant to Rule 50(b),

which states:

> If the court does not grant a motion for judgment as a matter of law made under Rule
> 50(a), the court is considered to have submitted the action to the jury subject to the
> court's later deciding the legal questions raised by the motion.  No later than 28 days
> after the entry of judgment – or if the motion addresses a jury issue not decided by
> a verdict, no later than 28 days after the jury was discharged – the movant may file
> a renewed motion for judgment as a matter of law and may include an alternative or
> joint request for a new trial under Rule 59.  In ruling on the renewed motion, the
> court may:
>
>     (1)    allow judgment on the verdict, if the jury returned a verdict;
>
>     (2)    order a new trial; or
>
>     (3)    direct entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

"Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a court may grant a motion

for judgment as a matter of law . . . against a party on a claim or issue where the party has been

'fully heard on [that] issue during a jury trial' and the court finds that a 'reasonable jury would

not have a legally sufficient evidentiary basis' to find for that party."  *Funai Elec. Co., Ltd. v.*

*Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1092-93 (N.D. Cal. 2009) (citing Fed. R. Civ. P.

50(a) & (b)).  "Where a party moves for [a motion for judgment as a matter of law] in a case that

has been tried to a jury, the court must determine whether 'there exists evidence of record upon

which a jury might properly have returned a verdict in [the non-movant's] favor when the correct

**MEMORANDUM DECISION AND ORDER - 4**

legal standard is applied.'" *Id.* (citations omitted).  "The test is whether the evidence, construed in the light most favorable to the non[-]moving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury."  *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *see also E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("We review a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b). . . . .  The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.").  Therefore, first, the court must determine the correct law; second, the court must review the jury's factual findings to determine whether they are supported by substantial evidence.  *See Funai Elec.*, 593 F. Supp. 2d at 1092 (citation omitted).  While the jury's factual findings are given "substantial deference," the legal standards the jury applies are considered *de novo* to determine, as a matter of law, whether the correct standards have been used.  *Id.* at 1092-93 (citation omitted).

A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion; rather, it is a *renewed* Rule 50(a) motion.  *See Go Daddy*, 581 F.3d at 961.  That is, under Rule 50(a), a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to a jury and, if the judge denies or defers ruling on the motion, and the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b).  *See id.* "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion."  *Id.*  "Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."  *Id*; *see also* Fed. R. Civ. P. 50(b) Adv. Comm. Notes 1991 ("A post[-]trial motion for judgment can be granted only on grounds

**MEMORANDUM DECISION AND ORDER - 5**

advanced in the pre-verdict motion."); Fed. R. Civ. P. 50(b) Adv. Comm. Notes 2006 ("Because

the Rule 50(b) motion is only a renewal of the pre[-]verdict motion, it can be granted only on

grounds advanced in the pre[-]verdict motion.").

Still, in ruling on a Rule 50(b) motion based on grounds *not* previously asserted in a Rule

50(a) motion, "'[courts] are limited to reviewing the jury's verdict for plain error, and should

reverse only if such plain error would result in a manifest miscarriage of justice.'"  *Go Daddy*,

581 F.3d at 961 (quoting *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002)).

"'This exception . . . permits only extraordinarily deferential review that is limited to whether

there was *any* evidence to support the jury's verdict.'" *Go Daddy*, 581 F.3d at 961 (quoting *Yeti*

*by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

      2.    <u>Idaho's Economic Loss Doctrine and Claims for Claims for Tortious Interference
with Contract[3]</u>

McClary contends that Idaho's Economic Loss Doctrine "prohibits recovery of purely

economic losses in tort" and, as such, "the jury should not have been instructed to award

damages for Plaintiffs' [tortious interference with contract] claim."  *See* Mem. in Supp. of

Renewed Mot. to Am. J., pp. 4 & 9 (Docket No. 153, Att. 1).  Such a description of the Idaho

Economic Loss Doctrine, however, is overly broad.

_____

   [3] As the Kaysers point out, McClary's Rule 50(a) motion did not speak to Idaho's
Economic Loss Doctrine.  *See* Resp. to Mot. to Am. J., p. 3 (Docket No. 155).  Even though
McClary correctly notes that the issue was raised during the jury instruction conference (after
her Rule 50(a) motion) (*see* Reply in Supp. of Mot. to Am. J., p. 2 (Docket No. 157)), there is no
reason why McClary's Rule 50(a) motion could not have attacked the Kaysers' tortious
interference claim based upon the same arguments raised during the jury instruction conference
and, now, in her Rule 50(b) motion – especially when recognizing that the contested jury
instruction was nearly identical to the Model Ninth Circuit Model Jury Instruction 5.1,
addressing "Damages-Proof."  Regardless, recognizing McClary's alternative attempt to alter or
amend the judgment under Rule 59(e), and to "settle the pond" on the matter, the Court will
address McClary's arguments here.

**MEMORANDUM DECISION AND ORDER - 6**

As a general matter, absent personal injury or property damage, Idaho's Economic Loss Doctrine prohibits recovery of purely economic losses[4] in product liability cases and negligence cases.[5] However, having said this, Idaho has not extended the Economic Loss Doctrine's reach to all tort claims, as McClary contends, and specifically has not extended the application of the Doctrine to tortious interference with contract claims. *See, e.g.*, *Ramerth v. Hart*, 133 Idaho 194, 197 (Idaho 1999) ("The economic loss rule applies to negligence cases in general; its application is not restricted to products liability cases."). There is no question that Idaho case law has, at times, contributed to this lack of certainty by loosely suggesting that economic losses are not recoverable "in tort" when addressing, for example, products liability actions and/or negligence claims generally. However, such generic references to a general rule stem from the fact that the issue almost always arises in products liability or more commonly-encountered tort claims. This case does not involve a commonly-encountered tort claim. Hence, such a characterization of the general rule does not necessarily mean that there are no exceptions to that rule. Indeed, McClary concedes that "Idaho courts have not dealt with the Economic Loss Doctrine in the context of tortious interference [with contract claims]." *See* Reply in Supp. of Mot. to Am. J., p. 5 (Docket No. 157).

In the Court's research, this precise issue has not been ruled upon by Idaho appellate courts. Nonetheless, other jurisdictions have ruled that the Economic Loss Doctrine does not

---

[4] "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 351 (Idaho 1975).

[5] This is because there is no "duty" to prevent economic loss to another. *See Duffin v. Idaho Crop Improvement Ass'n*, 895 P.2d 1195, 1200 (Idaho 1995). The two exceptions to this general rule – inapplicable here – are where a special relationship exists and the occurrence of a unique circumstance requires a different allocation of risk. *See id.* at 1200-01.

**MEMORANDUM DECISION AND ORDER - 7**

necessarily bar the recovery of compensatory tort damages.  *See Giles v. Gen. Motors Acceptance Cop.*, 494 F.3d 865, 875-76 (9th Cir. 2007) (citing and quoting *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 11 (Utah 2003) ("[T]orts such as fraud and conversion *exist* to remedy purely economic losses.") (emphasis added); *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226 (10th Cir. 2000) (refusing to apply Economic Loss Doctrine because, under Colorado law, "the economic loss rule applies only to tort claims based on negligence, and only to *some* negligence claims.") (emphasis in original); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 278-79 (S.D.N.Y. 2004) (allowing fraud claim to go forward because New York law permits recovery of economic loss on claims of fraud and fraud in the inducement even "in tandem" with contract claims); *Indem. Ins. Co. of North America v. American Aviation, Inc.*, 891 So. 2d 532, 543, n.3 (Fla. 2004) (noting that "[i]ntentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent generally remain viable" despite Economic Loss Doctrine); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995) (noting that torts outside the Economic Loss Doctrine's scope include defamation, misrepresentation, intentional misrepresentation, tortious interference with prospective economic advantage, intentional interference with contractual relations, and certain fraud in the inducement claims)); *see also Santucci Constr. Co. v. Baxter & Woodman, Inc.*, 502 N.E.2d 1134, 1139 (Ill. App. Ct. 1987) (holding that claim for intentional interference with contract not barred by Economic Loss Doctrine because "the very interest protected by the torts of intentional interference with contractual relations and prospective advantage is the reasonable expectation of economic advantage, [therefore,] economic losses are the damages recoverable.").

**MEMORANDUM DECISION AND ORDER - 8**

In examining these decisions, the Court is persuaded by their logic and reasoning, and is further convinced that the Economic Loss Doctrine is not an outright bar to a tortious interference with contract claim for at least two reasons.

First, a claim for tortious interference with contract is intended to protect a party's economic interest in contractual relations.  Accordingly, economic losses *must* be recoverable and it would not be sensible for the tort to be recognized under Idaho law on one hand, and then effectively eviscerated by application of the Economic Loss Doctrine on the other hand.  *See, e.g.,* Restatement (Second) of Torts § 774A (1979) ("One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for the pecuniary loss of the benefits of the contract or the prospective relation [and] consequential losses for which the interference is a legal cause . . . ."); Restatement (Second) of Torts § 766 (1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.").

Second, the very nature of a tortious interference with contract claim presumes that the parties are not in contractual privity with one another.  Therefore, in the ordinary circumstance, the injured party has no recourse under contractual rights, and the tort claim may be all that is available, even though the injured party's damages are likely entirely or substantially economic damages in nature.

Thus, this Court finds that, if confronted with the instant question, the Idaho Supreme Court would conclude that the Economic Loss Doctrine does not outright bar the Kaysers'

**MEMORANDUM DECISION AND ORDER - 9**

tortious interference with contract claim as McClary argues.[6]  Therefore, McClary's Renewed

Motion for Judgment as a Matter of Law and, alternatively, Motion to Amend or Alter the

Judgment is denied in this respect.

### 3.    Alleged Lack of Consideration for the Grant of Easement

McClary re-incorporates the arguments from her previous Rule 50(a) Motion for

Judgment as a Matter of Law (Docket No. 138), and argues that there was no consideration for

---

[6] Assuming Idaho's Economic Loss Doctrine does not foreclose the Kaysers' ability to
assert a tortious interference with contract claim, it is possible to still argue (though McClary
does not) that the *source* of McClary's duty not to interfere with the Kaysers' contract with the
Richardsons is the Grant of Easement itself, potentially compromising the recovery of economic
losses via tort theories, including a claim for tortious interference with contract.  *Compare, e.g.*,
Pls.' Second Am. Compl. at ¶ 12 (Docket No. 69) ("Defendant knowingly and intentionally
undertook to construct a fence in violation of the [Grant of] Easement with the specific intent
and purpose of interfering with Plaintiffs' contract to sell Plaintiffs' Property, and Defendant's
actions have prevented the pending sale of Plaintiffs' Property."), *with ACS Partners, LLC v.
Americon Group, Inc.*, 2010 WL 883663, *8 (W.D.N.C. 2010) ("The mere failure to carry out an
obligation in contract, however, does not support an action for tortious interference with contract
and prospective advantage."), *and Diamond Center, Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F.
Supp. 2d 1009, 1016 (W.D. Wisc. 2008) (applying Economic Loss Doctrine to dismiss tortious
interference with contract claim because "[w]hat plaintiff is essentially asserting in its tort claim
is that it has suffered damage as a result of defendant's failure to honor the warranty over the
gold products defendant has sold to plaintiff."), *and Topp, Inc. v. Uniden American Corp.*, 483 F.
Supp. 2d 1187, 1196 (S.D. Fla. 2007) ("[A] tort action is . . . barred where a defendant has not
committed a breach of duty apart from a breach of contract.  In other words, only if a tort is
independent of a breach of contract, and requires proof of facts separate and distinct from the
breach of contract claim, will the economic loss doctrine not operate as a bar to the tort claim."),
*and  Finepoint Innovations, Inc. v. A.T. Cross Co.*, 2006 WL 3313688, *3 (D. Ariz. 2006)
(unpublished) ("[N]o amendment can save Finepoint's intentional interference with business
expectancy claim, because it is a tort claim alleging only economic damages resulting from an
alleged breach of contract."), *and Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1107 (Colo. App.
2004) ("Because the source of Triple L & J's duty is the contract, we agree that the claim for
economic damages for tortious interference against Triple L & J cannot be maintained under the
economic loss rule.").  Even if such an argument were to apply to eviscerate the Kaysers'
tortious interference with contract claim and the corresponding damages, to avoid manifest
injustice, the undersigned would feel compelled to amend whatever judgment exists thereafter to
reflect the jury's intent to award Plaintiff $15,000 in damages resulting from McClary's breach
of the Grant of Easement.

**MEMORANDUM DECISION AND ORDER - 10**

the Grant of Easement.  *See* Mem. in Supp. of Renewed Mot. to Am. J., pp. 10-15 (Docket No.

153, Att. 1) ("In this matter, Plaintiffs failed to provide <u>any</u> evidence of consideration for the

easement agreement at issue.  In fact, it is undisputed that no consideration was given for the

January 11, 2000 easement agreement.") (emphasis in original).[7]  The Court disagrees.

        McClary admits that "there is a presumption of consideration when a document is

written" but that "the presumption is rebuttable and non conclusive."  *See id*. at p. 10 (citing I.C.

§ 29-103).  McClary goes on to argue that "[e]very witness probed on the question of

consideration freely admitted none was given for the Easement Agreement" and, "[t]hus, the jury

had no evidentiary basis to support its finding that the easement was supported by

consideration."  *See id*. at p. 11.  However, the parties to the Grant of Easement are no longer

alive.  Accordingly, there could be no true "admissions" as to what consideration was given, or

whether consideration was given at all.  Hence, all of the evidence as to such an issue, even in

the form of testimony, was necessarily indirect or circumstantial, and the jury was charged with

weighing such evidence in the context of the presumption of consideration that the law imposes

upon the facts in this case.  In other words, drawing all reasonable inferences in the Kaysers'

favor as is required under Rule 50, the fact that no witness at trial was able to either confirm or

deny the existence of consideration vis à vis the Grant of Easement is important only to establish

just that: that non-parties to the Grant of Easement are understandably unaware of whether

consideration existed, even though some witnesses described particular details of what they

believed was the consideration for the Easement.  Regardless, the fact that certain trial witnesses

---

        [7]  In addition to arguing that McClary failed to prove that the Grant of Easement lacked
consideration, the Kaysers contend that consideration is not even required to support a valid
conveyance of property.  *See* Resp. to Mot. to Am. J., p. 7, n.1 (Docket No. 155) (citing *Cox v.
Cox*, 71 P.3d 1028 (Idaho 2003)).

**MEMORANDUM DECISION AND ORDER - 11**

(who were not parties to the Grant of Easement) may have been unaware of the fact of any

consideration is not conclusive on the issue of the existence of consideration, as McClary would

contend.

Therefore, it cannot be said as a matter of law that there is no legally sufficient

evidentiary basis for the jury to find for the Kaysers on the issue of consideration – particularly

given the acknowledged presumption in place.  Therefore, McClarys' Renewed Motion for

Judgment as a Matter of Law and, alternatively, Motion to Amend or Alter the Judgment is

denied in this respect.

**B.      The Kaysers' Motion to Amend Judgment (Docket No. 148)**

On October 12, 2011, consistent with the verdict of the jury, this Court entered a

Judgment in favor of the Kaysers and against McClary in the amount of $23,000 ($15,000

attributable to McClary's tortious interference with contract and $8,000 in punitive damages).

*See* J. (Docket No. 147).  Within that Judgment, the Court added:

> Additionally, if necessary, the Court will consider motions resolving Plaintiffs'
> Fourth Cause of Action – Quiet Title/Injunction - consistent with the jury's Special
> Verdict.  This Judgment may therefore be amended accordingly.

*See id*. at p. 2.  The Kaysers' Motion to Amend Judgment seeks to finally resolve their quiet

title/injunction claim, while also increasing the amount of punitive damages from $8,000 to at

least the amount of their attorneys' fees.

1.      Legal Standard for Rule 59(e) Motion

A court has "considerable discretion" in ruling upon a Rule 59(e) motion since specific

grounds for a motion to amend or alter a judgment are not listed in the Rule.  *See McDowell v.*

*Calderon*, 197 F.3d 1253, 1255, n.1 (9th Cir. 1999).  However, amending a judgment is "an

extraordinary remedy which should be used sparingly."  *Id*.

**MEMORANDUM DECISION AND ORDER - 12**

"In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law."  *Allstate Ins. Co. V. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

    2.    <u>The Kaysers' Quiet Title/Injunction Claim</u>

The Kaysers' Quiet Title/Injunction claim is encapsulated within two paragraphs of the Kaysers' Second Amended Complaint:

> Plaintiffs and their successors-in-interest in Plaintiffs' Property are entitled to the benefit of the Easement, are entitled to a decree confirming the validity of the Easement and enjoining Defendant from taking any action in violation of the Easement.

> Plaintiffs are entitled to an order permanently enjoining Defendant from taking any action in violation of the Easement and ordering Defendant to remove the fence and other improvements constructed on the Easement Property.

*See* Second Am. Compl., ¶¶ 18 & 19 (Docket No. 69).  Accordingly, through their Rule 59(e) motion, the Kaysers request that the Court (1) quiet title to the Grant of Easement in their favor by decreeing the validity of the Grant of Easement, (2) order McClary to remove the fence, and (3) permanently enjoin McClary from taking any action in violation of the Grant of Easement. *See* Mem. in Supp. of Mot. to Am. J., pp. 2 & 5-9 (Docket No. 148, Att. 1).

There is implicit opposing argument contained in her own Rule 50(b)/59(e); however, otherwise, McClary offers no specific opposition to the Kaysers equitable relief efforts.  With that in mind, and in keeping with the jury's Special Verdict relating to the Grant of Easement's formation, the Court hereby confirms the validity of the Grant of Easement and, accordingly,

**MEMORANDUM DECISION AND ORDER - 13**

quiets title as to the Grant of Easement in the Kaysers' favor.  Further, the Court orders McClary

to remove the at-issue fence within two weeks of the entry of an Amended Judgment, following

this Memorandum Decision and Order.[8]  The Kaysers' Motion to Amend Judgment is therefore

granted in this respect.

However, once the fence is removed, any future harm to Plaintiff is speculative.  Without

actual or imminent injury moving forward (or any suggestion in the record that Plaintiff will

disregard the legal effect of the Grant of Easement), the Court will not enter a permanent

injunction.  *See* 11A Fed. Prac. & Proc. Civ. § 2942 (2d ed.) ("Because injunctive relief looks to

the future, and is designed to deter rather than punish, relief will be denied if the conduct has

been discontinued on the ground that the dispute has become moot and does not require the

court's intervention.").  Therefore, the Kaysers' Motion to Amend Judgment is denied in this

respect.  Having said this, there is now a judicial determination of the validity of the Grant of

Easement, and in the event McClary *does* violate the Grant of Easement (in any manner), the

Kaysers are free to assert new legal claims against McClary accordingly.

With all this in mind, and to maintain consistency with the jury's findings and the

evidence presented at trial, the Judgment will be amended to include the following language:

> Plaintiffs are awarded a Judgment of Quiet Title determining and declaring their
> rights pursuant to the Grant of Easement, recorded as Instrument No. 100003146 in
> the real property records of Ada County, Idaho, to be perpetual and appurtenant to
> Plaintiffs' real property described as Lot D, Block B, Capitol Sites Subdivision, a re-

---

[8]  The Kaysers' Second Amended Complaint alleges "other improvements constructed on
the Easement Property."  *See* Second Am. Compl., ¶ 18 (Docket No. 69).  The Court is unaware
of any "other improvements" beyond the at-issue fence (and the Kaysers' briefing does not
highlight anything other than the at-issue fence); therefore, any corresponding order is limited
accordingly.  Regardless, the Grant of Easement applies not only to the at-issue fence, but to any
other offending impediment covered by the Easement.

**MEMORANDUM DECISION AND ORDER - 14**

subdivision of Lots 3, 4, 12, 13 and a portion of Lot 5, Block B, Capitol Sites Subdivision records of Ada County, State of Idaho (herein "Lot D").  The Easement rights granted and determined herein shall run with and be appurtenant to Lot D and for the benefit of Plaintiffs and their successors and assigns.

- and -

Plaintiffs are entitled to and this Court hereby orders Defendant to remove the fence constructed along the southern boundary line of Lot B, Block B, Capitol Sites Subdivision, a re-subdivision of Lots 3, 4, 12, 13 and a portion of Lot 5, Block B, Capitol Sites Subdivision records of Ada County, State of Idaho (herein "Lot B"). Defendant is hereby ordered to remove the fence within fourteen (14) days of the entry of this Amended Judgment.  If she fails to do so, then Plaintiffs may remove the fence and the incurred expenses shall be added to the Judgment as damages.

3.      Increasing Punitive Damages Commensurate with the Kaysers' Attorneys' Fees

The Kaysers seek to amend the portion of the Judgment regarding punitive damages to include at least the amount of their attorneys' fees. *See* Mem. in Supp. of Mot. to Am. J., p. 9 (Docket No. 148, Att. 1) (citing I.C. § 6-807).[9]  This is a novel approach to recovering attorneys' fees under Idaho law and, in the Court's view, an inappropriate basis upon which to amend the Judgment.

The primary purpose behind an award of punitive damages is to deter similar conduct from happening in the future.  *See Vandelin v. Costco Wholesale Corp.*, 95 P.3d 34, 49 (Idaho

_____

[9]  The Court recognizes that increasing the punitive damages award in this manner may constitute an impermissible additur under the Seventh Amendment.  *See Dimick v. Shiedt*, 293 U.S. 474, 482-88 (1935).  However, where Idaho's additur law – Idaho Code section 6-807 – is substantive in nature, it must be applied by a federal court sitting in diversity.  *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 431-39 (1996).  Here, the Kaysers argue that Idaho Code section 6-807 is substantive in nature and, thus, controlling in federal court.  *See* Mem. in Supp. of Mot. to Am. J., pp. 9-11 (Docket No. 148, Att. 1) (comparing I.C. § 6-807 with I.C. § 6-1604).  McClary raises no argument to the contrary, arguing instead that Idaho case law does not endorse such an increase in punitive damages.  *See* Opp. to Mot. for Att'y Fees, pp. 9-12 (Docket No. 154).  Without resolving the issue of whether Idaho Code section 6-807 is substantive law or procedural law for the purposes of an *Erie* analysis, the Court will nonetheless address the Kaysers' arguments in the aggregate here.

**MEMORANDUM DECISION AND ORDER - 15**

2004); *see also* Jury Inst. No. 33 (Docket No. 142) (". . . you may, in addition to any compensatory damages to which you find Plaintiffs are entitled, award to Plaintiffs an amount which will punish Defendant and deter Defendant and others from engaging in similar conduct in the future.").  Recovery of attorneys' fees, therefore, is not the objective behind a punitive damages award – to be sure, specific Idaho statutes and court rules separately speak to the recovery of attorneys' fees under particular circumstances.

As pointed out by the Kaysers in their briefing, the Court addressed this issue during jury deliberations.  *See* Mem. in Supp. of Mot. to Am. J., p. 13 (Docket No. 148, Att. 1).  When presented with a question from the jury concerning whether it was allowed to  award "court costs," the Court indicated (without objection) that such matters were to be decided by the Court, at the conclusion of the case.  Additionally, the jury had no evidence before it about such matters.  The Kaysers' arguments do not compel a different result now.

First, the case law relied upon by the Kaysers (while admittedly subject to the Kaysers' interpretation, though mostly pre-dating Idaho Code section 6-1604) is not clear-cut.  As McClary points out, the majority of these cases largely exist to *justify* an existing punitive damages award,[10] *not* to establish a recovery floor for punitive damages.  *See* Opp. to Mot. for Atty's Fees, p. 11 (Docket No. 154) ("The fact that attorney fees are one measure for

---

[10]  Or, in the case of *Cox v. Stolworthy*, 496 P.2d 682 (Idaho 1972), a *decrease* in a punitive damages award to an amount in line with incurred expenses.  *But see Young v. Scott*, 700 P.2d 128, 133-34 (Idaho 1985) (upholding district court's increase of punitive damage award to amount equal to tenants' attorneys' fees, while simultaneously disregarding categorical limit upon amount of punitive damages); *Garnett v. Transamerica Ins. Servs.*, 800 P.2d 656, 671 (Idaho 1990) (concluding only that, in bad-faith claims, attorneys' fees may be awarded under Idaho Code section 41-1839(1), unless jury was specifically instructed to include attorneys' fees in any punitive damages award or unless trial court concludes that punitive damages award was so disproportionate that it included attorneys' fees).

**MEMORANDUM DECISION AND ORDER - 16**

determining whether the amount of punitive damages is justified in no way means punitive damages must cover attorney fees, or that the Court must increase punitive damages to cover the fees if the jury award does not suffice.").  That is to say, had the jury's punitive damages award in this case approached the amount of the Kaysers' attorneys fees, these cases would seem to apply to help substantiate that award.  But, where it is argued that punitive damages awards should begin with attorneys' fees as a *de facto* recoverable cost, the Court cannot agree.

Second, by amending a judgment to increase a punitive damages award to at least the amount of attorneys' fees incurred, the Court would be usurping legislative authority.  Currently, Idaho Code outlines the statutory avenues for recovering attorneys' fees – in fact, the Kaysers have cited to those sections of the Idaho Code in support of their contemporaneous Motion for an Award of Attorneys' Fees.  Overlooking these sections in favor of Idaho Code section 6-807 sidesteps the will of the Idaho Legislature, particularly when no Idaho statute specifically authorizes an attorneys' fees award as contemplated by the Kaysers' arguments in these respects.

Therefore, even assuming that Idaho Code section 6-807 represents substantive Idaho law, for the above-referenced reasons, the Court cannot conclude that the amount of the jury's $8,000 punitive damages award is somehow unsupported by the record or the product of legal error so as to justify an amendment to the Judgment.  As a result, the Kaysers' Motion to Amend Judgment is denied in this respect.

**C.     The Kaysers' Motion for an Award of Costs (Docket No. 151, Att. 1)**

An award of standard costs in a diversity case is governed by Rule 54(d) and the federal court's local rules.  *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1024 (9th Cir. 2003).  Local Rule 54.1 allows for an award of costs to the prevailing party, provided that a party

**MEMORANDUM DECISION AND ORDER - 17**

serve and file "a cost bill in the form prescribed by the Court" within "fourteen . . . days after entry of a judgment, under which costs may be claimed." Dist. Idaho Loc. Civ. R. 54.1(a). The "cost bill must itemize the costs claimed and be supported by a certificate of counsel that the costs are correctly stated, were necessarily incurred, and are allowable by law." *Id.* Rule 54(d)(1) "creates a presumption in favor of awarding costs to a prevailing party, but vests in the district court discretion to refuse to award coasts." *Assoc. of Mexican-Amer. Educators v. State of Calif.*, 231 F.3d 572, 591 (9th Cir. 2000). A losing party bears the burden of demonstrating why costs should not be awarded. *See Stanley v. Univ. of S. Calif.*, 178 F.3d 1069, 1079 (9th Cir. 1999) (citation omitted).

Local Rule 54.1(b) defines prevailing party as "the one who successfully prosecutes the action or successfully defends against it, prevails on the merits of the main issue, and the one in whose favor the decision or verdict is rendered and judgment entered." Dist. Idaho Loc. Civ. R. 54.1(b); *see also* Idaho R. Civ. P. 54(d)(1)(B) ("In determining which party to an action is a prevailing party and entitled to costs, the trial court shall in its sound discretion consider the final judgment or result of the action in relation to the relief sought by the respective parties. . . . ."). Here, the jury rejected McClary's affirmative defenses, while finding that she (1) breached the Grant of Easement, (2) trespassed, and (3) tortiously interfered with Plaintiff's contract to sell their property to the Richardsons. Additionally, as to the tortious interference with contract claim, the jury awarded Kaysers $15,000 in damages, along with an additional $8,000 punitive damages award. Finally, in this Memorandum Decision and Order (and stemming directly from the jury's verdict), this Court has granted the Kaysers' Motion to Amend Judgment regarding the Kaysers' quiet title/injunction claim. Under these circumstances, the Kaysers are the prevailing

**MEMORANDUM DECISION AND ORDER - 18**

party.  The fact that the Kaysers did not fully prevail upon alternate theories of recovery against McClary, coupled with the jury perhaps not awarding the Kaysers as much in damages as they might have preferred, does not change this conclusion.

Local Rule 54.1(c) defines the types of taxable costs available to the prevailing party under Rule 54(d)(1).  *See* Dist. Idaho Loc. Civ. R. 54.1(c)(1-7).  Through the Kaysers' Bill of Costs, supported by Anna E. Eberlin's Affidavit, the Kaysers seek to recover (1) $180.00 in clerk's fees and service fees pursuant to Local Rule 54.1(c)(1); (2) $1,589.07 in deposition costs pursuant to Local Rule 54.1(c)(3); (3) $498.96 in witness fees pursuant to Local Rule 54.1(c)(4); and (4) $37.67 in copying costs pursuant to Local Rule 54.1(c)(5).  *See* Bill of Costs (Docket No. 151); *see also* Eberlin Aff. (Docket No. 151, Att. 3).  McClary has not objected to any specific portion of these requested amounts, and the Kaysers' Bill of Costs complies with the requirements of Local Rule 54.1.  Therefore, costs will be taxed against McClary in the amount of $2,305.70  and the Kaysers' Motion for Award of Costs is granted in this respect.

The Kaysers seek an additional $2,195.10 under Local Rule 54.1(c)(8) for certain "other items" of costs, including $1,100.00 in expert witness fees/costs, $95.10 in miscellaneous online research, and $1,000.00 in mediation expenses.  *See id.*; *see also* Mem. in Supp. of Mot. For Award of Costs, pp. 4-5 (Docket No. 151, Att. 2); Dist. Idaho Loc. Civ. R. 54.1(c)(8) ("Other items may be taxed with prior Court approval.").  The Kaysers' secondary request is denied.

First, pursuant to Local Rule 54.1 and 28 U.S.C. § 1821, witnesses "in attendance at any court of the United States, . . . or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States" may be paid an attendance fee of $40 per day for each day's attendance, as well as travel costs, with certain limitations.  28 U.S.C. § 1821; Dist. Idaho Loc. Civ. R. 54.1(c)(4).  "Fees for expert witnesses are not taxable in a greater

**MEMORANDUM DECISION AND ORDER - 19**

amount than that statutorily allowable for ordinary witnesses."  Dist. Idaho Loc. Civ. R. 54.1(c)(4).  The Court has already permitted the recovery of those fees outlined by federal law and Local Rule and, in its discretion, will not expand the scope of related expenses (to include the costs of appraisals and trial testimony fee) now.  The Kaysers' Motion for Award of Costs is therefore denied in this respect.

Second, the Kaysers' attempts to recover online research fees (exclusive of the automated legal research they request in their Motion for Attorneys' Fees) and mediation costs are similarly rejected given not only the fact that there is no solid legal basis upon which to reimburse such expenses within this District, but also because doing so would potentially act as a disincentive to mediating claims generally.  The Kaysers' Motion for Award of Costs is therefore denied in these respects.

In sum, the Kaysers' $4,500.80 cost request is reduced by $2,195.10.  Accordingly, the Kaysers are awarded costs in the amount of $2,305.70.

## D.    The Kaysers' Motion for An Award of Attorneys' Fees (Docket No. 152)

Idaho law governs the award of attorneys' fees in this matter because federal courts must follow state law as to attorneys' fees in diversity actions.  *See Interform Co. v. Mitchell*, 575 F.2d 1270, 1280 (9th Cir. 1978) (applying Idaho law).  The Kaysers request attorneys' fees in the amount of $147,149.70 pursuant to Idaho Code section 12-120(3), Idaho Code section 12-121, and Idaho Code section 6-202.[11]  McClary objects.

---

[11] As previously described, the Kaysers also argue that they are entitled to attorneys' fees as an element of punitive damages.  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, pp. 11-13 (Docket No. 152, Att. 1).  For the reasons already explained, the Court will not increase the jury's punitive damages award.

**MEMORANDUM DECISION AND ORDER - 20**

1.      Idaho Code Section 12-120(3)

Idaho Code section 12-120(3) provides that the prevailing party "shall be allowed" an award of reasonable attorneys' fees in any civil action to recover on . . . "any commercial transaction."  I.C. § 12-120(3).  The statute defines the term "commercial transaction" to mean "all transactions except transactions for personal or household purposes."  *Id.*  Under Idaho Code section 12-120(3), an award of attorneys' fees is proper if "the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover."  *Brower v. E.E. DuPont De Nemours and Co.*, 792 P.2d 345, 349 (Idaho 1990).

The Kaysers are the prevailing party.  *See supra.*  As the prevailing party, the Kaysers argue that "the gravamen" of this lawsuit is the commercial transaction between their predecessors-in-interest (the Larsens) and McClary's predecessor-in-interest (her father, James McClary).  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, p. 14 (Docket No. 152, Att. 1) ("Each of the claims stems from the original commercial transaction between the Larsens and Mr. McClary, wherein the Larsens purchased Lot D and a view easement from Mr. McClary.").[12] In response, McClary argues that any deal between the Larsens and Mr. McClary for a view easement does not constitute a commercial transaction under Idaho Code section 12-120(3); instead, according to McClary, "[t]he gravamen of this case was a property dispute to determine

---

[12] The Kaysers seem to allege a separate basis for recovering attorneys' fees under Idaho Code section 12-120(3) through their contract with the Richardsons.  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, p. 14 (Docket No. 152-1) ("Additionally, a *second* commercial transaction was implicated in this case when Ms. McClary interfered with the contract between Kaysers and the Richardsons to sell Lot D.") (emphasis in original).  However, Idaho Code section 12-120(3) contemplates that the "commercial transaction" be between the litigating parties.  *See, e.g.*, *BECO Constr. Co., Inc. v. J-U-B Eng'rs, Inc.*, 184 P.3d 844, 851 (Idaho 2008).  McClary was not a party to the Kaysers' contract with the Richardsons; therefore, this separate contract is not a commercial transaction under Idaho Code section 12-120(3).

**MEMORANDUM DECISION AND ORDER - 21**

ownership and easement rights." *See* Opp. to Mot. for an Award of Attys' Fees, p. 14 (Docket No. 154).[13]  On this issue, the Court agrees with McClary.

Generally speaking, disputes seeking a determination of property rights are not considered commercial transactions within Idaho Code section 12-120(3).  *See Baxter v. Craney*, 135 Idaho 16 P.3d 263, 271-72 (Idaho 2000) ("[T]his action is primarily a dispute over property ownership and easement rights and as such does not fall within the meaning of a commercial transaction as defined in Idaho Code section 12-120(3) and as applied by the courts.") (citing *Jerry J. Joseph C.L.U. Ins. Assoc. v. Vaught*, 789 P.2d 1146 (Idaho Ct. App. 1990) (denying attorneys' fees under Idaho Code section 12-120(3) in action where, *inter alia*, property owner sought judgment to establish access easement and to remove fence hindering use of easement); *Chen v. Conway*, 829 P.2d 1355, 1361 (Idaho Ct. App. 1992) (determining that quiet title action involving dispute over existence of prescriptive easement was not a commercial transaction under Idaho Code section 12-120(3)); *Durrant v. Christensen*, 785 P.2d 634 (Idaho 1990) (holding that action in which landowners sought adjudication of water rights and permanent restraining order prohibiting defendant from interfering with diversion and use of water was not based on commercial transaction as defined in Idaho Code section 12-120(3)); *Sun Valley Hot Springs Ranch, Inc. v. Kelsey*, 962 P.2d 1041 (Idaho 1998) (concluding that action to determine

---

[13]  McClary also claims it "important to note" that "Plaintiffs did not plead Idaho Code section 12-120 in their Complaint nor either of their Amended Complaints as a basis for collecting attorneys' fees" and "only pled Idaho Code section 12-121 and Idaho Rule of Civil Procedure 54(e) with respect to fees."  *See* Opp. to Mot. for an Award of Attys' Fees, p. 12 (Docket No. 154).  This fact is immaterial to the Court's analysis.  *See O Bar Cattle Co. V. Owyhee Feeders, Inc.*, 2011 WL 692220, *4 (D. Idaho 2011) ("[A] party need not have listed a specific attorneys' fee provision in its pleading to obtain a fee award under that provision upon prevailing in the litigation.") (citing *Eighteen Mile Ranch LLC v. Nord Excavating & Paving, Inc.*, 117 P.3d 130, 135 (Idaho 2005).  Moreover, McClary's Answer, while making a request for attorneys' fees, referenced no legal basis for any such recovery.  *See* Answer (Docket No. 11).

**MEMORANDUM DECISION AND ORDER - 22**

ownership of easement rights did not fall within the meaning of commercial transaction under
Idaho Code section 12-120(3) and therefore attorneys' fees were properly denied)).

Here, the Kaysers' Second Amended Complaint highlights the fact that this action, while
possibly remotely connected to a commercial transaction and/or commercial purpose, is really
about a property dispute affecting the view from one property over another.  *See, e.g.*, Pls.'
Second Am. Compl., ¶¶ 6 & 18 (Docket No. 69) ("When Defendant became aware of Plaintiffs'
agreement to sell Plaintiffs' Property, Defendant willfully, maliciously and with the intent to
interfere with Plaintiffs' sale of Plaintiffs' Property, constructed a fence on the Easement
Property immediately adjacent to Plaintiffs' Property, thereby degrading and impairing the view
from Plaintiffs' Property in violation of the express provisions of the Easement. . . . .  Plaintiffs
and their successors-in-interest in Plaintiffs' Property are entitled to the benefit of the Easement,
are entitled to a decree confirming the validity of the Easement and enjoining Defendant from
taking any action in violation of the Easement.").  Thus, to the extent the Grant of Easement can
even be characterized as a commercial transaction, it is incidental to the Kaysers' penultimate
claim – in essence, a property dispute to determine ownership and easement rights.  Simply put,
Idaho Code section 12-120(3) does not apply to such actions and, therefore, does not apply to
award the Kaysers' their requested attorneys' fees.[14]  Therefore, the Kaysers' Motion for an

---

[14]  While the Kaysers' opening brief on this issue summarily states that the Grant of
Easement represents a commercial transaction without much in the way of corresponding legal
support, their reply brief attempts to fill that void.  *See* Reply in Supp. of Mot. for an Award of
Attys' Fees, pp. 8-9 (Docket No. 156).  However, the cases cited in their reply brief do not
squarely support their arguments.  For example, in *Garner v. Povey*, 259 P.3d 608 (Idaho 2011),
the Idaho Supreme Court determined that a prevailing defendant could recovery attorneys' fees
under Idaho Code section 12-120(3) if the opposing party's complaint alleged a claim seeking to
recover on a commercial transaction.  *See Garner*, 259 P.3d at 616-17.  Here, neither McClary's
pleadings, nor the Kaysers' own pleadings, reference a commercial transaction in ways similar to
those considered in *Garner*.  Additionally, *Phillips Indus., Inc. v. Firkins*, 827 P.2d 706 (Idaho

**MEMORANDUM DECISION AND ORDER - 23**

Award of Attorneys' Fees is denied in this respect.

      2.    <u>Idaho Code Section 12-121</u>

Courts have the authority to award reasonable attorneys' fees to prevailing parties under Idaho Code section 12-121, which provides in relevant part that "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties, provided that this section does not alter, repeal or amend any statute which otherwise provides for the award of attorney's fees." I.C. § 12-121. However, such fees "may be awarded by the court only when it finds, from the facts presented to it, that the case was brought, pursued or defended frivolously, unreasonably or without foundation . . . ." Id. R. Civ. P. 54(e)(1). This has been held to require a finding that "the position of the nonprevailing party is plainly fallacious and, therefore, not fairly debatable." *Assocs., Northwest, Inc. v. Beets*, 733 P.2d 824, 826 (Idaho Ct. App. 1987); *see also Bonapart v. Neff*, 773 P.2d 1147, 1151 (Idaho Ct. App. 1989). An award of attorneys' fees under Idaho Code section 12-121 is at the discretion of the Court, "but it must be supported by findings and those findings, in turn, must be supported by the record." *Partout v. Harper*, 183 P.3d 771, 777 (Idaho 2008) (citing *Wait v. Leavell Cattle, Inc.*, 41 P.3d 220, 227 (Idaho 2001)).

Here, the Kaysers argue that (1) McClary's conduct in violating the Grant of Easement warrants, in and of itself, an attorneys' fees award under Idaho law, and (2) McClary's defenses to the Kaysers' claims lacked evidentiary support, separately justifying an award of attorneys'

---

Ct. App. 1992) and *Caldwell v. Cometto*, 253 P.3d 708 (Idaho 2011) do not critically discuss the issue. *See Phillips Indus., Inc.*, 827 P.2d at 713 ("It has not been disputed that the prevailing party in this action is entitled to attorney fees under I.C. section 12-120(3)."); *Caldwell*, 253 P.3d at 715 ("Without a prevailing party, it is not necessary to discuss whether this appeal involves a 'commercial transaction' under section 12-120(3) . . . ."). Therefore, the Kaysers' counterarguments in these respects are not persuasive.

**MEMORANDUM DECISION AND ORDER - 24**

fees.  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, pp. 5-10 (Docket No. 152, Att. 1).

McClary naturally disagrees, arguing in response that she maintained legitimate defenses to the

Grant of Easement's formation, as supported by the evidence presented at trial.  *See* Opp. to Mot.

for an Award of Attys' Fees, pp. 4-9 (Docket No. 154).

      The Court disagrees with the Kaysers, to the extent they argue that *Skelton v. Haney*, 777

P.2d 733 (Idaho 1999), compels an award of their attorneys' fees.  *See* Mem. in Supp. of Mot.

for an Award of Attys' Fees, pp. 5-7 (Docket No. 152, Att. 1).  As McClary points out, in

*Skelton*, the defendants presented no defenses to the easement's validity; in contrast, here,

McClary argued that the Grant of Easement failed due to a lack of valid consideration and, also,

Mr. McClary's alleged incapacity to contract.  *See* Opp. to Mot. for an Award of Attys' Fees, pp.

4-6 (Docket No. 154) ("Considering the *Skelton* defendants had no remotely valid defenses to

the validity of the easement, it goes without saying that the court was justified in awarding fees

based on defendants making it virtually impossible for plaintiffs to get to their homes.  That is

not the situation the Court is dealing with here.").  The Kaysers' reading of *Skelton* is just too

expansive.  Nonetheless, McClarys' defenses themselves are lacking in substance.[15]

      It is clear from the trial record that the jury did not believe McClary's claims regarding

the alleged invalidity of the easement.  However, the fact that she lost the trial battle does not

compel, nor necessarily even suggest, a finding that her position in this lawsuit was "brought,

pursued or defended frivolously, unreasonably or without foundation," or that her position was

"plainly fallacious and, therefore, not fairly debatable."  *See* Id. R. Civ. P. 54(e)(1); *see also*

---

[15]  Even assuming the validity of McClary's proffered defenses, the Court cannot agree
that building the at-issue fence – which effectively destroyed the purpose of the easement – was
the only avenue available to her.  *See* Opp. to Mot. for an Award of Attys' Fees, p. 6 (Docket
No. 154) ("Pam McClary was merely protecting her long-standing position by prompting further
investigation into the Easement by potential purchasers.").  That simply is not true.

**MEMORANDUM DECISION AND ORDER - 25**

*Assocs., Northwest, Inc.*, 733 P.2d at 826 (Idaho Ct. App. 1987); *Bonapart*, 773 P.2d at 1151.  To answer that question requires a deeper examination of the evidence – the full constellation of facts pertaining to McClary's conduct and actions contemporaneous to the execution of the easement by her father, and her conduct and actions contemporaneous with and following her learning of the easement after her father had passed away.  In the Court's mind, that deeper examination of the evidence reveals that McClary's position in this lawsuit was unreasonable and without foundation, and that her actions in setting the stage for the filing of this lawsuit, and in defending against it, were fallacious and unsupportable.

McClary's claim that her father was incompetent to enter into an easement agreement was based, according to her testimony, upon her belief that her father was not competent to enter into the Grant of Easement.  She also believed that the easement itself was not supported by valid consideration.  *See* Opp. to Mot. for an Award of Attys' Fees, p. 5 (Docket No. 154) ("In the present case and as demonstrated at trial, Pam McClary never believed the Easement to be valid or binding based on her father's health and mental capacity at the time he executed the Easement, and because he never received any consideration for the Easement.").  Her position, and the related declaration concerning those beliefs, contributed to the denial of the Kaysers' Motion for Partial Summary Judgment.  *See* 1/15/11 MDO (Docket No. 44).

However, it is the underpinnings of McClary's positions that are important now – not the fact that she took such positions or held these beliefs at the summary judgment stage.[16]  At trial, McClary offered only subjective, vague, and conclusory allegations of her father's condition,

---

[16]  Of course, at the summary judgment stage, as the non-movant, McClary was entitled to the benefit of any inferences that might reasonably be drawn from the cold record of the briefing and its supporting materials.  Such inferences, however, can fade quickly in the crucible of the trial courtroom.

**MEMORANDUM DECISION AND ORDER - 26**

while not presenting any persuasive evidence rebutting the presumption of consideration from anyone privy to the deal between Mr. McClary and Mr. Larsen.  As someone with limited contact (necessitated, in part, from the fact she lived in Denver) with her father during this relevant time (as compared to those who were around, and cared for Mr. McClary, on a regular and even daily basis), her defenses to the Kaysers' claims appeared to be drawn from a sense of pique that her father's actions had diminished the potential value of the property that she ultimately inherited from her father.  Her conduct, and her testimony, suggested rather strongly that she believed her father essentially gave away an easement to the Larsens, and that she tried to avoid giving credence to that agreement so as to collect more money for herself, regardless of the bona fides of the easement and its application to the Kaysers, as the Larsens' successors-in-interest.  McClary's self-interested consternation over this underlying circumstance and its potential effect upon her own inheritance was borne out by her own conduct leading up to trial.

    a.    *Mr. McClary's Alleged Incompetence*

To begin, the primary evidence in the trial record that Mr. McClary was a man too incapacitated to grant a written easement is McClary's own testimony.  In some settings, the fact of McClary's testimony alone on such matters might be enough to resist an argument that the case had been defended unreasonably and without foundation.  That is not so in this case.

The Court has considered carefully the evidence pertaining to and the testimony of those persons who were in regular and even daily contact with Mr. McClary during the pertinent time period.  That evidence described a man of diminishing capacities as he aged and a man with various health difficulties, but they did not describe a man suffering from great dementia or ongoing mental confusion.  Mr. McClary was largely housebound because of physical

**MEMORANDUM DECISION AND ORDER - 27**

difficulties, according to the evidence at trial, but nonetheless he was making decisions every day about his daily activities and he followed that routine rigorously.[17]  His caregivers kept a daily journal of his activities, some of which was admitted into evidence at trial, and that journal contains only rare references to any difficulties on the part of Mr. McClary in knowing and understanding the world around him.  Similarly, the medical record placed into the record has scant reference to any cognitive difficulties of Mr. McClary, even though one might expect to find such references if a physician were dealing with someone who could not understand and could not decide what should be done with his personal affairs.

McClary, on the other hand, lived in Colorado, and would visit with her father by telephone (in short conversations she described as perfunctory) and she would come to Boise on an irregular basis and visit him in his home.  Her distance from Boise meant also that her contact with her father was much more limited than the contact of his caregivers and family friends in Boise.  Yet, the record indicates no effort on her part to fully investigate (or to reconcile against her own viewpoint) the assessment of persons who were regularly around her father as to what his mental capacities may have been at the time he executed the written easement document.

In contrast, however, there was evidence already known to McClary, or readily available to her, that supported the Kaysers' position that Mr. McClary had made a voluntary and knowledgeable decision to sign the written easement agreement, even if she believed it was a

---

[17]  The fact that Mr. McClary largely followed the same routine, day in and day out, as to his daily activities, his food choices, his regular habit of a drink of Scotch and a shrimp cocktail every afternoon, and other parts of his routine, are not necessarily evidence of dementia or other reduced mental capacity, in the Court's view.  Rather, such evidence describes someone who recognized and preferred a particular type of order to his day and insisted upon it being followed, from the set chronology of his activities, his choice of food, his choice of what television programs to watch, his routine in going through his daily mail, and so on.

**MEMORANDUM DECISION AND ORDER - 28**

foolish thing for him to have done.  In that regard, the record indicates that the view plane across the contested lot was never directly obstructed during the years it was owned by Mr. McClary, including not just the years that the adjoining property was owned by the Larsens, but also during the years the property was owned by the Kaysers.  In that time period, the contested lot was maintained as a broad expanse of grass, with various shrubs and trees around portions of its perimeter, but with no view-obstructing fences or other structures.  At any time, if the particulars of the agreement that the Kaysers allege had been made had not been honored and adhered to by Mr. McClary, there could have been a fence erected, or landscaping or structures placed, that would have directly affected the view plane.  That never occurred.  It is inescapable that McClary was aware of how the lot was maintained, and the fact that the manner in which it was maintained permitted a view from the home owned first by the Larsens, and later by the Kaysers, long before she took the position that the written easement was somehow unenforceable.

McClary's view of her father's incapacity to execute the Grant of Easement is made questionable by other facts in the record, as well.  For instance, during the period of time when McClary alleges her father was incompetent to enter into the Grant of Easement, and in the years that followed before his death, he was acting as the trustee for McClary's mother's trust, of which McClary was an ongoing beneficiary.  Yet, McClary did not seek to have her father declared incompetent to serve as trustee for the trust.

       b.     *McClary's Self-Serving Conduct Upon Learning of the Grant of Easement After Mr. McClary's Death*

McClary testified that she first became aware of the written easement when her fiancé discovered it on the desk in her father's home office, shortly after he had passed away.  *See* Jt. Tr. Ex. 1009.  Her voice was quite indignant at trial, when she said that after reading the

**MEMORANDUM DECISION AND ORDER - 29**

easement that it was "very clear to me that my father had been taken advantage of in the worst

way when he was ill [and] secondly, the value and use of his property rights had been taken

without any compensation for them."  She went on to say that she went to see Mr. Kayser about

the easement, and said to him "you have effectively taken away the property rights, how did you

get this, this is when my father was in the hospital!"

McClary's testimony made abundantly clear that she was angered by the fact of the

written easement.  It also is clear that her reaction to what had happened was not the product of

any reasonable investigation, but rather stemmed from her own, subjective, perception that her

father had given away something that she believed he should not have done.  Consider that she

was not present in 1979 when the oral agreement was first reached at the time Mr. McClary sold

the adjoining lot to the Larsens, when the record indicates that Mr. McClary promised Paul

Larsen that Lot B would be maintained so as not to obstruct the view from the lot that was sold

to the Larsens.  Neither, she admitted, was she present when the written agreement was executed

by her father in January, 2000.  But her statements and her actions demonstrated that she was

mad about it, didn't like it, was angry that it reduced the value of the property she was going to

inherit, and she didn't want to accept it, regardless of what the facts surrounding the granting of

the easement and its validity might have been.

Although both she and Mr. Kayser describe the other as being rude and intemperate at the

time McClary went to see Mr. Kayser after the easement had been discovered, the Court finds

Mr. Kayser's testimony regarding that encounter more credible.  From that testimony, and from

the entirety of McClary's testimony, the Court is left with the impression that McClary did not

want to dispassionately consider the Kaysers' point of view, and certainly didn't want to

**MEMORANDUM DECISION AND ORDER - 30**

consider that her father might have willingly, with a competent mind to do so, granted the Easement in a manner that was proper and enforceable.

Following that encounter with the Kaysers, McClary testified that she "talked to attorneys, realtors, some neighbors."  After that, she says that she never told anyone that she thought the easement was valid.  Implicit in her testimony is an assertion, on her part, that she believed the easement was invalid.  McClary's actions, however, strongly belie such a belief.  In 2004 after her father's death, she brought the easement to the attention of the personal representative of her father's estate.  According to McClary, the personal representative and the attorney for the estate were unaware of the existence of the easement.  After learning about it, McClary said that the personal representative had a reappraisal done of Mr. McClary's home, and the real property associated with it (including the lot affected by the easement), so that the value of the home and its connected real property was lessened, thereby lessening the value of the estate for estate tax purposes.  Although McClary could have contested those efforts, she did not do so.[18]

In 2006, after McClary had received title to her father's home, she talked to Gloria Shirley, a Boise real estate agent.  Those conversations, according to McClary, were to explore the possibility of selling the house.  She showed the easement to Ms. Shirley, who "commented upon it," but McClary did not say what those comments were.  Subsequently, McClary requested

---

[18] To be fair, McClary testified that she risked disinheritance if she had chosen to challenge the manner in which her father's estate was probated and distributed.  Her father's will contains such language, but was limited (in regard to McClary) to the amount of the particular amount that was challenged.  *See* Pls.' Tr. Ex.. 14, p. 4.  She also, however, was the beneficiary of not just particular assets of the estate, but also 50% of the residuary estate.

**MEMORANDUM DECISION AND ORDER - 31**

a reduction in the assessed value of Lot B.  In her trial testimony, she said that the taxes on Lot B were "too high" because it was assessed as if the lot could be developed for a residence. McClary took a copy of the easement to the assessor's office, and represented that Lot B could not be developed because of the easement, and therefore was overvalued.  In doing so,  she presented the easement as a valid legal instrument which created an encumbrance upon the property which limited the value of the property.  As a result, the assessed value of the property was reduced, and her real property taxes were also reduced.  There was no credible reason for her to take that action if she truly believed, for legitimate reasons, that the easement was unenforceable.

During this period between the death of her father in 2004 and her contemporaneous inheritance of her father's home, and the attempt by the Kaysers to sell their home beginning in 2009, McClary did nothing to seek to invalidate the easement.  She was well aware that the Kaysers firmly believed that the easement was valid.  At any time during that period, if she believed so strongly that it was invalid, she could have filed a judicial action seeking a declaratory judgment that the easement was invalid.  She did not do so.

In 2009, that changed.  First, McClary tried to sell her father's home, but only with Lot A, not also with Lot B – the lot affected by the easement.  The only plausible inference to be drawn from that effort is that she wanted to try to sell the home and Lot A separately from Lot B, in order to try to market Lot B as a building lot.  For whatever reason, the home and Lot A did not sell.

In the meantime, McClary had the financial benefit of the position she took with the taxing authorities (that the easement was valid), and her hand had not been forced to openly take

**MEMORANDUM DECISION AND ORDER - 32**

some other position.  However, presumably in large part because of the dilemma she faced in

trying to sell Lot B as a residential lot with the view easement restrictions, she was working

behind the scenes.  Sometime in the summer of 2009, she contacted Art Berry, a Boise

commercial real estate broker who lived in the same Hillcrest Country Club neighborhood as the

McClarys and the Kaysers.  McClary solicited his assistance in trying to sell the lot, or negotiate

a deal with the Kaysers to purchase the easement so as to remove the easement's encumbrance

upon Lot B.  Mr. Berry's initial feelers to potential buyers apparently were unproductive.  He

reported that to McClary, and had a further discussion with her of possibly trying to purchase the

easement from the Kaysers, which obviously would have made it easier to sell Lot B.  That led

to this e-mail from McClary to Mr. Berry on August 6, 2009:

> Art......Thanks so much for talking with Gale. I really didn't think that there are any
> enthusiastic investors in Idaho who would want to invest in high end property with
> a world of problems. I really do not want to negotiate because I am in no position to
> do that with no funds. I really don't want him to know that I am trying to do this. I
> believe that you have a copy of his response when I discovered the easement and he
> made it VERY clear that he would not give up the easement and views it as a huge
> part of the property's value. The 3 realtors I spoke to several years ago said that his
> house and lot were worth maybe $200,000-$250,000 because it is small, on a small
> lot, the bedrooms are tiny and it's on Hillcrest. There is no real mountain view as a
> selling point if you go and look. (Ironically, one of those realtors was Gloria Shirley,
> who at that point, had nothing nice to say about the Kaysers)
>
> I believe that if you were to approach the Kaysers in my name, he would get on his
> high horse and give you the same (pardon me) bullshit he gave me about how it was
> a "fair deal" and he is entitled to "his" property and he'll be damned if he will give
> anything up. He has had a long standing reputation as a rapacious, arrogant, nasty
> bastard (people who worked at MK hated him). I also think that he is like other aging
> retired executives who look for opportunities to prove that they've still got the right
> stuff. He made it very clear to me that he wanted to go to court. I didn't have title to
> the property at that time. He also has unlimited funds and 4 other houses. He said
> that going against him "would be the most expensive undertaking of my life."
>
> I appreciate your offer very much and am thinking about it.  Have you been able to
> find out if anyone else is actually interested in that [Kaysers'] house or have they

**MEMORANDUM DECISION AND ORDER - 33**

received any offers? I am trying to let the lot [Lot B] look as bad as possible and, when we get back to Boise, I have another idea or two that might make a sale problematic for them.  I don't know whey they are selling in this market. I feel that I don't have enough information to make a good decision. If no one is interested in the property, the price will come down on it's own I assume. I don't know how "motivated" they are. I still have the problem of no money to pay for it and know that nobody is getting any loan money.[19]  I'm sorry to make this so long - I know you have better things to do. Thank you for taking the time to do all you have done. Please let me know if you find anything out. I'll be in touch soon.

*See* Pls.' Tr. Ex.. 12.

This e-mail, capturing as it does McClary's mindset about the easement issues in an

unguarded moment, contains a nearly complete unraveling of her purported reasons for

challenging the validity of the easement in this lawsuit.  First, it demonstrates that she was

unwilling to test the easement in a lawsuit.  She did, however, want to "repurchase" the

easement, but only at a presumably reduced price that she was hoping the Kaysers might agree to

after she attempted to "make a sale [of their house] problematic."  Second, her e-mail, with its

unvarnished disdain for Mr. Kayser, illustrates that her motivation was not to demonstrate the

validity of her position regarding the easement (or even that she believed, for sound reasons, that

---

19  There are repeated instances in the record when McClary asserts that she has "no funds" or that, as she testified at trial, she was "encumbered by debt" and that "this lawsuit is the reason I'm in debt."  Even before her father passed away, the record indicates that she was receiving approximately $50,000 a year from a trust created by her late mother.  Under her father's will, she received the Boise real estate, valued at $500,000, and a residence in Arizona, which she sold for $200,000.  She also received half of her father's residuary estate.  Also, in 2004, the trust created by her mother came to a close, and she received another $200,000.  At the time of the trial, she said she also owned a home in Denver, and was a partner in three restaurants in Denver, from which she received an income of $20,000 to $25,000 a year.  Implausibly, given how closely she monitored the value of her Boise real property and its property taxes, she said at trial that she did not know how much her Denver home was worth, and that she did not know its assessed value.  Further, in this e-mail she tells Art Berry that she had "no money to pay [to repurchase the easement ]" and "nobody is getting any loan money."  But at trial, she testified that she "borrowed" against the Boise real property to pay the property taxes.

**MEMORANDUM DECISION AND ORDER - 34**

she was in the right about such matters).  Rather, her statements show an intent to make life

difficult for someone she disliked, and thereby gain an advantage for her own benefit, by seeking

to sabotage the potential sale of the Kaysers' property.

Initially, McClary's efforts in that regard were petty: "I am trying to make the lot look as

bad as possible," she wrote to Berry, and she said at trial that she had "no duty...to mow the lawn

for their pleasure."   Later, she tried to maneuver behind the scenes, which led to a contact by

Mr. Berry with Mr. Kayser in which Mr. Berry said that "he was trying to help Pam Cleary [sic]

down the street sell her father's home and adjacent lot."  Mr. Berry told Mr. Kayser that

McClary had told him "there is a cloud hanging over the marketability of the lot based upon a

view easement agreement which you and her father struck some years ago."  *See* Def.'s Tr. Ex.

552.  On behalf of McClary, Mr. Berry asked if "there would be a possibility of repurchasing

that easement to make the lot buildable...[or] to repurchase the easement for a lesser amount and

create a restriction on the building pad on the vacant lot so as to preserve some view for the

house...."  *Id.*

On September 17, 2009, Mr. Kayser responded to Mr. Berry's inquiries, stating in

relevant part:

> To understand my position on the easement it is necessary to understand the accurate
> facts about it.
>
> •       I struck no agreement with my very good friend Jim McClary.  I became a
>        successor to an agreement between Jim and Paul Larsen.
>
> •       When Paul purchased the 4848 lot from Jim, for two reasons it was on the
>        condition that Jim would do nothing to impair the then existing view over
>        Jim's lot to the rear.  First was to preserve the value of the view that was
>        reflected in the lot price.  Secondly, Larsen wanted relief from the rear
>        setback requirements so that he could build the house design he had planned
>        that extended close to the rear lot line.

**MEMORANDUM DECISION AND ORDER - 35**

- It was on the basis of this agreement that Planning Commission gave an exception that permitted Larsen's rear setback to be less than 10'.  This is documented in the meeting paperwork.

- When Paul decided to sell the house he asked Jim to put their agreement in recordable form so that future owners would be protected.  Jim readily agreed.  After being shown the recordable agreement I called Jim to ask him if he was comfortable with this, and he went on to tell me the history of the agreement.  He explained that he resubdivided the property so that the lot was not buildable and that he had recently run a new sewer line diagonally across the lot knowingly creating a problem for any construction on the lot.

- I purchased the property after the agreement was recorded.  Thus I subsequently became a successor to the agreement.  The agreement represented material value to the property, which was reflected in the price that I paid.

*Id.*

The proof at trial corroborated each of the points raised by Mr. Kayser.  His trial testimony in particular was consistent with this description of events, and was clearly believed by the jury over McClary's testimony about such matters.  But more significant, for these purposes, is the fact that there is no evidence that McClary investigated any of the objectively verifiable points raised by Mr. Kayser, all of which had been brought to her attention either directly by the Kaysers, or through their attorney communicating with McClary's attorney, and which had been set out, in large part, in Mr. Kayser's letter to McClary following their initial tete-a-tete about the easement five years earlier.  *See* Def.'s Tr. Ex. 546.  Or, even more telling, if she did so investigate, there was no mention of that at trial, leaving only one inference to be drawn – that her investigation indicated the easement was valid.

After receiving Mr. Kayser's September 17, 2009 correspondence, Berry reported back to McClary, stating that he had "sent a detailed e-mail to Kayser indicating [he] represented

**MEMORANDUM DECISION AND ORDER - 36**

[McClary] and asked for a purchase offer price to remove the easement," and that Kayser had "sent back a very polite email outlining the history of the easement relationship and indicating that he was merely the "inheritor" of the easement since it was negotiated and filed between Paul B. Larsen and [McClary's] Dad . . . ." Pls.' Tr. Ex. 13. Berry also asked about the sewer line through the middle of Lot B, and the lot line adjustments, asking if McClary knew anything about those things. Finally, Berry said that someone had surfaced who was interested in buying the Kaysers' house, and who was also interested in purchasing Lot B. Berry asked McClary to give him a price for which she would be willing to sell the lot. *Id.*

Following these events, McClary testified that she was "keeping an eye" on Boise property values (which she said were "dropping"), presumably in the context of her efforts to sell her parents' home, when she discovered that a sale was pending on the Kaysers' home. When the "sold" sign appeared, she made direct contact with the Kaysers' realtor, to say that her lawyer would be contacting the realtor about the easement, and then McClary's lawyer did just that, which led to further communications between McClary's lawyer and Mr. Kayser, after which Mr. Kayser asked his lawyer to communicate with McClary's lawyer. That led to an e-mail from Stephen Grant, on behalf of the Kaysers, to McClary's attorney, Julie Klein. In that e-mail, Mr. Grant repeats again the salient facts that the Kaysers contend supported the validity of the easement. *See* Def.'s Tr. Ex. 555.

Although for years McClary had accepted the validity of the easement in seeking and obtaining a property tax reduction, the marketing of the Kaysers' home apparently raised both her ire and the ante. The Kaysers were not dissuaded from seeking to sell their property by the contacts from McClary's lawyer. That fact should not have surprised McClary, given the

**MEMORANDUM DECISION AND ORDER - 37**

conversation and written communications on the subject that had taken place five years earlier. Yet, McClary still did not seek a judicial declaration of her rights.  Instead, she hired a contractor to build a fence along the property line between the McClary property and the Kayser property, directly and fully obstructing the view plane.  As was her unmistakable intent, the building of the fence scuttled the pending sale.

All of these actions reflect decisions made by someone *not* confident that she had a legitimate and reasonable basis to challenge the easement granted by her father.  Rather, they reflect decisions made by McClary from spite and from a misplaced and unsupportable belief that she could have her way by making life miserable for the Kaysers, particularly in regard to any attempt they might make to sell their home.

The Court is mindful that the ultimate issue of a claim for attorney's fees under I.C. section 12-121 turns not upon some single assessment of McClary's motivations for taking the positions she did in this lawsuit, or upon whether her behavior seems churlish.  Ordinarily, if there is a justifiable reason for contesting the validity of the easement, then that party's behavior or personality in pursuing such a battle matters not at all.  However, in this case, McClary's defenses to the Kaysers' claims in this lawsuit cannot be considered in isolation.  Her behavior, and her conduct, are all part of the evidence – indeed, it is her subjective view of her father's competency that primarily supports her claim that he was incompetent to execute the easement; therefore, her credibility, including the obvious financial bias, personal enmity toward the Kaysers, and the questionable tactics employed in dealing with the easement, are all fair game in assessing the genuineness of her positions in this lawsuit.

**MEMORANDUM DECISION AND ORDER - 38**

Viewed through such a lens, refined with the benefit of a more developed record in a trial, and for the reasons described at length above, the Court finds that McClary's "defenses" are unreasonable, unjustified, and offend Idaho Code section 12-121.   Accordingly, Idaho Code section 12-121 applies to award the Kaysers their reasonable attorneys fees.  The Kaysers' Motion for an Award of Attorneys' Fees is therefore granted in this respect.[20]

3.    Idaho Code Section 6-202

Relative to the Kaysers' trespass claim, the jury determined that McClary trespassed upon the easement by constructing a fence.  *See* Special Verdict Form, p. 2 (Docket No. 145). Although the jury also concluded that McClary's trespass did not cause damage to the Kaysers (*see id.* at p. 3), the Kaysers alternatively seek to recover their attorneys' fees under Idaho Code section 6-202 – Idaho's statute dealing with "actions for trespass."  Idaho Code section 6-202 reads:

> Any person who, without permission of the owner, or the owner's agent, enters upon the real property of another person which property is posted with "No Trespassing" signs or other notices of like meaning, spaced at intervals of not less than one (1) notice per six hundred sixty (660) feet along such real property; or who cuts down or carries off any wood or underwood, tree or timber, or girdles, or otherwise injures any tree or timber on the land of another person, or on the street or highway in front of any person's house, village, or city lot, or cultivated grounds; or on the commons or public grounds of or in any city or town, or on the street or highway in front thereof, without lawful authority, is liable to the owner of such land, or to such city or town, for treble the amount of damages which may be assessed therefor or fifty dollars ($50.00), plus a reasonable attorneys' fee which shall be taxed as costs, in any civil action brought to enforce the terms of this act if the plaintiff prevails.

I.C. § 6-202.

---

[20]   The Court's denial of the Kaysers' Motion for Directed Verdict (Docket No. 146) does not preclude an award of attorneys' fees under Idaho Code section 12-121.  *See Sun Valley Shopping Center, Inc. v. Idaho Power Co.*, 803 P.2d 993, 998 (Idaho 1991).

**MEMORANDUM DECISION AND ORDER - 39**

Courts interpret Idaho Code section 6-202 to apply "when the trespass is shown to have been willful and intentional, and the wronged party seeks treble damages therefore . . . .  In all other circumstances, the common law principles relating to trespass actions apply."  *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992).  The record in this case seems bare of the physical warnings of "no trespassing" referenced in the statute.  Nonetheless, even if there is such evidence, the Kaysers' trespass claim has always represented a *common law* trespass claim, not a *statutory* trespass claim under Idaho Code section 6-202.

In Idaho, the traditional common law requirements for a trespass claim include (1) an invasion, (2) which interferes with the right of exclusive possession of the land, and (3) which is a direct result of some act committed by the defendant.  *See id*.  Consistent with these elements, the Kaysers' Second Amended Complaint identifies only a claim for "trespass," without any reference to Idaho Code section 6-202 or the possibility for treble damages.  Further, the Kaysers' proposed jury instruction as to their trespass claim (adopted in all substantive respects within the Court's final jury instructions) identified their burden as having to prove "(1) [t]hat Defendant physically intruded or invaded Plaintiffs' interest in real property; (2) [t]hat Plaintiffs did not consent to Defendant's physical intrusion or invasion of Plaintiffs' interest in real property; [and] (3) [t]he nature and extent of the damages to Plaintiffs and the amount thereof."  *See* Pls.' Prop. Jury Inst. No. 29 (Docket Nos. 56 & 99);[21] *see also*  Jury Inst. No. 28 (Docket No.

---

[21]  Relevant here, the Kaysers' proposed jury instruction was modeled after IDJI 4.40.  Within the comments section to IDJI 4.40, the Civil Jury Instructions Committee recognized that, "[i]n a *common law* trespass action, the plaintiff is entitled to recover actual damages for defendant's wrongful entry on plaintiff's property, even if defendant's conduct was not 'willful or intentional.'" IDJI 4.40, cmt. (citing *Bumgarner v. Bumgarner*, 862 P.2d 321, 331 (Idaho Ct. App. 1993)) (emphasis added).  Logically, then, IDJI 4.40 speaks to a common law trespass claim, not a statutory trespass claim.

**MEMORANDUM DECISION AND ORDER - 40**

142).  In other words, the Kaysers have always alleged a common law trespass claim and, only

after researching potential bases for recovering attorneys' fees, are they now attempting to

characterize their trespass claim as one sounding in statute rather than common law.

The significance of the distinction between the two claims is self-evident when

examining a party's ability to recover attorneys' fees.  Because the Kaysers never brought their

trespass claim under Idaho Code section 6-202 but, instead, under Idaho common law principles,

Idaho Code section 6-202 is not available to the Kaysers to recover their attorneys' fees.

Therefore, the Kaysers' Motion for an Award of Attorneys' Fees under Idaho Code section 6-

202 is denied in this respect.[22]

       4.     <u>Reasonableness of Fees</u>

Having determined that Idaho Code section 12-121 applies, the Court must now

determine whether the requested attorneys' fees are reasonable.  "The most useful starting point

for determining the amount of a reasonable fee is the number of hours reasonably expended on

the litigation multiplied by a reasonable hourly rate."  *Jordan v. Multnomah County*, 815 F.2d

1258, 1262 & n.5 (9th Cir. 1987) (explaining method to arrive at "lodestar" figure).  In

determining a reasonable fee award, the Court considers both the "experience, skill and

---

[22] As a separate basis for recovering attorneys' fees in trespass actions, the Kaysers also
cite to *Skelton v. Haney* (*see supra*), arguing that "[a]ttorneys' fees have been awarded in
trespass actions even outside the parameters of [Idaho Code section 6-202] as an element of
damages."  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, p. 17 (Docket No. 152, Att.
1).  *Skelton*, however, does not readily apply here because, while the trial court's $5,250
attorneys' fees award was upheld, the rationale for doing so was never particularly addressed
beyond simply stating that "'defendants' conduct was outrageous,' 'illfounded,' and
'unreasonable.'"  *See id.* at 734.  Absent an identified and legally-recognized basis upon which
attorneys' fees were awarded there, *Skelton's* holding is inapposite here.

**MEMORANDUM DECISION AND ORDER - 41**

reputation of the attorney requesting fees," as well as "the prevailing market rates in the relevant community."  *Trevino v. Gates*, 99 F.3d 911, 924 (9th Cir. 1996); *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The "fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Multnomah County*, 815 F.2d at 1262.

What constitutes a reasonable fee is a discretionary determination for the trial court, to be guided by the criteria of Idaho Rule of Civil Procedure 54(e)(3).  *See Sanders v. Lankford*, 1 P.3d 823 (Idaho Ct. App. 2000) (citing *Kelly v. Hodges*, 811 P.2d 48, 52 (Idaho Ct. App. 1991)). "The factors of Rule 54(e)(3) include: time and labor; difficulty; skill required; prevailing charges; fixed or contingent fee; time limitations; amount and result; undesirability of the case; relationship with the client; awards in similar cases; costs of automated research; and any other factors."  *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.*, 85 P.3d 475, 483 (Idaho 2004).  The Court may not single out or give undue weight to any one factor such as to exclude the other factors listed in Rule 54(e)(3).  *See id.* (citing *DeWils Interiors, Inc. v. Dines*, 678 P.2d 80, 82 (Idaho Ct. App. 1984)).

The Kaysers seek $145,537.00 in attorneys' fees.  *See* Mem. in Supp. of Mot. for an Award of Attys' Fees, pp. 17-18 (Docket No. 152, Att. 1); *see also* Eberlin Aff. in Supp. of Mot. for an Award of Attys' Fees (Docket No. 152, Att. 3).  In response, McClary argues that this amount is excessive and unreasonable because (1) the issues in this action were not particularly novel or complex, (2) a large amount of time went into the Kaysers' unsuccessful Motion for Partial Summary Judgment, and (3) the transition in attorneys from Wayne Meuleman to Jeff

**MEMORANDUM DECISION AND ORDER - 42**

Sykes required Mr. Sykes "to get up to speed on a case that had been ongoing for a significant period of time." *See* Opp. to Mot. for an Award of Attys' Fees, pp. 16-19 (Docket No. 154). The Court takes up McClary's arguments in reverse order below.

First, the Court recognizes that a new attorney staffed to the case nearly one year after billing began may have some catching up to do. Even if that occurred here, any redundant billing is more than offset by the $55.00-$80.00 difference[23] between Mr. Sykes' and Mr. Meuleman's respective hourly billing rates. Said another way, had Mr. Meuleman stayed on the action instead of Mr. Sykes, the Kaysers would be seeking significantly more attorneys' fees now. McClary's argument in this respect is therefore not persuasive.

Second, while the Kaysers' Motion for Partial Summary Judgment was unsuccessful, the Court will not carve out those expenses here. Motion practice is an accepted and entirely legitimate means of trying to narrow issues, or decide disputes without a full-blown trial, and has an ultimate goal of reducing the ultimate expense of a particular lawsuit. Indeed, McClary herself filed numerous motions. This reality, coupled with the fact that the Kaysers' arguments within their Motion for Partial Summary Judgment were not frivolous (as borne out, ultimately, by the jury's verdict) weighs in favor of this Court not carving out the expenses related to such motions. McClary's position in this respect is therefore not persuasive.

Third, it is obvious that a considerable amount of the Kaysers' time and related expense correlated to McClary's extensive defense tactics – including, removing the action from state

---

[23] Mr. Meuleman's hourly billing rate increased from $300.00 to $325.00 during this action while Mr. Sykes' hourly billing rate remained $245.00 during this same time. *See* Eberlin Aff. in Supp. of Mot. for an Award of Attys' Fees (Docket No. 152, Att. 3).

**MEMORANDUM DECISION AND ORDER - 43**

court to federal court, later seeking to remand the action back to state court, and moving to continue/vacate the trial date.  Extensive discovery, and its attendant expense, originated because of the nature of McClary's arguments (such as the need to review her father's medical records), and there were multiple motions filed by the parties dealing with discovery disputes, expert witnesses, and trial *in limine* requests.  Those circumstances, combined with the apparent unhappiness of the parties toward each other which seemed to color the litigation, made this case a pricey proposition for both parties, even though the Court had alerted counsel early on, given the way the case was proceeding, about the Court's concern that  "no one will be happy at the end of this."

Such issues notwithstanding, the Court must still make an independent review of the request for attorneys' fees, to assess the reasonableness of the same.  A law firm's billings to a client may be entirely reasonable in the context of the relationship between the law firm and the client, and the work undertaken and performed, but the total fees represented in those billings are not necessarily all reasonable when it comes to deciding how much of that amount should be assessed against the opposing party.  That is the circumstance in this case.

The Court has scrutinized the billing records of the Kaysers' counsel carefully.  There are some particular instances where one might quibble with the time spent on a particular task, or the need for the task to be performed at all.  But those are easy targets in hindsight – in the course of litigation, and particularly during the course of trial preparation, such high and low water marks are much more difficult to discern, particularly when one hallmark of effective lawyering is prepared lawyering.  Although in some cases the Court will excise particular time entries and fee charges for excessiveness, or for lacking any reasonable necessity, there were no particular instances in this case that the Court found appropriate for such action.

**MEMORANDUM DECISION AND ORDER - 44**

However, this case involved two lawyers working on behalf of the Kaysers – a partner and an associate – for nearly the entirety of its course.  That is not unusual by itself.  Indeed, those tasks that can be performed well by a less-experienced lawyer, billing at a lower rate than a partner, is a common and appropriate practice in every law firm, and is beneficial to the client.  Even so, in this case the Court finds that it was not necessary to have two lawyers involved at trial.  That is not to say that the two lawyers involved in this case were not working diligently, or that there were not tasks that the less-experienced associate was doing that would have been required of the partner if the associate had not been involved.  Rather, the Court concludes that the presence of both lawyers at trial, and the full trial preparation preceding and during trial by two lawyers, even if determined by the law firm to be appropriate on behalf of its clients, is not something that is appropriately treated as reasonable for purposes of assessing against McClary.  After reviewing the record, the Court finds that a 40% reduction of the fees requested for the work of Mr. Sykes and Ms. Eberlin during the period of September 20, 2011 through October 7, 2011, is appropriate.  Such a reduction recognizes that there was appropriate work to be performed by a second attorney, but reduces the amount of fees for the period immediately preceding trial and during trial as an adjustment for the reason that it is not reasonable to assess fees against McClary for two lawyers in that period, both on a full time basis.

Accordingly, during the 17-day period referenced above, Mr. Sykes billed a total of 83.4 hours while Ms. Eberlin billed a total of 105.4 hours.[24]  After reducing these hours by 40%

_____

[24]  In addition to the 2.1 hours billed for trial preparation, strategy, and correspondence on September 20, 2011, Ms. Eberlin also billed 1.2 hours toward "research and draft bankruptcy brief."  *See* Eberlin Aff. in Supp. of Mot. for an Award of Attys' Fees (Docket No. 152, Att. 3).  The Court is not aware of any corresponding briefing in this matter and, therefore, reduces Mr. Eberlin's total hours during this time by 1.2 hours at the outset.

**MEMORANDUM DECISION AND ORDER - 45**

respectively, Mr. Sykes billed an adjusted total of 50 hours (33.4 hours subtracted) during this time while Ms. Eberlin billed an adjusted total of 63.2 hours (42.2 hours subtracted) during this time.  Deducting 33.4 hours from the original, total number of hours Mr. Sykes billed to this action in 2010 and 2011 (173.8 hours) yields 140.4 hours which, multiplied by Mr. Sykes' $245.00 hourly rate, results in $34,398.00 in total attorneys' fees attributable to Mr. Sykes.  In turn, deducting 42.2 hours from the original, total number of hours Ms. Eberlin billed to this action in 2011[25] (332.3 hours) yields 290.1 hours which, multiplied by Ms. Eberlin's $185.00 hourly rate for 2011, results in $53,668.50 in attorneys' fees attributable to Ms. Eberlin in 2011 for an overall $75,734.50 in total attorneys' fees ($22,066.00 in 2010 and $53,668.50 in 2011) attributable to Ms. Eberlin.  In toto, the Kaysers' recoverable attorneys' fees includes: (1) $16,532.50 relating to Mr. Meuleman; (2) $34,398.00 relating to Mr. Sykes; (3) $2,040.00 relating to Mr. Bauer; and (4) $75,734.50 relating to Ms. Eberlin.

Therefore, the Kaysers are entitled to recover $128,705.00 in attorneys' fees, $687.50 in paralegal/clerical fees, and $1,612.70 in automated legal research for a total of $131,005.20.  The Court finds this amount to be consistent with the reasonable rates in a case of this nature, appropriately and necessarily incurred, and in line with the rates prevailing in the community.

///

///

///

///

---

[25]  Ms. Eberlin's hourly billing rate increased from $170.00 to $185.00 in 2011.  *See* Eberlin Aff. in Supp. of Mot. for an Award of Attys' Fees (Docket No. 152, Att. 3).

**MEMORANDUM DECISION AND ORDER - 46**

## III.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.      The Kaysers' Motion to Amend Judgment (Docket No. 148) IS GRANTED, in part, and DENIED, in part, as follows:

        a.      The Court hereby confirms the validity of the Grant of Easement and, accordingly, quiets title to the Grant of Easement in the Kaysers' favor.  Further, the Court orders McClary to remove the at-issue fence within two weeks of the entry of an Amended Judgment, following this Memorandum Decision and Order.  The Kaysers' Motion to Amend Judgment is therefore granted in this respect.

        b.      Once the fence is removed, any future harm to the Kaysers is naturally speculative.  Without actual or imminent injury moving forward, there is no reason to permanently enjoin McClary from violating the Grant of Easement.  The Kaysers' Motion to Amend Judgment is therefore denied in this respect.

        c.      The Kaysers' punitive damages award will not be increased to an amount commensurate with the Kaysers' attorneys' fees.  The Kaysers' Motion to Amend Judgment is therefore denied in this respect.

2.      The Kaysers' Motion for an Award of Costs (Docket No. 151, Att. 1) is GRANTED, in part, and DENIED, in part.  The Kaysers' $4,500.80 cost request is reduced by $2,195.10.  Accordingly, the Kaysers are awarded costs in the amount of $2,305.70.

3.      The Kaysers' Motion for an Award of Attorneys' Fees (Docket No. 152) is GRANTED, in part, and DENIED, in part.  The Kaysers are entitled to recover $128,705.00 in

**MEMORANDUM DECISION AND ORDER - 47**

attorneys' fees, $687.50 in paralegal/clerical fees, and $1,612.70 in automated legal research for a total of $131,005.20.

    4.    McClary's Renewed Motion for Judgment as a Matter of Law and Alternative Motion to Alter or Amend the Judgment (Docket No. 153) is DENIED.



DATED:  **June 22, 2012**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 48**